NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section
AARON KOLLITZ (Cal. Bar No. 238580)
JOSEPH A. DARROW
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-2083 / 0436
E-mail: Aaron.Kollitz@usdoj.gov
Joseph.Darrow@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

OSNY SORTO-VASQUEZ KIDD; INLAND COALITION FOR IMMIGRANT JUSTICE; COALITION FOR HUMANE IMMIGRANT RIGHTS,

Plaintiffs,

v.

CHAD WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity; MATTHEW T. ALBENCE, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; DAVID MARIN, Los Angeles Field Office Director, U.S. Immigration and Customs Enforcement, in his official capacity; JOSEPH MACIAS, Los Angeles Special Agent in Charge, Homeland Security Investigations, U.S. Immigration and Customs Enforcements, in his official capacity; UNITED STATES OF AMERICA; DOES 1-10,

Defendants.

No. CV 20-3512-ODW (JPR)

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO USE PSEUDONYMS AND FOR PROTECTIVE ORDER; MEMORANDUM OF POINTS AND AUTHORITIES;**

[redacted]

Date: October 5, 2020
Time: 1:30 p.m.
Court: United States District Court
Courtroom 5D
350 West 1st Street
Los Angeles, CA 90012

Honorable Otis D. Wright II
United States District Judge

TABLE OF CONTENTS

I. INTRODUCTION ..... 1
II. PERTINENT ALLEGATIONS ..... 2
A. Plaintiffs' Allegations Of Sweeping, Agency-Wide Misconduct ..... 2
B. Plaintiffs Allege Individual Defendants Arrested Mr. Kidd Because of an Unlawful Ruse, in Accordance with ICE Practices and Training ..... 2
C. Plaintiffs Describe Arrests of Third-Parties Made by ICE Agents Other Than the Individual Defendants. ..... 3
D. Plaintiffs' Extraneous Allegations About Other ICE Activity ..... 3
III. STATEMENT OF FACTS ..... 4
IV. LEGAL ARGUMENT ..... 7
A. Individual Defendants Should be Authorized to Use Pseudonyms ..... 7
B. There is *De Minimis* Public Interest and Lack of Prejudice to Plaintiffs. ..... 11
V. CONCLUSION ..... 12

# TABLE OF AUTHORITIES

**PAGE**

Cases

*Doe No. 1 v. United States*,
143 Fed. Cl. 238 (Fed. Cl. May 15, 2019) .......... 8

*Doe v. Ayers*,
789 F.3d 944 (9th Cir. 2015) .......... 8, 11

*Doe v. Rostker*,
89 F.R.D. 158 (N.D. Cal. 1981) .......... 8

*Doe v. Stegall*,
653 F.2d 180 (5th Cir. 1981) .......... 8

*Does I Thru XXIII v. Advance Textile Corp.*,
214 F.3d 1058 (9th Cir. 2000) .......... 7, 8, 11

**NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE that, on October 5, 2020 at 1:30 p.m., or as soon thereafter as they may be heard, Defendants Chad F. Wolf, Acting Secretary of the Department of Homeland Security, in his official capacity; Matthew T. Albence, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; David Marin, Los Angeles Field Office Director, U.S. Immigration and Customs Enforcement, in his official capacity; Joseph Macias, Los Angeles Special Agent in Charge, Homeland Security Investigations, U.S. Immigration and Customs Enforcements, in his official capacity; and the United States of America (collectively, the “Defendants”) will, and hereby do, move this Court for an order authorizing the use of pseudonyms by the unnamed and unserved defendants in their individual capacities (“Individual Defendants”). This motion will be made in Courtroom 5D of the First Street Federal Courthouse before the Honorable Otis D. Wright II, United States District Judge, located at 350 West First Street, Los Angeles, California 90012.

Defendants bring the motion on the grounds that the public disclosure of the Individual Defendants’ identities likely will expose them to retaliation, harassment, and stigmatization unnecessarily.

This motion is made upon this Notice, the attached Memorandum of Points and Authorities, the Declarations of [redacted], and all pleadings, records, and other documents on file with the Court in this action, and upon such oral argument as may be presented at the hearing of this motion.

This motion is made following the pre-filing conference of counsel pursuant to Local Rule 7-3 which was held via telephone on July 10, 2020 and August 6, 2020.

