MICHAEL KAUFMAN (SBN 254575)
*mkaufman@aclusocal.org*
STEPHANIE PADILLA (SBN 321568)
*spadilla@aclusocal.org*
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017-4022
Telephone: (213) 977-5232
Facsimile: (213) 201-7878

Attorneys for Plaintiffs
*(additional counsel information on next page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| OSNY SORTO-VASQUEZ KIDD; INLAND COALITION FOR IMMIGRANT JUSTICE; COALITION FOR HUMANE IMMIGRANT RIGHTS,<br><br>Plaintiffs,<br><br>vs.<br><br>CHAD F. WOLF, Acting Secretary, U.S. Department of Homeland Security, in his official capacity; MATTHEW T. ALBENCE, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; DAVID MARIN. Los Angeles Field Office Director, U.S. Immigration and Customs Enforcement, in his official capacity; JOSEPH MACIAS, Los Angeles Special Agent in Charge, Homeland Security Investigations, U.S. Immigration and Customs Enforcement, | Case No. 2:20-cv-03512-ODW-JPR<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge: Hon. Otis D. Wright II |

in his official capacity; UNITED STATES OF AMERICA; O.M.; C.C.; J.H.; J.N.,

Defendants.

ANNE LAI (SBN 295394)
*alai@law.uci.edu*
CAITLIN BELLIS (SBN 304764)
*cbellis.clinic@law.uci.edu*
UC IRVINE SCHOOL OF LAW
IMMIGRANT RIGHTS CLINIC
401 E. Peltason Drive,
Irvine, CA 92697-8000
Telephone: (949) 824-9894
Facsimile: (949) 824-2747

ANJAN CHOUDHURY (SBN 236039)
*anjan.choudhury@mto.com*
JACOB KREILKAMP (SBN 248210)
*jacob.kreilkamp@mto.com*
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

TERRA CASTILLO LAUGHTON (SBN 321683)
*terra.laughton@mto.com*
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Attorneys for Plaintiffs

## PRELIMINARY STATEMENT

1. This case demands that federal immigration officers act openly, honestly, and in accordance with our laws. That is not the current state of affairs. Immigration and Customs Enforcement ("ICE") officers in this District routinely conduct arrests in or near the home that violate the Constitution in at least two ways: (1) ICE officers misrepresent themselves as police or probation to trick individuals into granting them entry into or otherwise relinquishing the privacy of their homes; and (2) ICE officers enter the constitutionally protected private areas around individuals' homes to arrest occupants without consent or a judicial warrant. These practices trample on well-established Fourth Amendment rights. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1343; and 28 U.S.C. § 1346.

2. In recent years, ICE officers have complained that "their jobs have become increasingly difficult . . . because of robust campaigns by immigrant advocacy organizations seeking to safeguard undocumented immigrants by educating them on the legal limitations that ICE officers face."[1] The Director of ICE's Los Angeles Field Office specifically criticized the Mayor of Los Angeles and the Chief of the Los Angeles Police Department for notifying individuals of their constitutional rights when ICE comes to their homes.[2] High-level officials in Washington, D.C. likewise have expressed dismay that community members have been empowered to invoke their constitutional rights, thus limiting ICE's ability to

---

[1] Caitlin Dickerson & Zolan Kanno-Youngs, *Border Patrol Will Deploy Elite Tactical Agents to Sanctuary Cities*, N.Y. Times (February 14, 2020), https://www.nytimes.com/2020/02/14/us/Border-Patrol-ICE-Sanctuary-Cities.html?referringSource=articleShare.

[2] Brittny Mejia, *As White House takes on 'sanctuary' cities, tensions between L.A. County sheriff and ICE ramp up*, L.A. Times (March 12, 2020), https://www.latimes.com/california/story/2020-03-12/sheriff-ice-la-tension-sanctuary-cities.

conduct warrantless home raids and other indiscriminate enforcement activities that can drive up deportation numbers.[3]

3. In the face of community members' growing determination to exercise their constitutional rights, ICE officers have resorted to deception and other illegal tactics to circumvent the Constitution's fundamental protections of the home. ICE officers routinely engage in ruses in which they impersonate other law enforcement officials to induce community members to "consent" to officers entering their homes or to lure them out of their homes to conduct warrantless immigration arrests.[4] As part of these ruses, ICE officers routinely wear uniforms that have "POLICE" written on them. Typically only after arresting unsuspecting residents do ICE officers reveal their true identities and purpose.

4. In addition to these deceptive tactics, ICE officers also routinely trespass on community members' porches and other private areas surrounding their homes (known as the curtilage) without permission or a judicial warrant.

5. ICE's practices violate the Fourth Amendment rights of both noncitizen and citizen residents of the home, as well as ICE's own rules and regulations. The Fourth Amendment does not permit ICE officers to coerce "consent" to enter the home by impersonating another government official and misrepresenting their purpose in seeking entry. Nor does the Fourth Amendment permit ICE officers to enter the curtilage around a home to arrest a resident without a judicial warrant or

---

[3] White House deputy press secretary Hogan Gidley compared educational outreach to telling a "crack dealer, 'Hey, heads up, man'" before a police raid. Courtney Hagle, *Fox News Is Furious That Immigrants Are Being Advised of Their Rights Ahead of Planned ICE Raids*, Media Matters for America (July 12, 2019, 2:22 PM) https://www.mediamatters.org/fox-friends/fox-news-furious-immigrants-are-being-advised-their-rights-ahead-planned-ice-raids.

[4] As used in the remainder of this Complaint, the term "ruse" refers to a home enforcement operation in which ICE officers misrepresent themselves as other government agents and/or misrepresent their purpose as relating to a government objective other than their true purpose—*i.e.*, immigration enforcement.

consent. ICE officers routinely disregard these core constitutional protections when carrying out arrests of community members in the sanctity of their homes.

6. ICE's practices do not further public safety and, in fact, make our communities less safe. By impersonating police and purporting to investigate fictitious crimes, ICE officers cause panic in the community and sow distrust of law enforcement generally. For these reasons, California state and local officials have repeatedly implored ICE to cease holding its officers out as police.

7. ICE has continued its troubling home arrest practices even in the midst of the current COVID-19 pandemic, during which California residents have been ordered to shelter in place at home. Entire segments of our community cannot feel safe at home because they are vulnerable to unconstitutional searches and arrests by ICE.

8. Plaintiffs in this action are one individual and two community organizations. Osny Sorto-Vasquez Kidd ("Mr. Kidd") seeks damages for the harms he suffered when ICE officers unconstitutionally impersonated local police officers and entered the curtilage of his home to arrest him without a warrant. The Inland Coalition for Immigrant Justice ("ICIJ") and the Coalition for Humane Immigrant Rights ("CHIRLA") (collectively, the "Organizational Plaintiffs"), on their own behalf as well as on behalf of their members and volunteers and a class of similarly situated individuals, seek injunctive and declaratory relief to compel the Department of Homeland Security ("DHS") and ICE to comply with the Fourth Amendment to the United States Constitution and federal law when conducting home arrests.

9. Unless this Court intervenes to stop Defendants from continuing to engage in these tactics, an untold number of people will be subjected to violations of their rights at home.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, which confers jurisdiction over federal questions; 28 U.S.C. § 1343, which confers

original jurisdiction over civil rights actions; and 28 U.S.C. § 1346, which confers original jurisdiction over suits against the United States.

11. This Court has authority to grant damages, declaratory and injunctive relief, and any other appropriate relief under 28 U.S.C. § 1651 (All Writs Act), 5 U.S.C. §§ 702 and 706 (Administrative Procedure Act), 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act), Fed. R. Civ. P. 65 (injunctive relief), 28 U.S.C. § 2674 (Federal Tort Claims Act), and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Defendants do not have immunity. *See*, *e.g.*, 5 U.S.C. § 702; *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949); *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 526 (9th Cir. 1989); 28 U.S.C. § 2674.

12. Pursuant to 28 U.S.C. § 2675(a), Plaintiff Osny Sorto-Vasquez Kidd's administrative tort claim set forth herein was filed with DHS and ICE on September 25, 2019. DHS and ICE failed to make a final disposition of the claim within the six months prescribed by statute, and such failure is deemed a denial of the claim. Mr. Kidd has therefore exhausted all available administrative remedies.

13. Venue is proper in the Central District of California because Defendants are officers or employees of the United States and at least one Plaintiff resides in this District, *see* 28 U.S.C. § 1391(e)(1)(c); 28 U.S.C. § 1402(b); because a substantial part of the events giving rise to the claims in this action took place in this District, *see* U.S.C. § 1391(e)(1)(B); 28 U.S.C. § 1402(b); and because a Defendant resides in this District, *see* 28 U.S.C. § 1391(e)(1)(A).

## PARTIES

### Plaintiffs

14. Osny Sorto-Vasquez Kidd is a native of Honduras. He came to the United States in 2003, when he was nine years old, and has lived here since that time. Mr. Kidd is a recipient of Deferred Action for Childhood Arrivals ("DACA") status and is a Certified Nursing Assistant. Mr. Kidd is married to a U.S. citizen, and

he works to support his mother and siblings, all of whom are U.S. citizens or have lawful immigration status. Mr. Kidd was arrested by ICE officers in October 2018 after they used deception to enter his home without a warrant or valid consent and to persuade him to exit his home. Mr. Kidd was subsequently detained at the Adelanto ICE Processing Facility (hereinafter the "Adelanto Detention Center" or "Adelanto") for over two months until his release in December 2018. During that time, Mr. Kidd was separated from his husband and family, who faced severe financial stress and the threat of eviction from their home without Mr. Kidd's financial support.

15. ICIJ is a fiscally sponsored organization based in Ontario, California. Its mission is to empower members of the immigrant community, collectively advocate to improve their lives, and work toward a more just immigration system. ICIJ's mission has been frustrated by ICE's home arrest practices, including the use of ruses, in several ways. Fear of unconstitutional home arrests has discouraged community members from participating in ICIJ activities. ICIJ also has been forced to expend scarce resources assisting families affected by ICE's unconstitutional home arrests instead of advancing other aspects of its core mission. Apart from the institutional harm to ICIJ, some volunteer members of ICIJ's Emergency Response Network are undocumented or have undocumented family members, and face a real and present risk of being subjected to an illegal ICE home search or arrest. Absent an injunction from the Court, ICIJ and its volunteers will continue to be subject to harm arising from ICE practices.