Dated: August 24, 2020

NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section

**/s/ *Aaron Kollitz***
AARON KOLLITZ
JOSEPH A. DARROW
Assistant United States Attorneys

Attorneys for Defendants

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

In their Complaint, Plaintiffs target the national, agency-wide practices and training of the Immigration and Customs Enforcement ("ICE"), yet seem to insist on singling out several ICE agents (hereinafter, "Individual Defendants") by naming them in the Complaint unnecessarily. Due to the abundance of documented threats against ICE officials, these yet-unnamed Individual Defendants cited in Plaintiff's Complaint (at ¶¶ 21, 54-56) need the protection of this Court in participating in this litigation with a modicum of personal privacy (i.e., the use of pseudonyms). This modest request will not interfere with Plaintiffs' pursuit of their case or materially affect the public interest.

The risk of harm to the Individual Defendants is clear: By simply being associated with ICE, the health and welfare of the Individual Defendants and their families will likely be jeopardized. The undisputed evidence establishes that within the last two years, approximately 9,243 employees of ICE have been "doxed."[1] Some of those doxing incidents included the disclosure of home addresses with encouragement to harass the ICE employees—or worse. People have tweeted about killing ICE agents. Violent riots have erupted outside of a local immigration detention center where government property has been destroyed. Notably, none of the targeted ICE employees were accused of doing anything other than fulfilling their job duties.

While the risk of harm to Individual Defendants is high, the public's interest in their identities and the prejudice to Plaintiffs is low. As Plaintiffs allege that Individual Defendants' conduct arose from ICE's training and practices, Individual Defendants' identities are not necessary for meaningful public scrutiny of the case. Further, Individual Defendants' anonymity will not impede Plaintiffs' discovery efforts.

Therefore, for the reasons set forth herein, Defendants ask this Court to authorize Individual Defendants to use pseudonyms in this lawsuit. Defendants also ask this Court

---

[1] "Doxing" is the dissemination of personal information such as where they work, their names, addresses, or contact information.

to order Plaintiffs to refrain from publishing, disclosing, or otherwise disseminating Individual Defendants' identities should Plaintiffs obtain them.

## II. PERTINENT ALLEGATIONS

### A. Plaintiffs' Allegations Of Sweeping, Agency-Wide Misconduct

Plaintiffs allege that: ICE "routinely" conducts arrests that "trample on well-established Fourth Amendment rights" by "resort[ing] to deception and other illegal tactics to circumvent the Constitution's fundamental protections of the home." ECF No. 1 (Compl., ¶¶ 1, 3). Moreover, "ICE's actions, policies, and practices routinely violate DHS and ICE rules and regulations." Id. ¶ 48. ICE agents "frequently engage in deceptive tactics" and coercive ruses to gain consent to enter a home or curtilage, as ICE promotes the use of ruses *nationally* as an "effective law enforcement tool." Id. ¶¶ 28-29, 31, 33. Plaintiffs further allege that "ICE policy and training do not prohibit or discourage ICE officers from conducting themselves in such a way that would mislead a reasonable person into believing that they are with another government agency." Id. ¶ 36. "ICE policy and training do not prohibit officers from entering into or onto the curtilage of a home for the purpose of conducting an arrest without a judicial warrant." Id. ¶ 37. Accordingly, up to 25% of ICE arrests nationwide, and nearly 40% of arrests within the geographic area covered by the Los Angeles ICE Field Office, occur in homes. Id. ¶ 23-24.

### B. Plaintiffs Allege Individual Defendants Arrested Mr. Kidd Because of an Unlawful Ruse, in Accordance with ICE Practices and Training.

Plaintiffs allege that: three ICE agents—the Individual Defendants—gained access to Mr. Kidd's apartment complex and approached the front door of his unit. See id. ¶ 52. When Mr. Kidd's mother answered the door, one of the Individual Defendants identified herself as a "detective" with the local police who was investigating a dangerous criminal who had been using Mr. Kidd's address. See id. ¶ 53. The Individual Defendants ultimately entered the apartment unit and searched the same. See id. When the Individual Defendants confirmed that Mr. Kidd was not home, they asked Mr. Kidd's mother to call

him and she obliged. See id. ¶ 54. The "detective" told Mr. Kidd that they had been tracking an extremely dangerous criminal and he agreed to meet the detective at a later date. See id. Two days later, the "detective" returned to the apartment complex and induced Mr. Kidd to exit the same. See id. ¶ 55. Upon confirmation of his identity, the Individual Defendants arrested him. See id.