16. CHIRLA is a nonprofit membership-based organization dedicated to creating a more just society fully inclusive of immigrants and to advancing the civil and human rights of immigrants and refugees. ICE's home arrest practices, including the use of ruses, have undermined CHIRLA's work to advance policies that build trust between local law enforcement and immigrant communities. CHIRLA has also been forced to divert scarce resources away from its core work in

order to educate the community about their rights vis-à-vis ICE's tactics and provide emergency assistance to those affected. Apart from the institutional harm to CHIRLA, CHIRLA's membership, which spans much of Southern California (and the rest of the state), includes citizens and noncitizens who have been subjected to and are at risk of being subjected in the future to an illegal ICE home search or arrest. Absent an injunction from the Court, CHIRLA and its members will continue to be subject to harm arising from ICE practices.

**Defendants**

17. Defendant Chad F. Wolf is the Acting Secretary of DHS. Defendant Wolf is charged with administering and implementing United States immigration law, and with the administration and oversight of ICE. Defendant Wolf is sued in his official capacity.

18. Defendant Matthew T. Albence is the Acting Director of ICE, an agency of the United States and a division of DHS. ICE's mission includes the enforcement of criminal and civil laws related to immigration. Among other things, ICE is responsible for the arrest and custody of individuals believed to be in violation of civil immigration law, including but not limited to arrests of individuals at or near their homes. Defendant Albence oversees, and is responsible for, the Los Angeles Field Office and its officers. Defendant Albence is sued in his official capacity.

19. Defendant David Marin is the Director of the Los Angeles Field Office of ICE. Defendant Marin oversees ICE's Los Angeles Field Office. He is responsible for the supervision of officers within ICE's Enforcement and Removal Operations ("ERO") who conduct arrests of individuals believed to be in violation of civil immigration law in the geographic area covered by the Los Angeles Field Office, including the Counties of Los Angeles, Orange, Riverside, San Bernardino, Ventura, Santa Barbara and San Luis Obispo. Defendant Marin is sued in his official capacity.

20. Defendant Joseph Macias is the Special Agent in Charge of ICE's Homeland Security Investigations ("HSI") in Los Angeles. Upon information and belief, Defendant Macias oversees ICE's HSI in Southern California, including the Counties of Los Angeles, Orange, Riverside, San Bernardino, Ventura, Santa Barbara and San Luis Obispo. He is responsible for the supervision of agents within ICE's HSI who conduct arrests of individuals believed to be in violation of civil immigration law. Defendant Macias is sued in his official capacity.

21. Defendants O.M., C.C., J.H., and J.N. (collectively, "the Individual Capacity Defendants") are officers of ICE, an agency of the United States of America. The Individual Capacity Defendants are referred to herein by pseudonyms, pursuant to the Court's October 5, 2020 Order. ECF No. 37. The Individual Capacity Defendants acted within the scope of their employment in deceiving Plaintiff Osny Sorto-Vasquez Kidd and his family, entering his home, coercing him to exit his home, and arresting him in violation of the United States Constitution and federal law. The Individual Capacity Defendants are also liable in their individual capacities under *Bivens*, 403 U.S. at 397.

22. The United States of America is an appropriate defendant under the Federal Tort Claims Act. The United States of America has jurisdiction and control over DHS and ICE.

## FACTUAL ALLEGATIONS

### <u>Background on ICE Practices</u>

23. According to DHS nationwide data, while the majority of ICE arrests still result from transfers from state and local custody (63%), a significant percentage of ICE arrests (25%) now occurs in homes, places of work or elsewhere in the wider community.[5]

---

[5] *See* TRAC Report, Tracking over 2 Million Ice Arrests: A First Look, TRAC Immigration (September 25, 2018), http://trac.syr.edu/immigration/reports/529; *see*

24. The rate of arrests in the community is even higher in the geographic area covered by the Los Angeles ICE Field Office. In Fiscal Year ("FY") 2018, community arrests accounted for nearly 40 percent of all ICE arrests in this area, an increase of more than 12 percentage points compared to FY 2016.[6]

25. In recent years, advocacy groups and state and local officials have launched "know your rights" campaigns to better educate community members about their constitutional rights when interacting with ICE officers.[7] These efforts have been effective. News accounts have documented numerous cases in which community members have exercised their right to deny ICE's warrantless entry to their homes or businesses.[8]

---

*generally* Adam Harris, *When ICE Raids Homes*, The Atlantic, (July 17, 2019), https://www.theatlantic.com/family/archive/2019/07/when-ice-raids-homes-immigration/594112/ ("a significant shift [] has taken place over the past several years: ICE agents . . . have been turning to people's homes as a place to find and detain them"); Sabrina Siddiqui, '*On a mission to destroy families': Ice targets migrants in once safe spaces*, The Guardian (July 14, 2018), https://www.theguardian.com/us-news/2018/jul/14/ice-trump-administration-immigrants-arrested-safe-spaces.

[6] TRAC Immigration, Immigration and Customs Enforcement Arrests Data, https://trac.syr.edu/phptools/immigration/arrest/ (last visited Nov. 26, 2019).

[7] *See, e.g.*, Ready California Resources, https://ready-california.org/print-resources/?cat=know-your-rights (last visited September 12, 2019). *See generally* Caitlin Dickerson, et al., *With Ice Raids Looming, Immigrants Worry: 'Every Time Someone Knocks, You Get Scared'*, N.Y. Times (July 13, 2019), https://www.nytimes.com/2019/07/13/us/ice-raids.html (discussing "know your rights" trainings and materials prepared by legal service providers); Khushbu Shah, *Why Were ICE Raids so Ineffective?*, Pacific Standard (July 29, 2019), https://psmag.com/social-justice/why-were-trumps-ice-raids-so-ineffective (observing "nationwide trend" of workshops "for the community on what to do and what to ask for when ICE agents show up").

[8] *See, e.g.*, Gadi Schwartz, *On the Ground with ICE: Where Marching Orders Meet Immigration Reality*, NBC News (April 21, 2017, 2:03PM), https://www.nbcnews.com/news/latino/ground-ice-where-marching-orders-meet-immigrant-reality-n749506 (ICE officers turned away after resident shows a "red

26. Faced with community members' growing understanding of and willingness to exercise their constitutional rights, ICE has turned to increasingly desperate and cruel tactics to maintain its arrest numbers. For example, ICE has arrested individuals at schools,[9] hospitals,[10] and other "sensitive locations" at which

---

card" that "says the bearer does not give permission for the home or belongings to be searched without a warrant"); Caitlin Dickerson, et al., *Ice Raids Targeting Migrant Families*, N.Y. Times (July 14, 2019), https://www.nytimes.com/2019/07/14/us/ice-immigration-raids.html (teenager refuses to open the door for ICE because "[h]aving seen numerous 'know your rights' posts on Instagram, she knew not to open it"); Jessica Haynes, *Ann Arbor restaurant refused kitchen entry to ICE agents, owner says*, MLIVE (August 9, 2017), https://www.mlive.com/business/annarbor/2017/08/ann_arbor_restaurant_refused_k.html.

[9] *See, e.g.*, Andrea Castillo, *L.A. father detained by ICE after dropping daughter at school may be deported*, L.A. Times (July 31, 2017), https://www.latimes.com/local/lanow/la-me-romulo-avelica-deportation-20170731-story.html; Christie Duffy, *2 dads nabbed by ICE as they drop off kids at NJ school; 3rd takes shelter in church*, PIX 11 (January 26, 2018, 5:57PM), https://pix11.com/2018/01/25/2-dads-nabbed-by-ice-as-they-drop-off-kids-at-nj-school-3rd-takes-shelter-in-church/.

[10] *See, e.g.*, Katie Shepherd, *ICE Arrested an Undocumented Immigrant Just Outside a Portland Hospital*, Willamette Week (October 31, 2017), https://www.wweek.com/news/courts/2017/10/31/ice-arrested-an-undocumented-immigrant-just-outside-a-portland-hospital/.

ICE policy purportedly discourages immigration enforcement actions,[11] as well as at courthouses[12] and even visa interviews.[13]

27. ICE officers have also arrested many community members at home. The Fourth Amendment generally prohibits government officials from entering a home without a judicial warrant, but ICE rarely if ever obtains such a judicial warrant before conducting a home search or arrest operation. In some cases, ICE officers may have an administrative warrant issued by the agency. However, ICE administrative warrants do not permit officers to enter the home because they are not reviewed by an independent judicial officer and therefore do not satisfy the Fourth Amendment.[14]

28. Instead of obtaining a judicial warrant, ICE officers frequently engage in deceptive tactics to gain "consent" to enter a home or to lure residents outside. ICE officers sometimes claim to be the police investigating a fictitious crime and show a picture of a suspect (other than the resident they are there to arrest) whom they claim to be trying to find. In other cases, ICE officers claim to be with

---

[11] Ben Leonard, *Numbers show ICE is using tougher tactics in New York under Trump, says report*, NBC News (July 25, 2018), https://www.nbcnews.com/politics/immigration/numbers-show-ice-using-tougher-tactics-new-york-under-trump-n893671.

[12] *See, e.g.*, Freezing Out Justice, American Civil Liberties Union (2018), https://www.aclu.org/sites/default/files/field_document/rep18-icecourthouse-combined-rel01.pdf.

[13] *See, e.g.*, Massoud Hayoun, *ICE Continued to Arrest Immigrants at their Hearings for Legal Residency Status, Pacific Standard*, (June 5, 2019), https://psmag.com/social-justice/ice-continues-to-arrest-immigrants-at-their-hearings-for-legal-residency-status; Susan Zalkind, *Arrested while applying for a green card: US immigration experts fear policy shift*, The Guardian (April 1, 2017), https://www.theguardian.com/us-news/2017/apr/01/green-card-arrests-undocumented-immigration-trump/.

[14] *See El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249, 276 (D. Conn. 2008).

"probation" and there to conduct a home inspection.[15] ICE's ruses are coercive and categorically violate the Fourth Amendment.

29. Further, ICE officers routinely enter the curtilage of individuals' homes without consent or a judicial warrant and with the intent to arrest an occupant, in violation of the Fourth Amendment.

30. Despite ICE's statement that it would limit enforcement actions during the current COVID-19 pandemic,[16] ICE has continued conducting community arrests in Southern California even during California's lockdown.[17] Upon information and belief, ICE continues to employ deception and other illegal tactics to arrest people sheltering at home during the pandemic.