**C. Plaintiffs Describe Arrests of Third-Parties Made by ICE Agents Other Than the Individual Defendants**.

Plaintiffs then assert allegations of nine other arrests, which have no connection to Mr. Kidd or Individual Defendants. Plaintiffs describe five alleged ruses in which ICE agents pretended to be probation officers to effectuate an arrest of other third-parties. See id. ¶¶ 71-92. But significantly, Plaintiffs do not allege that the Individual Defendants pretended to be probation officers when they arrested Mr. Kidd or that they were involved in the arrest of those third-parties. Plaintiffs also describe four other alleged incidents involving the arrests of various third-parties by unidentified ICE agents. See id. ¶¶ 59-70. Similarly, Plaintiffs fail to allege that the Individual Defendants were involved in those four other incidents.

**D. Plaintiffs' Extraneous Allegations About Other ICE Activity**

Further, Plaintiffs pepper their Complaint with inflammatory allegations irrelevant to their claims against Individual Defendants. Plaintiffs allege ICE utilized a ruse involving a North Carolina military base in 2005 which was condemned by Congress and multiple federal and state agencies. See id. ¶ 32. They also allege that ICE perpetuates its purported pattern of dishonesty by continuing its enforcement actions in Southern California—which necessarily include making arrests—during the COVID-19 pandemic despite the agency assuring the public that it will limit such activity. See id. ¶ 30. But ICE's statement about reducing its enforcement activity is entirely irrelevant, as it was issued 18 months after Mr. Kidd's arrest. Similarly, Plaintiffs aver that "ICE's impersonation of local law enforcement when making home arrests" was subject to "widespread news coverage and objections by state and local governments, but cite one

article written nine months after Mr. Kidd's arrest and another article related only to the activity of ICE agents in New York. See id. ¶¶ 28, 39.

## III. STATEMENT OF FACTS

Animosity directed towards ICE has escalated dramatically over the last few years, resulting in threats to its employees and their families. On June 19, 2018, Antifa posted the personal information of 1,595 ICE employees in response to ICE's "inhumane" conduct.[2] The person responsible for this unauthorized dissemination admitted to compiling a lot of the personal information from LinkedIn and posting it "with the hope . . . . activists will find it useful." Id. Among the personal information that was disseminated was a photograph of ICE's chief technology officer and his son. Id. This threatening behavior was encouraged and exacerbated, as other activists have analogized ICE employees to Nazis and called for the "doxing" of "more Nazis." Id.

The initial list of 1,595 ICE employees became the precursor to [redacted] an internet-based searchable website maintained and operated by [redacted].[3] The [redacted] website now features the personal information of 9,243 ICE employees.[4]

A few days after the initial list was posted, another activist used [redacted] to obtain and publish on the internet the names of five Ohio-based ICE employees, the names of their spouses, and their home addresses.[5] This personal information was published under photographs of Hermann Göring, Albert Speer, Rudolf Hess, and several other high-ranking Nazis. See id.

Another organization called [redacted] suggested that it used that same list to obtain and publish the names and home addresses of 36 Washington-based

---

[2] See https:[redacted]

[3] [redacted]

[4] https:/[redacted]

[5] [redacted]

ICE employees, along with one employee's date of birth, phone number, spouse's name, spouse's work address, and personal email addresses.[6] The [redacted] tacitly suggested that the published home addresses should be used for harassment or violence by urging people to "[u]se this information in whatever way inspires you." Id. On June 28, 2018, another activist group published the names and photographs of 10 [redacted]-based ICE employees, including the photographs of the young children of two of those employees.[7]

The indirect threats soon intensified and materialized into advocacy for violent action. On July 2, 2018, just weeks after ICE employees were "doxed" *en masse*, a 33-year old man tweeted his frustration over the government's immigration policies and proclaimed "I will scrounge and literally give $500 to anyone who kills an ice agent."[8] A few days later, after a public meeting to discuss ICE's 287(g) program, an organization called [redacted] posted on the internet the name, phone number, home address, and a photograph of another ICE employee, [redacted], a public affairs official, and appealed to the public to ensure that [redacted] does not continue working with ICE when there is a change in the Presidential Administration. See Declaration of [redacted], ¶ 5, Ex. "2." The postings were accompanied by allegations that [redacted] is a "racist" and a "fascist." See id., at ¶3. [redacted] subsequently received numerous phone calls from people who reiterated those personal attacks. See id., at ¶4. This incident caused [redacted] and [redacted] wife great anxiety, and they felt compelled to contact local law enforcement and take enhanced security precautions. See id., at ¶¶7-8. They also modified their personal routines and sleeping schedules out of fear they may be targeted with violence. See id.,