---

[15] *See* ICEwatch: Ice Raids Tactics Map, Immigrant Defense Project (July 2018) at 7, 9, 12–13 https://www.immigrantdefenseproject.org/wp-content/uploads/ICEwatch-Trends-Report.pdf (documenting increase in ruses by ICE and collecting cases and instances where ICE officers have impersonated probation officers); Nausicaa Renner, *As Immigrants Become More Aware of Their Rights, ICE Steps Up Ruses and Surveillance*, The Intercept (July 25, 2019), https://theintercept.com/2019/07/25/ice-surveillance-ruse-arrests-raids/; Filipe De La Hoz, The ICE Ruse: *How Agents Impersonate Local Law Enforcement and Lie to Make Arrests*, Documented (June 18, 2018), https://documentedny.com/2018/06/18/the-ice-ruse-how-agents-impersonate-local-law-enforcement-and-lie-to-make-arrests/.

[16] Maria Sacchetti & Arelis R. Hernandez, *ICE to stop most immigration enforcement inside U.S., will focus on criminals during coronavirus outbreak,* Wash. Post (Mar. 18, 2020), https://www.washingtonpost.com/national/ice-halting-most-immigration-enforcement/2020/03/18/d0516228-696c-11ea-abef-020f086a3fab_story.html.

[17] Ken Cuccinelli Acting Deputy Secretary of Department of Homeland Security (@HomelandKen), Twitter (Mar. 19, 2020, 7:22 AM), https://twitter.com/HomelandKen/status/1240644873369407491 (clarifying that ICE "will continue to prioritize arresting and removing criminal aliens and other aliens who pose a threat to public safety" during the coronavirus pandemic); First Am. Pet. Writ Habeas Corpus & Declaratory & Injunctive Relief at 5, ¶ 6, Bravo Castillo v. Barr, No. CV 20-00605 TJH (AFMx) (C.D. Cal. Apr. 6, 2020), ECF No. 34 (discussing an ICE home arrest completed on March 25, 2020).

**ICE Policy Promotes the Use of Deception and Other Unlawful Practices**

31. ICE policy does not prohibit officers from impersonating another government agent to gain entry into a home or lure an individual outside. Indeed, the agency has acknowledged the practice in public statements, including for large operations.[18] For example, a spokeswoman for the western region of ICE told NPR that "[a]s a standard practice, special agents and officers . . . may initially identify themselves as 'police' during an encounter."[19] ICE documents promote the use of ruses as an "effective law enforcement tool that enhances officer safety."[20]

32. ICE policy contains a limited exception prohibiting the use of health and safety ruses at the workplace. In one prominent case in 2005, ICE officers claimed to be U.S. Occupational Safety and Health Administration ("OSHA") officials and set up a "mandatory safety training" for employees of federal

---

[18] Rebecca Hersher, *Los Angeles Officials to ICE: Stop Identifying Yourself As Police*, NPR (February 24, 2017 5:13 PM), https://www.npr.org/sections/thetwo-way/2017/02/24/517041101/los-angeles-officials-to-ice-stop-identifying-yourselves-as-police; *ICE arrests nearly 200 in Los Angeles-area operation targeting criminal aliens, illegal re-entrants, and immigration fugitives*, ICE News Release (May 5, 2017), https://www.ice.gov/news/releases/ice-arrests-nearly-200-los-angeles-area-operation-targeting-criminal-aliens-illegal-re; ICE *operation in LA results in 212 arrests, 122 notices of inspection*, ICE News Release (Feb. 16, 2018), https://www.ice.gov/news/releases/ice-operation-la-results-212-arrests-122-notices-inspection; *ICE arrests 162 in Los Angeles-area operation targeting criminal aliens, illegal re-entrants and immigration fugitives*, ICE News Release (June 14, 2018), https://www.ice.gov/news/releases/ice-arrests-162-los-angeles-area-operation-targeting-criminal-aliens-illegal-re.

[19] Hersher, *supra*, footnote 18.

[20] Memorandum from John Torres, Acting Director, U.S. Immigration and Customs Enforcement, on Use of Ruses in Enforcement Operations (March 6, 2006), https://www.immigrantdefenseproject.org/raids-foia/.

contractors at a North Carolina Air Force base.[21] After the operation was condemned by members of Congress, federal and state health and safety agencies, and labor groups,[22] ICE decided in 2006 to no longer permit this particular type of ruse.[23] However, it continued to encourage the use of ruses involving impersonation of other agencies.

33. A 2005 ICE memorandum sets forth further procedures for the use of ruses by officers.[24] The memo explains that ruses "can run the gamut from announcing that you are with [ICE] and looking for a person other than the target to adopting the guise of another agency (federal, state, or local) or that of a private entity." Recognizing that such a ruse could "affect [the] public image" of the impersonated agency or "raise security concerns for their employees," the memo requires that ICE officers first notify an agency or entity it plans to impersonate and provide it with an opportunity to object. An ICE operations manual further requires officers to both notify and obtain the "permission" of any proposed "cover" agency.[25]

---

[21] Steven Greenhouse, *Immigration Sting Puts 2 U.S. Agencies at Odds*, N.Y. Times (July 16, 2005), https://www.nytimes.com/2005/07/16/politics/immigration-sting-puts-2-us-agencies-at-odds.html.

[22] *Id*.

[23] Torres, *supra* note 20.

[24] Memorandum from John Torres, Acting Director, U.S. Immigration and Customs Enforcement, on Addition to Section 5, Chapter 19 (Field Operations and Tactics) of the Detention and Deportation Officer's Field Manual (DFFM) – Use of Ruses During Arrest Operations (August 15, 2005), https://www.immigrantdefenseproject.org/raids-foia/ (requiring that "[w]hen using the name of another agency or that of a private entity to cover the operation, the Team Leader *will contact* that agency or entity") (emphasis added).

[25] Enforcement and Removal Operations Fugitive Operations Handbook, U.S. Department of Homeland Security (July 23, 2010), 16, https://www.immigrantdefenseproject.org/raids-foia/.

34. Despite the 2005 ICE memorandum and operations manual rule, ICE officers do not provide notice to, or seek the permission of, agencies they impersonate. Upon information and belief, local law enforcement agencies in Southern California have not received any notifications or requests by ICE to identify themselves as local police or probation officers.

35. ICE officers regularly wear uniforms emblazoned with the word "POLICE." To further conceal their true identity, ICE officers use unmarked cars and sometimes use patches to deliberately hide the abbreviation "ICE" on their uniforms, leaving only the word "POLICE" visible.

36. Upon information and belief, ICE policy and training do not prohibit or discourage ICE officers from conducting themselves in such a way that would mislead a reasonable person into believing that they are with a different government agency. Nor does ICE policy and training prohibit or discourage ICE officers from misrepresenting their true purpose for approaching a residence. Upon information and belief, ICE encourages its officers to initially identify themselves as "police" when conducting operations in the field. It provides no guidance as to when during an operation officers should affirmatively identify themselves as being with ICE.

37. Moreover, upon information and belief, ICE policy and training do not prohibit officers from entering into or onto the curtilage of a home for the purpose of conducting an arrest without a judicial warrant, even if the ICE officers lack prior permission to enter the curtilage. ICE officers routinely violate individuals' reasonable expectations of privacy by entering the curtilage of individuals' homes without a warrant or consent.

38. ICE officers are supposed to file reports documenting a home arrest, including the time and place of any arrest and whether officers obtained consent to conduct a search or enter the premises. This information is also recorded in some cases on the Form I-213, the Record of Deportable/Inadmissible Alien, prepared by ICE officers following an arrest. However, upon information and belief, ICE does

not adequately ensure that required documentation is always completed or that it is completed accurately, thus undermining its ability to hold officers accountable for unlawful practices in its enforcement operations.

39. Local and national news outlets have documented reports of ICE's impersonation of local law enforcement when making home arrests.[26] Despite widespread news coverage and objections by state and local governments, ICE has not changed its tactics.

**ICE Practices Violate the Fourth Amendment and Federal Law**

40. ICE's policies and practices for home arrests violate the constitutional and statutory rights of Southern California residents.

41. The Fourth Amendment protects "against unreasonable searches and seizures." U.S. CONST. amend. IV. Defendants' actions, policies, and practices by which ICE officers conceal their true identities and falsely state to individuals that they are affiliated with other law enforcement agencies, so as to induce people to let them into homes or to lure them outside to arrest them, violate the Fourth Amendment.

42. "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Fla. v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Accordingly, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).

43. Warrantless entry into a home can be justified by the "voluntary consent of an individual possessing authority," but consent is a "'jealously and carefully drawn' exception." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)). An individual can never

[26] *See, e.g.*, Renner, *supra* note 15.

provide valid consent where a government agent poses as a different government agent or misrepresents his or her purpose. *See Whalen v. McMullen*, 907 F.3d 1139, 1147 (9th Cir. 2018); *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990). Similarly, using a ruse to convince an individual to relinquish the privacy of his or her home by stepping outside violates the Fourth Amendment. *See Bosse*, 898 F.2d at 115; *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir.1980); *Ciampi v. City of Palo Alto*, 790 F. Supp. 2d 1077, 1096 (N.D. Cal. 2011).

44. The home's special protections under the Fourth Amendment also "exten[d] to outdoor areas traditionally known as 'curtilage'—areas that, like the inside of a house, 'harbor[ ] the intimate activity associated with the sanctity of a [person's] home and the privacies of life.'" *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (citing *United States v. Dunn*, 480 U.S. 294, 300 (1987)). These special protections apply to places like yards, porches, vestibules, private doorways and hallways, regardless of whether the home is a single-family home, an apartment, or other dwelling, so long as occupants have a reasonable expectation of privacy. *See, e.g.*, *United States v. Maxi*, 886 F.3d 1318, 1327 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 351 (2018); *United States v. Whitaker*, 820 F.3d 849, 853 (7th Cir. 2016).

45. As is true for the home itself, intrusions into the curtilage must be justified by a warrant or consent. A limited form of implied consent, known as the "knock and talk rule," permits officers to approach a home and knock on the door for the limited purpose of asking questions of or providing information to the occupant. *Jardines*, 569 U.S. at 7-9. The knock and talk exception does not permit officers to approach a home with the intent of effectuating a warrantless arrest. *United States v. Lundin*, 817 F.3d 1151, 1159-60 (9th Cir. 2016).

46. In addition to violating the Fourth Amendment, ICE's practices also violate ICE's own rules and regulations. DHS regulations prohibit ICE from entering a "residence including the curtilage of such residence . . . for the purpose of

questioning the occupants . . . concerning their right to be or remain in the United States" without a warrant or valid consent. 8 C.F.R. § 287.8(f)(2).