---

[6] https:/[redacted]

[7] [redacted]

[8] https://www.washingtonpost.com/nation/2019/12/09/brandon-ziobrowski-ice-agent-twitter-threat/

at ¶ 10.

Over the following year, the threatening behavior became more brazen. In August 2019, a protestor specifically threatened GEO Group, Inc.'s[9] former general counsel and his family by shouting his name, the locations and addresses of his children's homes, and the name of the church he attends, for public consumption during a demonstration outside of GEO Group's offices in Florida.[10] The next day, gunmen opened fire into ICE offices and GEO Group offices in San Antonio, Texas. See id.

In December 2019, another man tweeted his support for violence directed at ICE, advocating "[w]e need to kill all ICE agents" and asked rhetorically "why can't mass shootings occur at @ICEgov buildings them [m****r-f*****s] need to get smoked."[11] He then promoted violent behavior toward ICE by posting a euphemism from a Martin Scorcese film that refers to killing people. See id.

In April 2020, within one week after the Court in Torres v. Dep't of Homeland Sec., CV 18-02604-JGB (SHKx), issued an Order of Preliminary Injunction for the limited disclosure of some ICE employees' government issued cell phone (see ECF No. 153, at 3 ["These telephone numbers shall be disclosed only to attorneys and their staff who represent Adelanto detainees in legal proceedings **during the period this Preliminary Injunction is in effect**. The numbers are not to be disclosed to any third parties and shall be used only in connection with legal representation"]), Defendants confirmed that this Order was violated, leading to a broad dissemination of at least one employee's cell phone number. Indeed, Defendants obtained a flyer that was distributed to the participants in a rally outside of Adelanto with instructions on how to harass that

---

[9] GEO is a Government contractor that operates some immigration detention centers.

[10] https://www.lawenforcementtoday.com/protestors-threaten-ice-children/

[11] https://www.nj.com/bergen/2019/12/we-need-to-kill-all-ice-agents-nj-man-posted-on-twitter-federal-agents-arrested-him.html

particular ICE employee. See Declaration of [redacted], ¶ 2.

On June 6, 2020, TIME reported that ICE agents are assisting in law enforcement's response to civil unrest.[12] The next day, a riot erupted outside of the Adelanto ICE Processing Center ("Adelanto")—the only immigration detention center in the Central District of California. Rioters broke windows and damaged the main building at Adelanto.[13] They threw large rocks at staff. See id. The rioters spray painted several areas, stole the American flag flying outside of Adelanto and burned it, and vandalized 44 government and employee vehicles. See id. One rioter even attempted to blow up a truck parked outside of Adelanto by stuffing a rag in the gas tank and attempting to light the rag on fire. See id.

In July 2020, Defendant DHS sent several federal agents, including ICE officers, to Portland, Oregon, in response to the prolonged civil unrest, which has been the subject of controversy and criticism.[14] Defendants anticipate even more criticism and possibly even more doxing and violent reactions in response to the airing of "*Immigration Nation*," a docuseries recently released on Netflix, which depicts footage of ICE officers enforcing recent controversial immigration policies, like "zero-tolerance," "remain in Mexico," and family separations.

## IV. LEGAL ARGUMENT

### A. Individual Defendants Should be Authorized to Use Pseudonyms

There is a strong likelihood that Individual Defendants would be subject to harassment and/or injury if their identities are disclosed in this lawsuit. Parties may use pseudonyms when nondisclosure of their identities is necessary "to protect a person from harassment, injury, ridicule, or personal embarrassment." Does I Thru XXIII v. Advance

[12] https://news.yahoo.com/ice-agents-detain-police-brutality-203924509.html

[13] https://www.vvdailypress.com/news/20200608/protest-at-adelanto-ice-processing-center-turns-violent