47. Further, ICE rules and regulations require ICE to notify another agency if officers intend to represent themselves as affiliated with such agency and seek the cover agency's permission to impersonate it.

48. ICE's actions, policies, and practices routinely violate DHS and ICE rules and regulations and, in turn, violate the Administrative Procedure Act ("APA"). *See United States ex. re. Accardi v. Shaughnessy*, 347 U.S. 260, 265-67 (1954).

## **Examples of ICE Misconduct**

49. The paragraphs that follow describe several examples of ICE officers' misconduct when conducting home arrests. These examples illustrate the officers' unlawful conduct in home arrest operations, and demonstrate the prevalence and consistency of ICE's illegal practices, as well as the harm they inflict on community members.

### ***Fictitious Police Investigations***

50. ICE officers pretending to investigate a fictitious crime often identify themselves as "detectives" or "police officers" and request individuals' assistance, only to place them under arrest after they have agreed to cooperate. Officers also unconstitutionally enter the curtilage with the intent to effectuate warrantless arrests.

a. **Osny Sorto-Vasquez Kidd.**

51. At the time of the incidents giving rise to this complaint, Osny Sorto-Vasquez Kidd lived in Hacienda Heights, California, with his mother and younger siblings. The apartment complex is gated and monitored by video surveillance to keep tenants safe and secure.

52. Early one morning in October 2018, the Individual Capacity Defendants waited outside the enclosed parking lot. When a tenant opened the gate and exited the parking lot in his or her vehicle, the Individual Capacity Defendants

quickly walked into the parking lot before the gate closed. They then walked from the parking lot to the Kidd family's apartment.

53. Mr. Kidd's mother answered the door. Upon information and belief, C.C. identified herself as a "detective" with the local police and said she was investigating a dangerous criminal who had been using the Kidd family's address. Mr. Kidd's mother was shocked and agreed to help the "detective" and ensure her family's safety. Once inside the home, the Individual Capacity Defendants went into every room of the apartment, banging on the doors and requesting the identification of Mr. Kidd's younger siblings, then-aged 11 to 16 years old.

54. After realizing Mr. Kidd was not home, the Individual Capacity Defendants asked his mother to call him. When Mr. Kidd answered, he could hear his siblings crying in the background, and his mother worriedly stated that the police told her there was a dangerous criminal "out to get" their family. Mr. Kidd then spoke with the "detective," who stated that she was with the police and needed to talk to him in person to help ensure his family's safety. The "detective" told Mr. Kidd that they had been tracking the criminal and that this person was extremely dangerous. Mr. Kidd agreed to meet the "detective" at a later date.

55. Two days later, the same "detective" called Mr. Kidd around 8 a.m., and insisted that he come outside of his home to speak to the officers. The "detective" asked that Mr. Kidd bring a form of identification with him. When Mr. Kidd exited the complex, there were multiple black SUVs parked outside of his apartment, and he was met by the Individual Capacity Defendants wearing tactical vests with the word "POLICE" on them. After the Individual Capacity Defendants checked Mr. Kidd's identification, they told him "don't cry," that his family was not at risk, and that they had invented the story to get to Mr. Kidd. The Individual Capacity Defendants then admitted that they were ICE officers, and were there to arrest Mr. Kidd for alleged immigration violations. Mr. Kidd informed the

Individual Capacity Defendants that he was a DACA recipient, but the officers told him that they would be stripping him of his status and deporting him immediately.

56. The Individual Capacity Defendants then handcuffed Mr. Kidd, and transported him to an ICE processing center in downtown Los Angeles. When Mr. Kidd was booked into custody, an ICE officer told Mr. Kidd that he had no rights and that he should give up and agree to be deported. Mr. Kidd refused. Mr. Kidd was later transferred to the Adelanto Detention Center.

57. Mr. Kidd remained at the Adelanto Detention Center for over two months until his release on December 17, 2018. At Adelanto, Mr. Kidd was subjected to harsh and inhumane conditions of confinement. He was harassed by guards and denied access to necessary medical treatment. In addition to being deprived of his physical liberty, Mr. Kidd was unable to provide any financial or emotional support to his family during his detention, who faced the threat of eviction from their home as a result of Mr. Kidd's lost income. Mr. Kidd and his family were deeply traumatized by his arrest and detention, and continue to suffer trauma today.

58. Defendants harmed Mr. Kidd by violating his constitutional rights; causing the loss of his physical liberty; causing emotional pain, suffering, trauma, worry, anxiety, humiliation, and embarrassment; and causing him lost employment and income.

b. **Jesus Maria Del Rio.**

59. Jesus Maria Del Rio and his wife, Antonia Del Rio, called the police in May 2017 to report the theft of their vehicle. Two weeks later, Mrs. Del Rio woke a little after 6 a.m. to loud knocking on the windows and door of their single family house in El Monte, California. Officers had driven up the Del Rio's private driveway and crossed through the fenced perimeter of their yard in order to approach their home. Mrs. Del Rio asked who was knocking and, when the officers

responded "police," she opened the door, thinking the officers were there about the stolen car.

60. When she opened the door, Mrs. Del Rio saw that around ten officers had entered the yard in front of her home. They were armed, and wearing vests that said "POLICE." The officers asked if Mr. Del Rio was home and stated they had a warrant for his arrest. Mrs. Del Rio told them that he had left for work and asked what he was being arrested for. The officers stated they could not tell her, and never showed Mrs. Del Rio a warrant. She asked if the officers were investigating the stolen car, but they refused to tell her.

61. The officers demanded that Mrs. Del Rio call Mr. Del Rio, and she complied. Mrs. Del Rio told her husband over the phone that the police were at their home with a warrant for his arrest and that an officer wanted to speak to him. Mrs. Del Rio handed the phone to an ICE officer, who identified himself to Mr. Del Rio as a police officer. The officer insisted that he needed to speak to Mr. Del Rio in person and requested that he come home. Mr. Del Rio said that he could be there in an hour. The officer left a phone number with Mrs. Del Rio and Mr. Del Rio began his drive home from work.

62. When Mr. Del Rio arrived at his house, he and his wife gathered the documents they had relating to the stolen car. They then called the officer, who stated he would be at the house in 15 minutes. The officer also instructed Mr. Del Rio to come out onto the main street to wait for him. Mr. Del Rio and Mrs. Del Rio complied and stood on the street waiting for the officers. Soon, several cars arrived: one vehicle was marked "POLICE" and the remaining vehicles were unmarked. Approximately five officers exited the vehicles and approached Mr. Del Rio. One of the officers showed Mr. Del Rio a picture of himself and asked him to confirm that he was Jesus Maria Del Rio. Mr. Del Rio confirmed that was him and showed the officer his driver's license.

63. Mrs. Del Rio asked the officer what this was about, to which he replied that it had to do with a 1992 domestic violence incident. The officer stated that the judge just wanted to see Mr. Del Rio and that he would be back within two hours. The officer asked Mr. Del Rio to remove anything he had in his pockets and then handcuffed him. Mr. Del Rio was taken to a detention facility for processing. Only then was Mr. Del Rio informed that he had been arrested by ICE officers. He was not going home after all.

c. **Xaviera Alyssa Lazo.**

64. Xaviera Alyssa Lazo is a prior recipient of DACA and is married to a U.S. citizen. She lives in an apartment in Los Angeles County. In August of 2018, at around 8:30 a.m., three officers knocked on her apartment door. To reach the front door, officers entered the apartment building from the main road, and then climbed a flight of stairs to the left of the building's entrance. When Ms. Lazo opened the door, she saw two men and one woman wearing vests that said "POLICE."

65. The officers identified themselves as the police and asked if they could enter her apartment. When Ms. Lazo asked why the officers were there, they stated that there was an issue with her car, which Ms. Lazo had recently registered. At the officers' request, Ms. Lazo stepped outside to walk with the officers to her car, where she kept her registration. As soon as she was outside of the apartment, the officers told her that they were actually with ICE and were arresting her for overstaying her visa.

66. Ms. Lazo was shocked to hear this and started to retreat into her home, stating that she was in the process of applying for legal status. She offered to show the ICE officers her paperwork, but they refused to let her do so. As Ms. Lazo stood on the threshold of her doorway, the officers grabbed her and handcuffed her. They told her that they were taking her to downtown Los Angeles to be processed. After the officers placed her in a van, Ms. Lazo expressed her shock that she was handcuffed. The officer responded, "Well, you know you're illegal."

d. **Cruz Manuel Reyes Maldonado.**

67. At about 6 a.m. one morning in January 2019, Cruz Manuel Reyes Maldonado was at his home in Downey when he heard knocking on his door and voices saying "police." He opened the door to find three officers; two wore vests that said "POLICE," and the third wore a grey jacket with no identifying insignia visible. The officers asked Mr. Maldonado for his identification and he complied.

68. After confirming Mr. Maldonado's full name, the officers asked him to step outside. Mr. Maldonado thought he was being questioned by the police, so he complied and stepped outside of his apartment. At that point, the officers immediately turned Mr. Maldonado to face the wall and told him to put his hands up. Only then did they identify themselves as ICE officers and state that they were there to arrest him. Officers handcuffed him, placed him an unmarked truck, and transported him to the Adelanto Detention Center, where he was subsequently detained.

e. **Carlos Ortiz Becerra.**

69. One morning in February 2017, ICE officers arrived at Carlos Ortiz Becerra's home in Pasadena at around 5:30 a.m. The officers identified themselves as police and said they were looking for someone named "Rodrigo." Mr. Ortiz Becerra's daughter, who was then 19 years old, opened the door and told the officers that no "Rodrigo" lived at the house. The officers informed her that they needed to verify that Rodrigo was not present. She let them in because the officers claimed to be police and she thought she should help them.

70. Mr. Ortiz Becerra's daughter woke her parents and brother and the officers demanded that everyone provide their identification. After Mr. Ortiz Becerra provided his identification, the officers arrested him and took him out to their car. Mr. Ortiz Becerra and his daughter did not know why he was being arrested. They learned that the officers were immigration officers only when the officers provided their business cards after Mr. Ortiz Becerra's arrest. Mr. Ortiz

Becerra was first taken to an immigration detention center in Los Angeles, and then to Adelanto.