[14] https://www.washingtonexaminer.com/washington-secrets/not-dhs-challenges-claim-of-portland-withdrawal-will-not-back-down

Textile Corp., 214 F.3d 1058, 1068 (9th Cir. 2000). The use of pseudonyms is warranted "when identification creates a risk of retaliatory physical or mental harm." Id.; see also Doe v. Stegall, 653 F.2d 180, 183 (5th Cir. 1981). "Courts generally conclude that a threat of physical or psychological harm is sufficiently severe." Doe No. 1 v. United States, 143 Fed. Cl. 238 (Fed. Cl. May 15, 2019); see, e.g., Doe v. Ayers, 789 F.3d 944 (9th Cir. 2015) (inmate's presenting evidence of past assault in habeas proceeding exposed him to risk of further assault). Courts also have held that the risk of social stigmatization is sufficient. See Doe v. Rostker, 89 F.R.D. 158, 162 (N.D. Cal. 1981) ("A plaintiff should be permitted to proceed anonymously in cases where a substantial privacy interest is involved. The most compelling situations involve matters which are highly sensitive, such as social stigmatization.")

When pseudonyms are used to shield anonymous parties from retaliation, this Court should evaluate the following factors: (1) the severity of the threatened harm; (2) the reasonableness of the Individual Defendants' fears; and (3) Individual Defendants' vulnerability to such retaliation. See Advance Textile, 214 F.3d at 1068.

First, the threatened harm is significant and undeniable. At a minimum, the public disclosure of the Individual Defendants' names risks an invasion of their personal privacy and heightens the potential for harm to their families and property. Should their addresses, telephone numbers and names and photographs of their immediate family members be published permanently on the internet, Individual Defendants and/or their families would likely feel vulnerable and may be harassed in their own homes or in their communities. But a more heinous possibility exists: an act of violence, or even murder. Many activists have indirectly and directly advocated for this outcome and many activists attempted to effectuate this outcome through vandalism and shooting at ICE offices.

The fear of harm Individual Defendants likely will suffer is illustrated by how [redacted], an ICE public affairs official, described how [redacted] wife were terrified after [redacted] was doxed. Like [redacted] other doxed ICE employees likely feel the need to alert law

enforcement and obtain enhanced security for their homes. Like [redacted] other doxed ICE employees likely must change their behavior to reduce the risk of being followed when they go the grocery store or drop off their children at school. Individual Defendants' fear of harm will be no different.

Second, Individual Defendants' fear of the threatened harm is reasonable. The doxing campaigns against ICE officers have needed only three basic data points: (1) their names; (2) employer; and (3) geographic locations. Using this seemingly innocuous data set, activists found the home addresses, phone numbers, and photographs of spouses and children of several ICE employees. That information was then posted along with comparisons of the ICE personnel to mass murders and calls to action. And not a single person who disseminated the personal information of those unsuspecting ICE employees attempted to justify their malicious conduct by the additional claim, alleged here, that any of those ICE employees acted illegally. Indeed, those ICE employees were victimized and compared to genocidal war criminals exclusively because they worked for ICE, and nevertheless, the activists responsible for "doxing" them encouraged others to harass, threaten, or harm them.

As explained, activists have become more brazen as the tension directed toward ICE has continued to escalate throughout the United States and locally. Doxers have called for the indiscriminate murder of ICE agents and opened fire on ICE offices. ICE opponents have violated an Order of Preliminary Injunction that specifically precluded widespread dissemination of ICE employees' names and contact information. In Torres, within days after the District Court of the Central District of California forbade the parties from disseminating the names and contact information of ICE deportation officers that it ordered released, [redacted] name and phone number was distributed during a rally outside of Adelanto. Then, one day after the media reported that ICE would assist local law enforcement with responding to civil unrest, a riot broke out at Adelanto where criminals caused extensive damage to government and ICE employees' personal property.

Here, Individual Defendants' anonymity is all that prevents a perpetrator from completing the limited data set that would allow someone to dox them, as their employer and geographic location would be readily known. If Individual Defendants are identified in the Complaint or other filings on the docket—all public documents—ICE opponents would have access to all of the data points that were used to dox other ICE personnel. And the risk that Individual Defendants would be targeted is arguably greater.