***Probation Ruses***

71. In other instances, ICE officers have represented themselves as probation officers. Individuals on probation typically have no choice but to comply with officers' requests because the terms of their probation require them to permit probation officers to access their homes and persons. Once ICE officers have gained entry into the home or have lured an individual outside, they reveal their true identities as immigration officers. Officers pretending to be probation also unconstitutionally enter curtilage around individuals' homes with the intent to effectuate warrantless arrests.

a. **Diana Rubick Rodriguez.**

72. In 2017, Diana Rubick Rodriguez was living in Santa Ana with her five-year-old son. She rented a room in a house with several other housemates. Her bedroom was her own. The house also had a back stairway that led directly from the kitchen into a fenced backyard that was not visible from the street.

73. Ms. Rodriguez was on probation following a January 2017 conviction and she had just met with her probation officer. During this meeting she was asked to provide her DNA and was told there would be a home inspection the following day.

74. The following morning, Ms. Rodriguez was getting ready for work when she heard the daughter of the owner of the house asking "who has probation?" followed by a knock on her private bedroom door. Ms. Rodriguez's girlfriend opened the door and saw an officer wearing a vest marked "SHERIFF." The officer asked who was in the room and stated that he was looking for Diana. Ms. Rodriguez stated that she was Diana, and that her girlfriend and son were also in the room.

75. The officer asked Ms. Rodriguez to step out of the room so that he could ask her some questions. Ms. Rodriguez assumed this was about her probation

because her probation officers had told her that she was going to have a home visit on this day. Wishing to cooperate with the man she thought was a probation officer, she stepped out of her bedroom.

76. Once she was in the kitchen, Ms. Rodriguez saw several additional officers. The officers stated that they were with probation and that they had a warrant for her arrest. When she asked what the warrant was for, the officers just said "probation." The officers then asked Ms. Rodriguez to step outside of the house.

77. Ms. Rodriguez and the officers exited the house through the back stairway into the fenced backyard. The officers told Ms. Rodriguez to sit on the back steps. Despite the cold weather, the officers refused to allow her back inside to get her personal belongings or her inhaler. Ms. Rodriguez's girlfriend brought her a sweater, socks, shoes, and a bra. When Ms. Rodriguez asked for privacy so that she could change, the officers simply laughed.

78. The officers then asked Ms. Rodriguez her name, if she had committed a crime, and why she was on probation. They also asked for her identification. The officers subsequently stated that they had additional questions and asked if Ms. Rodriguez could leave her five-year-old son with the women at the house. Ms. Rodriguez was not comfortable leaving her son because she had recently moved in and did not know the other tenants very well. Because the officers told her that she would be gone only for an hour, Ms. Rodriguez agreed to leave her son with her girlfriend.

79. The officers then handcuffed Ms. Rodriguez and brought her to a grey, unmarked SUV. Once in the car, one of the officers said "you know why we're really here." Ms. Rodriguez was confused and said she did not understand. The officers stated it was because she did not have "papers." Ms. Rodriguez was still not sure what the officers meant because they had never identified themselves as ICE, and she believed she was speaking with probation officers. It was not until Ms.

Rodriguez arrived at ICE's offices and was booked into custody that she was informed that she had been arrested by ICE.

80. Despite the officers' representations that she would be gone for only an hour, Ms. Rodriguez was instead held in detention and was not able to return home until she was released on bond by an immigration judge more than a month later.

b. **Jose Urbano Vasquez.**

81. In April 2019, Jose Urbano Vasquez was on probation and lived with his sister, brother-in-law, and his three nephews in Pomona, California. Early one morning, his sister opened the door for two officers who identified themselves as probation officers. They requested that she bring Mr. Urbano Vasquez to the front door. Mr. Urbano Vasquez was sleeping on the back patio when his sister woke him up. Under the assumption that the probation officers were conducting a routine home visit, Mr. Urbano Vasquez went inside the house to retrieve his ID, and then went to the front of the house. The officers were standing on one of the two covered stairways that flank the standalone house's patio and lead to the front door. The officers were wearing vests that said "POLICE." To reach the patio and stairs, the officers entered a front yard enclosed by a fence. The Urbano family always kept the fence closed.

82. The officers asked Mr. Urbano Vasquez for his ID, which he provided. Then, without stating why, one of the officers placed Mr. Urbano Vasquez under arrest. While Mr. Urbano Vasquez was being handcuffed, the second officer stated in Spanish that they were from ICE. It was only then that Mr. Urbano Vasquez realized the officers were immigration officers. He was placed in an unmarked SUV, processed for ICE detention in Los Angeles, and then transferred to Adelanto, where he remained until November 2019, when an immigration judge ordered his release on bond.

c. **Eduardo Rojas.**

83. In September 2018, Eduardo Rojas was on probation and lived with his brothers in East Los Angeles. Mr. Rojas' standalone home had a front yard enclosed by a four-foot tall fence with a gate.

84. One morning around 5 or 6 a.m., there was a knock on the door and voices shouted "we are probation officers looking for Eduardo!" Based on his understanding that probation officers could conduct home visits at any time, and wanting to comply with the officers' request, Mr. Rojas opened the door. Standing on his doorstep were several officers with weapons drawn. The officers asked him to step outside. Once he had merely one foot outside the door, officers placed restraints on his feet and wrists and arrested him. At that point he learned they were from immigration.

85. After arresting Mr. Rojas, the officers demanded that Mr. Rojas's two brothers come outside and provide the officers with their IDs. The officers placed both of his brothers in handcuffs while they conducted a background check. The officers eventually removed the handcuffs from his brothers and let them go. Without a warrant or consent, several officers then rushed into the house with weapons drawn to search for other individuals, but did not find anyone.

86. The officers placed Mr. Rojas into an unmarked car that was parked on the street. They then removed their "POLICE" vests and revealed the ICE emblem on the shirts underneath.

d. **Octavio Rocha Garcia.**

87. In September 2018, Octavio Rocha Garcia was living in an apartment in Los Angeles with his girlfriend of ten years and their then-eight-year-old son. One morning around 7:00 a.m., his girlfriend heard someone aggressively knock on their door and yell "police department!" Mr. Garcia's girlfriend opened the door.

88. From upstairs, Mr. Garcia could hear the officers state they were there to check in on Mr. Garcia to ensure that he was complying with the terms of his

probation. Mr. Garcia went downstairs because he knew that refusing to do so would be a violation of his probation.

89. As Mr. Garcia came down the stairs, three of the five officers, who wore "POLICE" vests and told him they were with probation, rushed through the door into his apartment without consent or showing a warrant, one with a gun drawn. One of the officers grabbed Mr. Garcia's arm and pulled him outside, where he was then placed under arrest. Once handcuffed, the officers asked Mr. Garcia for proof of his legal status. It was only at this point that Mr. Garcia realized they were ICE officers. Mr. Garcia was arrested and taken to Adelanto, leaving his girlfriend alone with their son.

e. **Sigifredo Zendejas Lopez.**

90. Sigifredo Zendejas Lopez is a resident of Anaheim who was arrested at the apartment he was living in with his girlfriend and their young son. One morning in October 2019, at around 8 a.m., he awoke to knocking at his door. Through the curtain, Mr. Zendejas Lopez's girlfriend saw two men standing at the door. One of them was wearing green clothing and the other was wearing black clothing with blue pants; both were wearing vests. Believing that the men were sheriffs, Mr. Zendejas Lopez's girlfriend opened the door. The men told her that they were from probation and that they were checking on Mr. Zendejas Lopez in connection with an incident from several months prior where the police were called to their home. The officers asked Mr. Zendejas Lopez's girlfriend to get him to come to the door and to tell him that probation was here for him.

91. When Mr. Zendejas Lopez came to the door, the officers asked if he was Mr. Zendejas Lopez, and he replied yes. The officers then told him to go outside, but did not tell him why. Mr. Zendejas Lopez went outside because he thought the men were with local law enforcement and that he had to obey them. He was wearing the clothes he had been sleeping in and no shoes.

92. After Mr. Zendejas Lopez stepped outside, one of the officers handcuffed him and took him toward an unmarked black SUV. The officer did not tell Mr. Zendejas Lopez why he was arresting him. The officer asked Mr. Zendejas Lopez if he wanted to talk about an incident he had with his girlfriend. Mr. Zendejas Lopez agreed to do so, but the officer did not ask him any follow up questions. The officer did not allow Mr. Zendejas Lopez to go back to the apartment to get his shoes or to get his girlfriend's phone number, which Mr. Zendejas Lopez did not know by heart. Instead, the officer put Mr. Zendejas Lopez in the back of the SUV. Only then did the officer tell Mr. Zendejas Lopez that he was with ICE. The officer opened his vest and Mr. Zendejas Lopez saw for the first time the word "ICE" on the officer's chest.

**ICE's Home Arrest Practices Exploit Community Policing Policies and Undermine Public Safety**

93. ICE's use of ruses exploits, and at the same time undermines, state and local policies that seek to further public safety.

94. In recent years, state and local governments throughout the nation have adopted policies that limit local law enforcement agencies' involvement in civil immigration enforcement. For example, in 2017, California adopted the "California Values Act," which "limits law enforcement's 'discretion to cooperate with immigration authorities.'" *United States v. California*, 921 F.3d 865, 876 (9th Cir. 2019) (quoting Cal. Gov't Code § 7282.5(a)). The California Legislature found that "[a] relationship of trust between California's immigrant community and state and local agencies is central to the public safety of the people of California." Cal. Gov't Code § 7284.2(b). "This trust is threatened when state and local agencies are entangled with federal immigration enforcement, with the result that immigrant community members fear approaching police when they are victims of, and witnesses to, crimes, seeking basic health services, or attending school, to the detriment of public safety and the well-being of all Californians." *Id.* at 7284.2(c).

95. Many local governments in Southern California have adopted similar measures. For example, in 1979, Los Angeles adopted Special Order 40, which prohibits Los Angeles Police Department officers from questioning community members about their immigration status.[27] In subsequent decades, Los Angeles has adopted additional measures to disentangle local policing from immigration enforcement, which are "rooted in the principle that all of Los Angeles is safer when the Police Department maintains a relationship of trust, respect and cooperation with all city residents."[28] The City of Santa Ana has also adopted a robust sanctuary policy separating its local police from the business of federal immigration enforcement,[29] as have other Southern California communities.[30]

96. Congress has also passed legislation with the clear intent that immigrant community members be able to contact the police without fear that it will lead to negative immigration consequences. In the Violence Against Women Act and its subsequent reauthorizations, Congress created a series of visas for undocumented individuals who cooperate with law enforcement in the investigation and prosecution of certain crimes. *See* 8 U.S.C. §§ 1154(a)(1)(A)(iii), (B)(ii)(I) (visa for immigrant victims of domestic violence); 8 U.S.C. § 1101(a)(15)(T)(i)(I) (T-visa

---

[27] Doug Smith, *How LAPD's law-and-order chief revolutionized the way cops treat illegal immigration*, L.A. Times (February 5, 2017), https://www.latimes.com/local/lanow/la-me-ln-special-order-40-retrospective-20170205-story.html.