Unlike other targets of doxing, Individual Defendants are accused of violating Mr. Kidd's constitutional rights, an inflammatory claim and potential reason to single them out. If so many of Individual Defendants' colleagues were doxed, harassed, and threatened simply because they were ICE employees, Individual Defendants will be even more attractive targets because of the allegations made against them and other ICE agents in the Complaint.

As Plaintiffs allege Individual Defendants' illegal arrest arose out of a national practice, by identifying them in the Complaint, they may become the names and the faces of the purportedly agency-wide misconduct. Threats and acts of violence against Individual Defendants likely will be exacerbated because of Plaintiffs' irrelevant and provocative allegations of prior misdeeds of *other* ICE agents. Therefore, the history of hostility directed towards ICE employees paired with the nature of Plaintiff's allegations make Individual Defendants' fear of harassment and harm reasonable.

Third, the Individual Defendants would be very vulnerable to harassment or harm if their names are disclosed in this action. For all of the ICE employees whose names and addresses are published on the internet, they and their families are accessible 24-hours a day to any irrational, unstable activist with bad intentions. There is no safe haven for them. There is no protection for them, as doxers are even willing to violate court orders, such as the Preliminary Injunction Order in Torres. See [redacted] Decl., ¶ 2. The toll of constantly wondering and worrying about whether such a person will come to their home is immeasurable. See generally [redacted] Decl. Without anonymity, there is a high risk that Individual Defendants would suffer the same unnecessary and anxiety-provoking

experience.

**B. There is *De Minimis* Public Interest and Lack of Prejudice to Plaintiffs.**

Anonymity for the Individual Defendants does not harm Plaintiffs at all. This Court must "balance the need for anonymity against the general presumption that parties' identities are public information and the risk of unfairness to the opposing party." Advanced Textile, 214 F.3d 1068. The public's interest in this litigation is not best served by requiring Individual Defendants to reveal their identities because anonymity does not significantly obstruct the public's view of the issues. See Ayers, supra, 789 F.3d at 946.

Here, the public's interest in knowing the names of specified ICE agents – when the true target of the litigation are agency-wide practices – is *de minimis*. As the legal dispute revolves around of the policy of the agency, promulgated by its decision-makers and not the rank and filed Individual Defendants, using pseudonyms for the Individual Defendants will not materially impact the public's interest in the subject matter of this case.

Further, the Individual Defendants' anonymity will not cause Plaintiffs any prejudice, particularly at this stage of the litigation. Individual Defendants still will file responsive pleadings when they are served with the summons and Complaint. They will respond to discovery and appear for their depositions. Their anonymity will not preclude Plaintiffs from filing or opposing any motions with this Court. Indeed, Plaintiffs will not experience any appreciable difference should this Court authorize Individual Defendants to use pseudonyms.

This Court also must "determine the precise prejudice at each stage of the proceedings to the opposing party, and whether proceedings may be structured so as to mitigate that prejudice." Advanced Textile, 214 F.3d 1068. The need for Individual Defendants' anonymity is even more pronounced at the early stages of litigation as they will file motions to dismiss and may not be parties to this action for very long. The institutional Defendants have a pending motion to dismiss arguing the Court's lack of

jurisdiction over this entire matter. Especially in light of these circumstances, exposing Individual Defendants to harm by publishing their names in the Complaint is unnecessary and inappropriate.

## V. CONCLUSION

Based upon the foregoing, Defendants request that this Court authorize Individual Defendants to use pseudonyms throughout this litigation. Defendants also request that this Court order Plaintiffs to use the Individual Defendants' pseudonyms for all purposes in the litigation and, should their real names be disclosed, prohibited from disseminating their identities to anyone.

Dated: August 24, 2020

NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section

**/s/ *Aaron Kollitz***
AARON KOLLITZ
JOSEPH A. DARROW
Assistant United States Attorneys

Attorneys for Defendants

NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section
AARON KOLLITZ (Cal. Bar No. 238580)
JOSEPH A. DARROW
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-2083 / 0436
E-mail: Aaron.Kollitz@usdoj.gov
Joseph.Darrow@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

OSNY SORTO-VASQUEZ KIDD; INLAND COALITION FOR IMMIGRANT JUSTICE; COALITION FOR HUMANE IMMIGRANT RIGHTS,

Plaintiffs,

v.