[28] Executive Order No. 20 Standing with Immigrants: A City of Safety, Refuge, and Opportunity for All, City of Los Angeles, Mayor Eric Garcetti (March 21, 2017), https://www.lamayor.org/sites/g/files/wph446/f/page/file/Exec.%20Dir.%20No.%2020--Standing%20with%20Immigrants.pdf.

[29] Jessica Kwong, Santa Ana's status as sanctuary city made official, O.C. Register (Jan. 19, 2017), https://www.ocregister.com/2017/01/19/santa-anas-status-as-sanctuary-city-made-official/.

[30] *E.g.*, Pasadena, Cal., Police Dep't Policy Manual §§ 428.4, 428.6 (2019), https://www.cityofpasadena.net/police/wpcontent/uploads/sites/28/Pasadena-Police-Department-Policy-Manual.pdf.

for immigrant victims of human trafficking); 8 U.S.C. § 1101(a)(15)(U)(i)(I) (U-visa for immigrant victims of serious crimes). Congress found that providing protections to immigrant survivors "frees them to cooperate with law enforcement and prosecutors in criminal cases." Victims of Trafficking and Violence Prevention Act of 2000, Pub. L. No. 106–386, § 1502(a)(2), 114 Stat. 1464, 1518.

97. ICE's impersonation of police and probation officers exploits the trust that these policies seek to build with members of immigrant communities. Many individuals who have been subjected to ICE ruses have expressed anger and betrayal upon learning the officers' true identifies, and report that they and their family members now feel wary of uniformed officers. Young children who were present during ruse arrests now become upset and cry when they see a uniformed police officer.

98. For these reasons and others, state and local governments have objected to ICE's practice of posing as police officers. In 2017, the California Legislature passed a law making clear that ICE does not qualify as a "peace officer" under California law. The Legislature explained that ICE's deceptive "tactics undermine the trust and faith California's local law enforcement works to develop with local communities every day to provide for the public's safety."[31] Additionally, in February 2017, Los Angeles Mayor Eric Garcetti, City Attorney Mike Feuer and Los Angeles City Council President Herb Wesson sent a joint letter to federal authorities urging ICE to cease impersonating police because it "undermines decades of work" by the Los Angeles Police Department to establish better relationships with the community and "erodes public safety."[32]

---

[31] Assemb. B.11401(c), 2017-2018 Reg. Sess. (Cal. 2017), https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180AB1440.

[32] Doug Smith, *Los Angeles officials urge ICE agents to stop identifying themselves as police*, L.A. Times (February 23, 2017), https://www.latimes.com/local/lanow/la-

99. ICE is aware that its misrepresentation of local law enforcement agencies can damage those agencies' public safety missions. ICE's 2005 memo concerning ruses acknowledges that the tactic can threaten the "public image" of the agencies it impersonates.[33] ICE has also recognized that ruses involving health and safety agencies could "impede the functions of those organizations by creating a perception that [those] organizations are acting as an enforcement tool of ICE."[34] The same holds true of ICE impersonating local law enforcement—such a practice can make local officers' jobs more difficult by making community members less likely to open their doors to the police.

100. ICE's impersonation of probation officers is problematic for an additional reason. Many defendants *must* agree to routine searches and diminished Fourth Amendment rights as a condition of their probation. *See United States v. Knights*, 534 U.S. 112, 114-16 (2001) (observing that it is a "common California probation condition" for the defendant to submit his "person, property, place of

---

me-ln-la-officials-protest-ice-tactics-20170223-story.html; *see also* Alex Emslie, *S.F. Police Commissioners Want ICE Agents to Stop 'Impersonating' Police*, KQED News (January 18, 2018), https://www.kqed.org/news/11642905/s-f-police-commissioners-want-ice-agents-to-stop-impersonating-police (San Francisco Police Commissioner Petra DeJesus publicly called on ICE officers to "stop…wearing jackets that say 'Police' and… representing themselves as local law enforcement," because "[t]hose tactics and attire can hinder local policing."); Hartford Mayor, Police Chief Say Immigration Agents Posted as Police, NBC Connecticut (March 20, 2017, 2:51PM), https://www.nbcconnecticut.com/news/local/Hartford-Mayor-Police-Chief-Condemn-Immigration-Agents-Posing-as-Police-416640183.html (Hartford, Connecticut Police Chief observed that "it is misleading when ICE agents identify themselves as police and can damage the relationship that local officers have with the community").

[33] Torres, *supra* note 24.

[34] Memorandum from Mary Forman, Director, Office of Investigations, and John Torres, Acting Director Detention & Removal Operations, U.S. Immigration and Customs Enforcement, on the Use of Ruses in ICE Enforcement Operations (August 22, 2006), https://www.immigrantdefenseproject.org/raids-foia/.

residence, vehicle, personal effects, to search at any time, with or without a search warrant, warrant of arrest or reasonable cause"). Individuals subject to probation reasonably believe they have no choice but to open the door and let officers in when they come knocking.

101. Despite objections by state and local officials, ICE has continued to engage in ruses. In fact, ICE has cynically defended its reliance on deceptive practices as a response to California's sanctuary laws.[35]

**Impact on the Immigrant Community and Plaintiffs' Response**

a. *Plaintiff Inland Coalition for Immigrant Justice*

102. Plaintiff ICIJ is an umbrella organization comprised of approximately 45 diverse organizations serving the immigrant community in the Inland Empire. Its fiscal sponsor is Inland Congregations United for Change, Inc.

103. The mission of ICIJ is to empower members of the immigrant community, collectively advocate to improve their lives, and work toward a more just immigration system. Participating organizations range from grassroots groups to faith-based organizations, policy advocacy organizations, direct service providers, worker centers, and labor unions.

104. To fulfill its mission, ICIJ, among other things, engages in policy advocacy, community education and organizing, and fundraising for the needs of immigrant community members. To build regional capacity, ICIJ also engages in training, technical assistance, leadership development and other activities. ICIJ has its own staff who support the work of the coalition.

105. In response to a wave of Border Patrol raids in 2008-2009, ICIJ created an Emergency Response Network, which provides support to individuals and families affected by Border Patrol or ICE operations. The Emergency Response Network also helps to document immigration enforcement practices, mobilize other

[35] Mejia, *supra* note 2.

community resources in the region as needed, and publicize the impact of immigration enforcement practices on the community.

106. ICE's home arrest practices, including its use of ruses, have frustrated ICIJ's mission by sowing fear and distrust in the immigrant community. Much of the organization's policy advocacy, civic participation, and empowerment work depends on individuals turning out to ICIJ's meetings and events. But members of the immigrant community in the Inland Empire have expressed to ICIJ staff in recent years that they would prefer to limit their public engagement for fear that ICE may target them or an undocumented family member living at their home for arrest. ICE's illegal home arrest tactics are particularly terrifying for community members because they cannot even be safe at home—they understand ICE may not respect their constitutional rights, and indeed, they may not even know it is ICE at the door. This has made it harder for ICIJ to do its work and further its mission of advancing immigrant justice.

107. In addition, ICIJ has spent a great deal of time advocating for sanctuary policies and gathering and disseminating information about the degree to which local law enforcement agencies in the region are involved in federal immigration enforcement. ICIJ considers it a priority that community members know which local agencies they can and cannot trust. ICE's ruse practices undermine ICIJ's efforts on this front by making community members suspicious of local police, even in jurisdictions that have sanctuary policies, because ICE may be posing as the police.

108. To respond to and counteract the harm of ICE home arrest practices, ICIJ has been forced to divert scarce human and financial resources away from other critical programmatic needs.

109. For example, ICIJ's Deportation Defense Coordinator is responsible for helping to coordinate and strengthen the Emergency Response Network, build regional legal response capacity, and support individual families affected by immigration enforcement. She is also tasked with supporting the work of ICIJ's

Immigrant Detention Coordinator to advocate for better conditions at the Adelanto Detention Center.

110. In recent years, however, ICIJ's Deportation Defense Coordinator has had to spend significant time conducting intake with community members affected by ICE home arrests; documenting their stories; trying to place their cases with attorneys; helping to identify sponsors and secure bond; and providing other humanitarian support. She has also had to spend time responding to questions and concerns raised by community members and adding material on home arrests and ICE deception to Know-Your-Rights ("KYR") presentations. Even though responding to ICE arrests is supposed to be only one part of her job, she estimates that at times she has had to spend over 50% of her time responding to ICE home arrests, including ruse arrests.

111. Because ICIJ's Deportation Defense Coordinator has been forced to spend so much time responding to ICE home arrests, she has been unable to follow through on her plans to obtain Board of Immigration Appeals ("BIA") accreditation or otherwise expand immigration legal services capacity in the region. As a result, individuals affected by other forms of immigration enforcement, such as Border Patrol activity or local jail transfers, have received less assistance.

112. Additionally, because she has been forced to spend so much time responding to ICE home arrests, ICIJ's Deportation Defense Coordinator has had to decline assistance on all but a few cases of individuals subject to inhumane treatment at the Adelanto Detention Center.

113. ICIJ also has an Immigrant Justice Fellow whose position was intended to be primarily devoted to supporting the Emergency Response Network and recruiting and training volunteers. He too has had to spend significant time, sometimes up to a third or half of his total time, assisting the Deportation Defense Coordinator with responding to ICE home arrests. As a result, ICIJ has had difficulty meeting its goals for growing the Emergency Response Network.

114. To counteract the fear generated by ICE home arrests, including ruse arrests, ICIJ must now spend more of its time during KYR presentations discussing these topics; now at least half of KYR presentations are devoted to ICE home arrests and deception. This has resulted in ICIJ spending less time speaking with community members about other topics critical to its mission, such as forms of immigration relief.

115. Additionally, resources for immigrants seeking to be released from detention have been depleted because ICIJ has had to respond to cases involving ICE homes arrests, including those involving ruses. Approximately 75% of ICIJ's bond fund has gone toward assisting individuals with an ICE home arrest case, and nearly all of ICIJ's Immigrant Justice Fund, set up to fund representation of individuals in their bond/custody hearings, has gone toward such cases. Furthermore, ICIJ has been less able to secure legal representation for other community members with worthy cases because it has had to make so many referrals for home arrest and ruse cases. ICIJ's use of its scarce financial resources and referral contacts to assist victims of home arrests, including ruses, has left it unable to provide sufficient assistance to other immigrants in the region.