CHAD WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity; MATTHEW T. ALBENCE, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; DAVID MARIN, Los Angeles Field Office Director, U.S. Immigration and Customs Enforcement, in his official capacity; JOSEPH MACIAS, Los Angeles Special Agent in Charge, Homeland Security Investigations, U.S. Immigration and Customs Enforcements, in his official capacity; UNITED STATES OF AMERICA; DOES 1-10,

Defendants.

No. CV 20-3512-ODW (JPR)

**DECLARATION OF [redacted] IN SUPPORT OF DEFENDANTS' MOTION TO USE PSEUDONYMS AND FOR PROTECTIVE ORDER**

Honorable Otis D. Wright II
United States District Judge

**DECLARATION OF [redacted]**

I, [redacted], hereby declare:

1. I am the [redacted] for United States Immigration Customs and Enforcement ("ICE"). I have served in that capacity since April 1, 2018. I base this testimony on my personal and professional experience, and if called to testify, I could and would testify competently to the facts set forth herein.

2. On July 11, 2018, I spoke at a public meeting in [redacted] to explain ICE's 287(g) program in the county and ICE policy in general. Dozens of activists attended that meeting. They repeatedly interrupted my presentation and made derogatory remarks towards me, like accusing me of lying and being an immoral person simply because I am an ICE employee. After the meeting, I drove from [redacted] to [redacted].

3. That same day, I became aware that an organization known as [redacted] had made several posts on its Twitter handle [redacted] that repeated those same personal attacks that were levied against me during my [redacted] presentation and described me as a "fascist" and a "racist." Those Twitter postings also reflected my work phone number that I had provided to reporters at the [redacted] presentation, and encouraged people to call me and "mention [redacted], [redacted] remember us." Attached hereto as Exhibit "1" are true and correct copies of the tweets that encouraged harassers to "mention [redacted], [redacted] remember us."

4. I subsequently received numerous phone calls from people who repeated the same personal attacks of calling me a "racist," "fascist," and "liar," because I was an ICE employee and I attended the [redacted] public meeting in ICE's behalf.

5. The [redacted] then made an indirect threat on social media by inciting other people to take actions against me. During the [redacted] presentation, I remarked that I am a non-partisan career civil servant who served under multiple presidential administrations and I plan to continue regardless of which political party is in office. In response to that comment, [redacted] tweeted "let's not let that

happen" and that my "last known address is in [redacted]." I interpreted these tweets to reflect the group's intent to do something to me personally that would make me unable to continue my federal service in the future. Attached hereto as Exhibit "2" is a true and correct copy of the tweet that reflects those comments.

6. The next day, while monitoring social media, I became aware that [redacted] had obtained and posted on Twitter my home address and sent it to other activists groups, including [redacted], in an attempt to encourage them to take action against me as well. Attached hereto as Exhibit "3" is a true and correct copy of the [redacted] tweet with my home address.

7. Those incidents caused me and my wife to fear for our personal safety. I immediately reported the tweets from [redacted] to Twitter as a threat and a violation of the site's Terms of Service. Twitter agreed and removed the material.

8. However, as my personal information already had been shared to multiple other accounts and those posts remained online, I spent the next several days checking the physical security of the windows and doors of my home and removing contents from our personal vehicles that we parked outside. I also installed additional home security equipment at my home and contacted local law enforcement agencies about this situation. The United States Attorney's Office for the [redacted] asked me to prepare a written statement in connection with an investigation of the incident.

9. I also contacted various other websites, like White Pages, Spokeo, and Pipl, in an attempt to have as much personal information about myself removed as possible to minimize the ability of persons to obtain my home address from the internet.

10. After this doxing incident, my wife and I eventually moved to another state. But for the time we lived at that address after the doxing incident, my wife and I remained concerned and anxious for our personal safety. We modified our personal routines as much as possible to reduce the likelihood of getting stalked. We varied our home departure and arrival times and took different routes to and from our routine

destinations. We also varied our sleep schedule and kept different lights on in different rooms of my house to minimize predictability of our daily schedules.

11. All of the actions my wife and I undertook in response to the doxing incident were tedious, expensive, and stressful.

I declare under the penalty of perjury under 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on August 24, 2020.

[redacted]

[redacted] Follow

[redacted] does [redacted] for ICE in the [redacted] office. [redacted] don't b afraid to say hello! mention [redacted] remember us.