116. Absent intervention by this Court, ICIJ will continue to be harmed by ICE's home arrest practices. It will continue to face a reduced ability to engage in policy advocacy directly related to its mission and respond to other threats to the well-being of the immigrant community. ICIJ will also continue to face a significant reduction in its capacity to advance organizational priorities such as operating and expanding the Emergency Response Network and addressing substandard conditions at the Adelanto Detention Facility.

117. In addition to the harm that ICIJ faces as an organization, volunteer members of ICIJ's Emergency Response Network stand to be harmed by ICE's home arrest practices, including the use of ruses, absent an injunction from the Court.

118. ICIJ's Emergency Response Network is staffed by volunteer members who help operate the Network, direct the Network's strategies, and serve in leadership roles. Volunteers perform a variety of tasks, from holding community preparedness workshops to coordinating fundraisers and humanitarian support for families affected by immigration enforcement. Volunteers also often donate their own money to buy food or supplies for Network meetings and events.

119. A sizable percentage of the Emergency Response Network's volunteer members are undocumented. Others are U.S. citizens or persons who have lawful immigration status, but live in the same household as someone who is undocumented. These volunteers face an imminent risk of ICE coming to their home to conduct an illegal ICE home arrest or ruse. Some of the Emergency Response Network's active volunteers have even expressed a desire to step back from their work with the Network due to fear of being targeted in an ICE home arrest.

120. ICIJ brings this suit on behalf of itself and on behalf of volunteer members of its Emergency Response Network who face a likelihood of future injury due to ICE home arrest practices, including the use of ruses. Because ICIJ seeks only declaratory and injunctive relief, individual participation by its volunteers is not necessary. Given the climate of fear ICE's practices have created, it is not likely that any of ICIJ's volunteers who face a risk of future injury would come forward to assert their rights individually in any event.

121. ICIJ's pursuit of this litigation is pertinent to the organization's mission of advocating for immigrants' rights. ICIJ has no relevant conflicts of interest with its volunteers.

b. *Plaintiff Coalition for Humane Immigrant Rights*

122. CHIRLA is a nonprofit organization formed in 1986 with a mission to create a more just society fully inclusive of immigrants and to advance the civil and human rights of immigrants and refugees. It has offices throughout California and a policy office in Washington, D.C.

123. To carry out its mission, CHIRLA operates a variety of programs ranging from the provision of legal services (including removal defense, DACA renewals, U and T visas, and naturalization assistance) to civic engagement, community education, community organizing, policy advocacy, and leadership development in immigrant communities. CHIRLA is also a founding member of the Los Angeles Raids Rapid Response Network, a network formed in 2007 to respond to worksite immigration raids and ICE enforcement activities.

124. CHIRLA is also a membership organization. It currently has approximately 13,000 members in communities across California, the majority of whom reside in the greater Los Angeles Area, including the Inland Empire. CHIRLA's membership includes U.S. citizens, noncitizens, DACA recipients, and members of mixed-status families.

125. Some of CHIRLA's members pay dues to the organization, and those dues help to fund the organization's operations. Other CHIRLA members have become members by virtue of their participation in the organization's meetings, programs, and policy campaigns.

126. CHIRLA's members regularly meet with each other in regional committees. Committee meetings can range from a small handful of people to hundreds. In addition, CHIRLA's student members hold regional statewide conference calls and meetings throughout the year. During these meetings, CHIRLA's members plan local advocacy campaigns, share information, and discuss issues that affect them, their families, and their local communities. Information from these meetings is reported to CHIRLA's leadership and used to guide CHIRLA's programmatic agenda.

127. CHIRLA also holds quarterly membership retreats at which core leaders discuss issues they are seeing in their communities and set priorities for the organization.

128. Finally, CHIRLA members volunteer their time at events put on by the organization. They help with set up and clean up, especially at large events.

129. ICE home arrest practices, including its practice of using ruses, have negatively affected CHIRLA's mission and work in several ways.

130. First, CHIRLA has been very active in efforts to strengthen laws and policies that disentangle local law enforcement from federal immigration enforcement in Southern California and statewide. It has done so with a goal of empowering members of the immigrant community to feel more comfortable interacting with police and other local government officials. ICE's home arrest practices undermine CHIRLA's work in this area by taking advantage of community members' willingness to trust their local officials; they also make it more difficult to build such trust in the future. This frustrates CHIRLA's mission because community members are consequently less willing to access the services and benefits they need to thrive.

131. Additionally, as noted above, ICE's home arrest practices, including the use of ruses, have contributed to a climate of fear in the community. This has discouraged some community members from participating in CHIRLA events or sharing their personal stories as part of policy campaigns, which in turn undermines CHIRLA's goal of developing leaders and building power in the community. In CHIRLA's experience, ICE home arrests have been even more disruptive than some other types of immigration enforcement because they attack the sanctity of the home, where community members' families and children live.

132. As a result of ICE's illegal practices, CHIRLA has been compelled to spend significant time responding to the community's needs, investigating ICE activity, conducting intakes with individuals, locating loved ones, providing legal representation, giving impromptu or planned KYR presentations, helping to raise funds for urgent humanitarian needs, developing new resources and materials, and responding to community inquiries and concerns. These activities are conducted by

staff in nearly all departments, including Policy, Organizing, Community Education, and Legal Services, even though they are often not a part of those staff members' formal job responsibilities.

133. As a result of this expenditure of staff time and resources, CHIRLA has not been able to devote as much time to other important activities of the organization. Staff members report that each time they receive a report of an ICE home arrest, they must put down what they are doing. They end up triaging their other cases and projects, and in some cases, are unable to keep up with their work plans. For example, one member of CHIRLA's External Affairs Department who serves as the Los Angeles Rapid Response Network Coordinator reports that, because she has been so busy responding to ICE home arrests, she has been unable to devote sufficient time building relationships with other rapid response networks and elected officials, or participating in coalitions focused on longer-term advocacy work. The Community Education team, which is responsible for staffing the CHIRLA hotline, has sometimes even had to pull staff from other departments to answer hotline calls about ICE activity, including home arrests. CHIRLA's hotline currently fields almost 20,000 calls a year.

134. Finally, staff members report that the issue of ICE home arrests, including the use of ruses, is now taking up a great deal of time in its KYR and community education workshops. As a result, there has been less time to cover other important topics at the core of CHIRLA's mission, such as immigrant eligibility for benefits.

135. Absent an injunction, CHIRLA will continue to be harmed by ICE's tactics.

136. In addition to the harm that CHIRLA faces as an organization, CHIRLA's members have been and will continue to be harmed as a result of ICE's home arrest practices.

137. Because a significant percentage of CHIRLA's members are undocumented or live in the same household as a family member or loved one who is undocumented, CHIRLA members face an imminent risk of ICE conducting an illegal search or arrest in or near their home. Some CHIRLA members have already been arrested in unconstitutional home arrests conducted by ICE or had family members unconstitutionally arrested.

138. CHIRLA brings this suit on behalf of itself and its members who face a likelihood of future injury due to ICE home arrest practices, including the use of ruses. Because CHIRLA seeks only declaratory and injunctive relief, individual participation by its members is not necessary.

139. CHIRLA's pursuit of this litigation is pertinent to the organization's mission of advocating for the civil and human rights of immigrants. CHIRLA has no relevant conflicts of interest with its members.

## CLASS ACTION ALLEGATIONS

140. The Organizational Plaintiffs bring this action on behalf of themselves and their members and volunteers. In addition, they bring this action under Federal Rules of Civil Procedure 23(a) and (b)(2), on behalf of a class of persons similarly situated to their members and volunteers. The class, as proposed by the Organizational Plaintiffs, is defined as follows:

a. All individuals residing at a home in Southern California[36] where ICE has or will conduct a warrantless arrest at the home or in the immediate vicinity thereof.

141. *Numerosity*. The proposed class meets the numerosity requirements of Rule 23(a)(1) because it consists of a large number of similarly situated individuals located within Southern California, such that joinder of all members of the class is

---

[36] This includes the counties of Los Angeles, Orange, Riverside, San Bernardino, Ventura, Santa Barbara and San Luis Obispo.

impracticable. Although the number of individuals who have been or will be subject to ICE's unconstitutional ruse arrests and warrantless home intrusions is not known with precision, on information and belief, class members number in the hundreds, if not thousands. In FY 2018 alone, ICE made 5,671 community arrests in the geographical area covered by the Los Angeles Field Office, an average of 710 arrests per month.[37]

142. Joinder is also impractical because the proposed class includes individuals who will be subjected to ICE's unconstitutional enforcement practices in the future and therefore cannot be joined.

143. *Common Questions of Law and Fact*. The proposed class meets the commonality requirements of Rule 23(a)(3) because all the proposed class members have been or will be subjected to the same unconstitutional practices. Thus, there are numerous questions of law and fact common to the proposed class, which predominate over any individual questions, including:

a. whether ICE officers may permissibly encroach on class members' private property without a warrant or consent with the intent to effectuate warrantless arrests;

b. whether ICE officers may permissibly gain entry into class members' homes or persuade class members to leave the privacy of their homes by misrepresenting themselves as government agents with a different identity and/or purpose;

c. whether ICE has a policy, practice or custom of permitting officers to encroach on class members' curtilage and other private property without a warrant or other consent with the intent to effectuate warrantless arrests; and

[37] TRAC Immigration, *supra* note 6.

d. whether ICE has a policy, practice or custom of permitting officers to misrepresent their identity and purpose to gain access to class members or entry into their homes.

144. *Typicality*. The proposed class meets the typicality requirements of Rule 23(a)(3) because the Organizational Plaintiffs' claims are typical of those of the class as a whole with respect to the legality of ICE's policies, practices, and conduct at issue here.

145. *Propriety of Class Action Mechanism*. The prosecution of individual actions against Defendants by individual members of the proposed class would be inefficient and create a risk of inconsistent and varying adjudications.

146. *Adequacy of Class Representation*. The adequacy requirements of 23(a)(4) are met. The Organizational Plaintiffs know of no conflict between their interests and those of the proposed class and, in fact, seek relief identical to the relief sought by all class members.