4:29 PM - 11 Jul 2018

**2** Retweets **11** Likes

3 2 11

[redacted] · 2h

Apparently [redacted] did [redacted] guess desk jockeying for evil makes you ugly

[redacted] · 17h

Replying to [redacted]

phone # is [redacted] ••

1 2 4

[redacted]



[redacted] · 17h

[redacted] does [redacted] for ICE in the [redacted]ffice. [redacted] don't be afraid to say hello! mention [redacted], [redacted]emember us.

3 2 11



[redacted] 2h

why does [redacted]ook like the literal spawn of fucking Satan

[redacted]

1



[redacted] Follow

Replying to [redacted]

Apparently [redacted] did [redacted] 🤔 guess desk jockeying for evil makes you ugly

10:30 AM - 12 Jul 2018



[redacted] Wednesday in so called [redacted]

Actions against ICE are happening all over the country. #abolishice

In [redacted] we're fighting to #end287g #stop287g [redacted] came to try and sell #287g to our community as if it were used car, attempting to hide fascist politics with weak and misguiding statistics. [redacted] claims [redacted] done this job for multiple "administrations" (44 & 45 assumed) and will continue onto the next. Lets not let that happen. Last known address is in [redacted]

**Knoxville Radical Alliance**
@knoxradical

Follow

[redacted] at U.S. Immigration and Customs Enforcement"

[redacted] attempts to cover fascist policy with misguiding statistics and lies.
Last known address
[redacted]
#AbolishICE #Stop287g #End287g



NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section
AARON KOLLITZ (Cal. Bar No. 238580)
JOSEPH A. DARROW
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-2083 / 0436
E-mail: Aaron.Kollitz@usdoj.gov
Joseph.Darrow@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

OSNY SORTO-VASQUEZ KIDD; INLAND COALITION FOR IMMIGRANT JUSTICE; COALITION FOR HUMANE IMMIGRANT RIGHTS,

Plaintiffs,

v.

CHAD WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity; MATTHEW T. ALBENCE, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; DAVID MARIN, Los Angeles Field Office Director, U.S. Immigration and Customs Enforcement, in his official capacity; JOSEPH MACIAS, Los Angeles Special Agent in Charge, Homeland Security Investigations, U.S. Immigration and Customs Enforcements, in his official capacity; UNITED STATES OF AMERICA; DOES 1-10,

Defendants.

No. CV 20-3512-ODW (JPR)

**DECLARATION OF [redacted] IN SUPPORT OF DEFENDANTS' MOTION TO USE PSEUDONYMS AND FOR PROTECTIVE ORDER**

Honorable Otis D. Wright II
United States District Judge

**DECLARATION OF [redacted]**

I, [redacted], hereby declare:

1. I am employed as a Deportation Officer by the United States Department of Homeland Security, United States Immigration and Customs Enforcement, Office of Enforcement and Removal Operations. I have been employed by the United States Department of Homeland Security since April 15, 2018. Presently, I work at the Adelanto Immigration Processing Center ("APC"). I base this testimony on my personal knowledge and professional experience. If called to testify, I could and would testify competently to the facts set forth herein.

2. In accordance with the Order of Preliminary Injunction issued in Torres v. DHS, CV 18-02604-JGB (SHKx), my telephone number for my government-issued cell phone was provided to attorneys who represented detainees at APC. By the end of April 2020, my name and cell phone number was put on a flyer that was disseminated to the attendees of a protest outside of APC. As of the date of this declaration, a copy of that flyer is available for the public's viewing by searching for [redacted] on Instagram. Attached hereto as Exhibit "1" is a true and correct copy of the flyer.

3. Before the Torres Order of Preliminary Injunction, I did not provide my cell phone number to anyone outside of the Government. I never authorized the publication or broad dissemination of my name and work cell phone number.

I declare under the penalty of perjury under 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on August 27, 2020.

[redacted]


CALL TO ACTION!
LONG BEACH RESIDENT, ROT, WHO SUFFERS FROM ASTHMA, SITS IN FEAR OF ICE DETENTION AS CASES OF COVID-19 RISE!
[redacted]
Call Officer [redacted] and say:
"I am calling on ICE to release Mr. Mythong (A[redacted]). He survived cancer twice and suffers from asthma. He recently had an asthma attack, constant coughing, and dryness in his throat. With these conditions, he is at high risk of COVID-19. Please release him today!"
(213) [redacted]