147. *Adequacy of Counsel for the Class*. The Organizational Plaintiffs are represented by counsel with deep knowledge of immigration law and extensive experience litigating class actions and complex federal cases. Counsel have the requisite level of expertise to adequately prosecute this case on behalf of Plaintiffs and the proposed class.

148. Finally, the proposed class satisfies Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the class, thereby making equitable relief appropriate with respect to the class as a whole.

## CAUSES OF ACTION

## Count One

***Violation of the Fourth Amendment to the United States Constitution***

***(Against Defendants Wolf, Albence, Marin, and Macias by Organizational Plaintiffs ICIJ and CHIRLA)***

149. The Organizational Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

150. The Fourth Amendment to the U.S. Constitution provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV.

151. Defendants have a policy and practice of misrepresenting themselves as government agents with a different identity and/or purpose in order to persuade community members to allow Defendants into their homes, or to lure community members out of their homes, to conduct warrantless immigration arrests.

152. Defendants have a policy and practice of entering community members' homes and surrounding curtilage without a judicial warrant or permission, and with the intent to conduct warrantless immigration arrests.

153. Defendants' actions, policies, and practices violate the Fourth Amendment.

154. The Organizational Plaintiffs have suffered injury resulting from Defendants' Fourth Amendment violations. The Organizational Plaintiffs have suffered harm to their missions and been forced to divert scarce resources away from their other work to respond to Defendants' actions. In addition, individual members of the Organizational Plaintiffs and others similarly situated are at imminent risk of being subjected to unconstitutional arrests and encroachments on their home.

155. The Organizational Plaintiffs have no adequate remedy at law.

**Count Two**

***Violation of the Administrative Procedure Act (Regulatory)***

***(Against Defendants Wolf, Albence, Marin and Macias by Organizational Plaintiffs ICIJ and CHIRLA)***

156. The Organizational Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

157. The APA permits persons and organizations to challenge final agency actions in the federal courts. 5 U.S.C. §§ 702, 704, 706. Final agency action can be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)–(B).

158. DHS regulations prohibits ICE officers from entering a "residence including the curtilage of such residence . . . for the purpose of questioning the occupants or employees concerning their right to be or remain in the United States" without a warrant or valid consent. 8 C.F.R. § 287.8(f)(2).

159. Defendants have a policy and practice of entering the home, including the curtilage of the home, without a warrant or valid consent to conduct warrantless immigration arrests.

160. ICE policy requires that any ruse involving the impersonation of a federal, state, local, or private-sector agency or entity be contingent on permission from the proposed cover agency or entity, and that officers document such permission in a memorandum.

161. Defendants have a policy and practice of failing to obtain or document permission from proposed cover agencies.

162. Defendants' actions, policies, and practices violate the above DHS regulation and ICE policy, and their actions are therefore arbitrary, capricious, an

abuse of discretion, and otherwise not in accordance with law under the APA. *See* 5 U.S.C. § 706(2)(A).

163. Defendants' actions, policies, and practices violate the APA. *See Accardi*, 347 U.S. at 266-67.

164. Defendants' actions, policies, and practices of not following DHS regulation and ICE policy constitute final agency action subject to judicial review within the meaning of the APA. 5 U.S.C. § 704.

165. Defendants' actions, policies, and practices have caused the Organizational Plaintiffs to suffer a "legal wrong because of agency action." 5 U.S.C. § 702.

166. The Organizational Plaintiffs are "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

167. The Organizational Plaintiffs have no adequate remedy at law.

**Count Three**

***Violation of the Administrative Procedure Act (Constitutional)***

***(Against Defendants Wolf, Albence, Marin and Macias by Organizational Plaintiffs ICIJ and CHIRLA)***

168. The Organizational Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

169. The APA permits persons and organizations to challenge final agency actions in the federal courts. 5 U.S.C. §§ 702, 704, 706. Final agency action can be set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(B).

170. Defendants have a policy and practice of misrepresenting themselves as government agents with a different identity and/or purpose to persuade community members to allow Defendants into their homes, or to lure community members out of their homes, to conduct warrantless immigration arrests.

171. Defendants have a policy and practice of entering community members' homes and surrounding curtilage without a judicial warrant or permission, and with the intent to conduct warrantless immigration arrests.

172. Defendants' actions, policies, and practices violate the Fourth Amendment and therefore must be set aside. 5 U.S.C. § 706(2)(B).

173. To the extent Defendants may contend that ICE possesses authority for its home arrest practices pursuant to regulation or policy, that regulation or policy must be set aside under the APA as arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and contrary to constitutional rights. 5 U.S.C. § 706(2)(A)-(C).

174. Defendants' actions, policies, and practices of engaging in ruses and unconstitutionally entering the curtilage constitute final agency action subject to judicial review within the meaning of the APA. 5 U.S.C. § 704.

175. Defendants' actions, policies, and practices have caused the Organizational Plaintiffs to suffer a "legal wrong because of agency action." 5 U.S.C. § 702.

176. The Organizational Plaintiffs are "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

177. The Organizational Plaintiffs have no adequate remedy at law.

## **Count Four**

***Trespass***

***(Against Defendant United States of America by Plaintiff Kidd)***

178. Mr. Kidd repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

179. At the time of Mr. Kidd's arrest, he was residing in a rented apartment with his family in Hacienda Heights, California.

180. The Individual Capacity Defendants intentionally entered Mr. Kidd's private property without a warrant or valid consent.

181. Mr. Kidd was harmed by ICE's trespass, which was a substantial factor causing his unlawful arrest and detention.

182. Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671 *et seq.*, the United States of America is liable for the above-described actions of the Individual Capacity Defendants because they were acting within the scope of their employment for the United States of America, DHS and ICE.

## **Count Five**

***False Imprisonment***

***(Against Defendant United States of America by Plaintiff Kidd)***

183. Mr. Kidd repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

184. After the Individual Capacity Defendants lured Mr. Kidd out of his home without a warrant and on the pretense of a fictitious criminal investigation, the officers intentionally deprived Mr. Kidd of his freedom of movement by arresting and detaining him.

185. If not for the deception by ICE, Mr. Kidd would not have consented to leave the privacy of his home.

186. Mr. Kidd was actually harmed by his arrest and detention at Adelanto Detention Center for about 75 days, and Defendant's conduct was a substantial factor causing Mr. Kidd's harm.

187. Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671 *et seq.*, the United States of America is liable for the above-described actions of the Individual Capacity Defendants because they were acting within the scope of their employment for the United States of America, DHS and ICE.

**Count Six**

***Negligence/Negligent Infliction of Emotional Distress***

***(Against Defendant United States of America by Plaintiff Kidd)***

188. Mr. Kidd repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

189. ICE officers owe a duty of care to community members, including Mr. Kidd, to not enter their property without consent.

190. The above-described acts and omissions by the Individual Capacity Defendants breached the duty of care owed to Mr. Kidd.

191. The ICE officers' negligence caused Mr. Kidd harm in the form of the deprivation of his privacy and liberty and the infliction of emotional distress—manifested through, in part, humiliation, embarrassment, anxiety, worry, emotional pain, suffering and trauma.

192. The ICE officers' negligence was a substantial factor causing Mr. Kidd's harm.

193. Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671 *et seq.*, the United States of America is liable for the above-described actions of the Individual Capacity Defendants because they were acting within the scope of their employment for the United States of America, DHS and ICE.

**Count Seven**

***Violation of the Fourth Amendment to the United States Constitution***

***(Against Defendants O.M., C.C., J.H., and J.N. by Plaintiff Kidd)***

194. Mr. Kidd repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

195. The Individual Capacity Defendants (O.M., C.C., J.H., and J.N.) gained entry to Mr. Kidd's home and coerced Mr. Kidd into exiting his home by falsely claiming to be police officers conducting a criminal investigation and by concealing their true identity and purpose to arrest Mr. Kidd for alleged immigration violations.

196. The Individual Capacity Defendants entered the curtilage of Mr. Kidd's home without a warrant or valid consent, and with the intent to arrest him.

197. The Individual Capacity Defendants' actions violated clearly established law pertaining to the Fourth Amendment to the United States Constitution of which a reasonable person would have known.

198. Mr. Kidd suffered injury resulting from the Individual Capacity Defendants' Fourth Amendment violations, including but not limited to loss of privacy, loss of liberty, loss of income, violation of his constitutional rights, and emotional distress.

199. The Individual Capacity Defendants are liable in their personal capacity for their violations of Mr. Kidd's Fourth Amendment rights pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Osny Sorto-Vasquez Kidd respectfully asks this Court to grant the following relief:

1. Compensatory and punitive damages, including damages for loss of privacy, loss of liberty, loss of income, violation of constitutional rights, and emotional distress, in an amount to be proven at trial;

2. Reasonable attorneys' fees, costs, and other disbursements permitted under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable statute; and

3. Any and all other such relief as the Court deems just and equitable.

**WHEREFORE**, the Organizational Plaintiffs respectfully ask this Court to grant the following relief:

1. Certification of a class under Rule 23(b)(2), as described above;

2. A declaration that Defendants' challenged actions, policies, and practices under which ICE officers enter residents' homes or curtilage to arrest occupants without a judicial warrant or valid consent and/or misrepresent their identity or purpose to gain entry into or lure occupants out of their homes violate the Fourth Amendment and the APA;

3. An order enjoining Defendants from engaging in the above challenged actions, policies, and practices in the future;

4. Reasonable attorneys' fees, costs, and other disbursements permitted under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable statute; and

5. Any and all other such relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues for which a jury trial is available.

DATED: October 27, 2020

Respectfully submitted,

MUNGER TOLLES & OLSON LLP

By: /s/ *Terra Castillo Laughton*

TERRA CASTILLO LAUGHTON
*terra.laughton@mto.com*
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Anjan Choudhury (SBN 236039)
*anjan.choudhury@mto.com*
Jacob Kreilkamp (SBN 248210)
*jacob.kreilkamp@mto.com*
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Michael Kaufman (SBN 254575)
*mkaufman@aclusocal.org*
Stephanie Padilla (SBN 321568)
*spadilla@aclusocal.org*
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017-4022
Telephone: (213) 977-5232
Facsimile: (213) 201-7878

Anne Lai (SBN 295394)
*alai@law.uci.edu*
Caitlin Bellis (SBN 304764)
*cbellis.clinic@law.uci.edu*
UC IRVINE SCHOOL OF LAW
IMMIGRANT RIGHTS CLINIC
401 E. Peltason Drive,
Irvine, CA 92697-8000
Telephone: (949) 824-9894
Facsimile: (949) 824-2747

Attorneys for Plaintiffs