O

# United States District Court
# Central District of California

| | |
|---|---|
| OSNY SORTO-VASQUEZ KIDD et al., | Case № 2:20-cv-03512-ODW (JPRx) |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION TO CERTIFY CLASS [243] [244] AND APPOINTING LEAD PLAINTIFFS AND CLASS COUNSEL** |
| ALEJANDRO MAYORKAS,[1] United States Secretary of Homeland Security, in his official capacity, et al., | |
| Defendants. | |

## I.    INTRODUCTION

Plaintiffs Osny Sorto-Vasquez Kidd, the Inland Coalition for Immigrant Justice ("ICIJ"), and the Coalition for Humane Immigrant Rights ("CHIRLA") allege that U.S. Immigration and Customs Enforcement ("ICE") officers violate the Fourth Amendment's prohibition on unreasonable searches and seizures in arresting and detaining removable immigrants in and near their own homes. Plaintiffs bring claims against several officials for ICE and the U.S. Department of Homeland Security

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Alejandro Mayorkas and Tae D. Johnson substituted in as Defendants in this case for Chad Wolf and Matthew T. Albence, respectively.

working in their official capacities; the United States of America; and individual ICE officers O.M., C.C., J.H., and J.N. (the "Officers").

ICIJ and CHRILA (the "Coalition Plaintiffs") seek certification of two classes of individuals who have been or will be affected by Defendants' alleged unconstitutional practices.  (Mot. Certify Class ("Motion" or "Mot."), ECF Nos. 243 (unsealed, redacted), 244 (sealed, unredacted).)   The Court carefully considered the parties' papers and the arguments presented at the January 30, 2023 hearing, and for the following reasons, the Court **GRANTS** Plaintiffs' Motion.

## II.    FACTUAL BACKGROUND

With this action, Plaintiffs challenge how ICE conducts law enforcement in its Los Angeles Area of Responsibility ("LA AOR"), which includes the counties of Los Angeles, Orange, Riverside, San Bernardino, Ventura, Santa Barbara, and San Luis Obispo.  (Decl. M.R. ISO Mot. Compel ¶ 9, ECF No. 87-4.)  In particular, Plaintiffs allege that ICE agents in the LA AOR regularly and systematically violate the Fourth Amendment's prohibition on unreasonable searches and seizures by (1) obtaining consent or compliance by using ruses, including by falsely presenting themselves as local police or probation officials, and (2) entering the curtilage of individuals' homes to conduct a "knock-and-talk" without a valid warrant.

## A.    ICE Operations in Southern California

ICE has two teams responsible for conducting field operations: Pro-CAP (Criminal Apprehension Program) and fugitive operations.  (Decl. Aaron Kollitz ISO Opp'n Mot. ("Kollitz Decl.") ¶ 2 Ex. A ("T.G.[2] PMK[3] Dep.") 30:7-31:1, ECF No. 262-2[4,5].)   The mission of the Pro-CAP team is to look for undocumented noncitizens that were released from jail after committing a crime, whereas the fugitive

---

[2] The Court abbreviates and anonymizes names of ICE officers and officials.
[3] PMK stands for Person Most Knowledgeable and refers to deponents deposed pursuant to Federal Rule of Civil Procedure 30(b)(6).
[4] Where both sealed and unsealed versions of evidence exist, the Court cites only to the sealed version.
[5] Exhibits A through P to the Kollitz Declaration are all found at ECF No. 262-2.

operations team focuses on individuals who have been ordered removed but have not left the United States. (*Id.* at 31:2–13.) Typically, both teams conduct operations in the field with administrative warrants. (*Id.* at 190:12–19.) They conduct thousands of civil immigration arrests in the LA AOR each year. (Decl. Giovanni Saarman González ISO Mot. ("Saarman González Decl.") ¶¶ 3–4, ECF No. 244-1 (summarizing ICE declarations).)

ICE officers go through the Basic Immigration Enforcement Training Program, which lasts sixteen to twenty weeks. (Kollitz Decl. ¶ 3 Ex. B ("T.G. Dep.") 54:9–16, 260:3–9.) ICE officers who work in the field also take Fourth Amendment training on a bi-annual basis and receive special Fourth Amendment refresher training before particularly large operations. (*Id.* at 65:18–25, 267:5–19.) These trainings address common Fourth Amendment compliance issues that officers face, including knock-and-talks, ruses, curtilage, and consent. (Kollitz Decl. ¶ 5 Ex. D ("R.H. Dep.") 49:11–22.) The materials and content for the Fourth Amendment training come from ICE's national headquarters, (Kollitz Decl. ¶ 4 Ex. C ("A.P. PMK Dep. Opp'n") 241:21–242:1), and local offices will often tailor the training to address situations unique to their specific circuit, (*id.* at 65:14–24).

**B.    ICE Policies and Practices**

As part of their training, ICE officers are instructed to refer to themselves as "police." (*Id.* at 56:21–57:3, 133:25–134:3.) According to ICE, this is because the term is recognized in many languages and helps to ensure the safety of the officers. (*Id.*; R.H. Dep. 75:19–77:2.) It also allows ICE to efficiently communicate that the person knocking on the door has the authority of the state, which ostensibly promotes the safety of the officers and the public. (R.H. Dep. 77:3–77:15; A.P. PMK Dep. Opp'n 159:1–160:15.)

Under nationwide ICE policy, during operations, field officers must clearly display their affiliation with ICE by wearing a badge on the vest, on the belt, or around the neck. (A.P. PMK Dep. Opp'n 140:19–141:6.) The ICE badge is gold, has

the words "ICE Officer" and the DHS seal, and is four to six inches tall.  (Saarman González Decl. Ex. 35 ("J.A. Dep.") 148:17, ECF No. 244-2[6]; T.G. Dep. 173:14–174:6.)

For officers working in the LA AOR, local policy is to have each officer wear a tactical bulletproof vest with an ICE badge and a police badge on the front of the vest, and the word "police" and an additional ICE indication on the back of the vests.  (T.G. PMK Dep. 202:18–203:14, 207:10–20; R.H. Dep. 72:18–73:25.)  These vests are issued to all LA AOR field officers with these markings already in place.  (T.G. PMK Dep. 209:5–15.)

   *1.   Ruses*

ICE defines a ruse as "[a] tactic designed to control the time and location of a law enforcement encounter."  (Decl. A.P. ISO Opp'n Mot. ("A.P. Decl.") ¶ 6 Ex. 3 ("2018 ICE Handbook") at 4, ECF Nos. 262-4.[7])  Implicit in both this and the dictionary definition of "ruse" is the use of some sort of misrepresentation or concealment as part of the tactic.  (*See* A.P. Decl. ¶ 8 Ex. 5 ("Ruse Memo") ("Ruses may involve impersonating employment with other federal, state, local, or private entities.")); *Ruse*, Merriam-Webster.com Dictionary, accessed Feb. 6, 2023, http://www.merriam-webster.com/dictionary/ruse (defining *ruse* as "a wily subterfuge").  According to ICE, "[t]he use of ruses in law enforcement operations is an effective law enforcement tool that enhances officer safety.  One main objective of a ruse is to prevent violators from fleeing and placing themselves, officers, and innocent bystanders in a potentially dangerous situation."  (Ruse Memo.)

ICE gives its officers some measure of discretion in determining whether to use a ruse in effecting an arrest, in light of the totality of the circumstances.  (T.G. PMK Dep. 175:13–21; A.P. PMK Dep. Opp'n 195:18–196:2.)  As part of this discretion, officers have further discretion to be "high visibility" or "low visibility"—that is, to

---

[6] Exhibits 5–7, 10–28, 31, 32, 35, and 36 to the Saarman González Declaration are all found at ECF No. 244-2.

[7] Exhibits 1 through 7 to the A.P. Declaration are all found at ECF No. 262-4.

display their identifying badges and markings as normal or to conceal them to assist with the ruse. (Saarman González Decl. Ex. 28 ("A.P. PMK Dep. Mot.") 142:7–145:20.)

At the same time ICE policy contemplates the use of ruses, ICE also trains its officers that they need informed, voluntary consent to enter a residence and that the nature of a ruse may impact whether consent was voluntary. (A.P. Decl. ¶ 4 Ex. 1 ("2021 Refresher Training Opp'n") 42, 46.) Pursuant to these principles and Fourth Amendment jurisprudence, ICE policy prohibits field officers from (1) using ruses involving health or safety programs administered by a private or public entity, such as the Occupational Safety and Health Administration ("OSHA"); (2) representing themselves as employees of another government entity without that entity's permission; (3) representing themselves as an employee of a real private business; and (4) fabricating an emergency. (*See* A.P. Decl. ¶ 10 Ex. 7 ("April 2020 Training Materials") 268–269; *see also* Ruse Memo.)

No one disputes that ICE officers are trained to identify themselves as police during enforcement actions and that the vests of officers in the LA AOR further identify ICE officers as "police." Plaintiffs contend that this practice itself constitutes a ruse because it leads targets and other individuals to believe that ICE is with local law enforcement. (Mot. 5.) Defendants contend that this practice is not a ruse because ICE officers are law enforcement officers and that the word "police" fairly and accurately captures their identity and purpose. (Opp'n 11–12, ECF No. 262.)

The parties dispute the content of ICE's policies, and the extent of its practices, regarding mentioning an arrest target's probationary status or impersonating a probation officer. ICE officers are typically aware of an arrest target's probationary status because, prior to an enforcement action, ICE runs a criminal rap sheet on the target that indicates, among other things, the target's probationary status. (R.H. Dep. 306:17–24.) Defendants suggest that the only way field officers use this information is to remind the arrest target that they are on probation and to threaten to

contact the target's probation officer in the event the target refuses to exit the residence. (Opp'n 6–7; R.H. Dep. 304:24–306:5.) ICE officer testimony reflects that ICE officers' practice was to mention a target's probationary status as part of their effort to convince the target to leave the residence, but that ICE officers did not actually impersonate probation officers. (Saarman González Decl. Ex. 32 ("J.H. Dep.") 196:18–21 ("It would be as simple as, you know, 'You are on [c]ourt [o]rdered probation, and you have to listen to all law enforcement authorities as a condition of your release, so could you come outside.'"); *id.* at 197:4 ("[T]o clarify, we don't say we are probation.").)

Plaintiffs vigorously dispute these contentions, arguing that ICE officers regularly identify themselves as probation officers in order to induce consent to enter a home or to convince a target to step outside, and that the ruse is effective because probationers are required by law to comply with the requests of probation officers. (Decl. Linda Urbano Vasquez ¶ 4, ECF No. 226-17 ("One officer, speaking in Spanish, said that they were probation officers looking for my brother."); Decl. Diana Rubick Rodriguez Ramirez ¶ 6, ECF No. 226-15 ("[S]omeone knocked loudly on the door of my room, and a voice said, 'Probation. Open up.'"); Decl. Miguel Vidal Figueroa ¶¶ 6–7, ECF No. 226-20 ("[A]n officer who introduced himself as a probation officer called me on my cell phone.").)

As part of Fourth Amendment training, ICE instructs officers that they must verbally identify themselves as ICE when someone whom ICE engages asks the officer directly the agency with which the officer is affiliated. (Saarman González Decl. Ex. 8 ("2021 Refresher Training Mot.") 101, ECF No. 226-2.) This policy appears to be narrow in its scope; for example, when officers were asked if they "were Los Angeles or Burbank Police Officers," under ICE policy, it was permissible for officers to simply say no and state they were with "a different law enforcement agency." (Saarman González Decl. Ex. 28 ("A.P. PMK Dep. Mot.") 135:15–138:19.)

ICE does not have a systemwide mechanism for tracking the use of ruses during enforcement actions.  Whether a ruse is used is left to the officers' discretion, and there is no requirement that officers document the use of a ruse.  (Saarman González Decl. Ex. 27 ("T.G. PMK Dep. Mot.") 151:3–152:2, 220:6–17, 224:14–21.)

### 2. Knock-and-Talks

ICE defines a "knock-and-talk" as simply walking up to the door of a residence to speak with an occupant.  (A.P. PMK Dep. Opp'n 91:24–92:2.)  The use of knock-and-talks is a part of ICE's general policy and practice.  (*Id.* at 92:17–19; 2021 Refresher Training Mot. 108 (instructing officers that they may "walk across the curtilage to speak to . . . occupants if the general public could do so as well").)  Nevertheless, officers use knock-and-talks relatively rarely, during about five to ten percent of arrests.  (R.H. Dep. 83:22–84:7 (characterizing knock-and-talks as a "last resort"); T.G. Dep. 132:17–133:18; Kollitz Decl. ¶ 7 Ex. F ("J.H. Dep.") 204:17–205:18.)  Most often, the purpose of knock-and-talks is to persuade an occupant to come outside, and other times the purpose is to induce the occupant's consent to officers entering the residence.  (J.H. Dep. 199:2–14; A.P. PMK Dep. Mot. 91:24–93:9.)

## C. Kidd

The events involving Kidd took place in October 2018, when Kidd lived in a gated apartment complex.  (First Am. Compl. ("FAC") ¶¶ 51–52, ECF No. 38.)  As Plaintiffs allege in the First Amended Complaint, the Officers first gained access to Kidd's apartment complex by waiting outside until a different tenant who was exiting the complex opened the parking gate.  (*Id.* ¶ 52.)  The Officers knocked on Kidd's front door, and Kidd's mother answered.  (*Id.* ¶ 53.)  Officer C.C. identified herself as a "detective" with local police investigating a dangerous criminal using Kidd's address.  (*Id.*)  Kidd's mother was shocked and agreed to help the "detective."  (*Id.*)  Once the Officers were inside the home, they visited every room, banging on doors

1   and requesting identification from Kidd's siblings, who at the time were between the

2   ages of eleven and sixteen.  (*Id.*)

3       Realizing that Kidd was absent, the Officers asked Kidd's mother to call him.

4   (*Id.* ¶ 54.)  Kidd answered his mother's call, and he could hear his siblings crying as

5   his mother "worriedly stated that the police told her there was a dangerous criminal

6   'out to get' their family."  (*Id.*)  Kidd then spoke with C.C., who again identified

7   herself as police and said she needed to speak with Kidd in person to guarantee that

8   his family was safe from an extremely dangerous criminal.  (*Id.*)  Kidd agreed to meet

9   with C.C.  (*Id.*)

10      Two days later, Kidd received a call from C.C. asking him to come outside with

11  a form of identification.  (*Id.* ¶ 55.)  Kidd exited his apartment complex to find the

12  Officers waiting for him in tactical vests emblazoned with the word "POLICE."  (*Id.*)

13  After checking Kidd's identification, the Officers revealed that his family was not at

14  risk and that they had invented the story to induce his compliance.  (*Id.*)  They

15  admitted their true identities as ICE officers and arrested Kidd for removal.  (*Id.*)

16  **D.    Other Individuals**

17      Plaintiffs identify nine other individuals who are not named Plaintiffs but who

18  have similar stories.  In all the alleged incidents, ICE officers made some sort of

19  misrepresentation in order to induce consent to enter an individual's home or to induce

20  them to step outside.  (*Id.* ¶¶ 59–60, 62, 64–65, 67, 69 (impersonation of police); *id.*

21  ¶¶ 76, 81, 84, 89, 90 (impersonation of probation officers).)  As alleged, the

22  community members ICE targeted were particularly susceptible to the probation

23  officer ruse because those on probation are typically required by law to permit

24  probation officers to access their homes and persons, leaving probationers with no

25  choice but to comply with officers' requests.  (*Id.* ¶ 71.)

26  **E.    CHIRLA and ICIJ**

27      The Coalition Plaintiffs, CHIRLA and ICIJ, bring their claims on behalf of

28  themselves, their members and volunteers, and the putative classes.  (FAC ¶¶ 120,

138, 140–148.)  CHIRLA is a membership-based organization serving immigrants in Southern California and elsewhere, providing services from its offices in Los Angeles, Compton, and San Bernardino.  (Decl. Carl Bergquist ("CHIRLA Decl.") ¶¶ 3–4, ECF No. 226-6.)   CHIRLA has approximately 52,000 members in California, most of whom reside in the Los Angeles area.  (*Id.* ¶ 3)  ICIJ is an umbrella organization comprised of roughly three dozen organizations primarily serving the immigrant community in the Inland Empire region.  (Decl. Lizbeth Abeln ("ICIJ Decl.") ¶ 3, ECF No. 226-7.)

CHIRLA's and ICIJ's stated purposes are to improve the lives of immigrants and immigrant communities, including by advancing the rights of immigrants.  To fulfill their missions, CHIRLA and ICIJ engage in policy advocacy, community organizing, and educational campaigns, including by operating hotlines that provide emergency assistance to individuals impacted by ICE enforcement operations.  (CHIRLA Decl. ¶ 4; ICIJ Decl. ¶ 4.)  Both organizations have been forced to divert resources from other core priorities to assist individuals impacted by the challenged home arrest practices.  (CHIRLA Decl. ¶¶ 8, 11; ICIJ Decl. ¶¶ 7, 9.)  Moreover, according to Plaintiffs, CHIRLA's and ICIJ's members and volunteers have been impacted by the challenged home arrest practices and are at risk of being impacted in the future.  (CHIRLA Decl. ¶¶ 6–11, ICIJ Decl. ¶¶ 6, 8.)

### III.    PROCEDURAL BACKGROUND

On April 16, 2020, Plaintiffs filed their Complaint, and on October 27, 2020, they filed the operative First Amended Complaint.  (Compl., ECF No. 1; FAC.)  Defendants moved to dismiss, and the Court granted in part and denied in part Defendants' motions.  (Order on Mots. Dismiss 2, ECF No. 58.)

On September 12, 2022, the Officers moved for judgment on the pleadings based on the intervening authority of *Egbert v. Boule*, 142 S. Ct. 1793 (2022).  (Mot. J. Pleadings, ECF No. 193.)   The Court denied the Motion.  (Order Den. Mot. J. Pleadings, ECF No. 298.)  Meanwhile, the parties filed and fully briefed the Motion to

Certify Class now under consideration.  (Mot.; Opp'n; Reply, ECF Nos. 285-1 (sealed, unredacted); 307-1 (unsealed, redacted).)

Then, on December 23, 2022, Defendants moved a second time for judgment on the pleadings, this one based on the intervening authority of *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057 (2022).  (Second Mot. J. Pleadings, ECF No. 312.)  The Court struck the Motion, reasoning that it was brought too late to avoid delaying the trial.  (Order Striking Second Mot. J. Pleadings 2, ECF No. 313.)  The Court noted that *Aleman Gonzalez* had issued many months prior, on June 13, 2022, and the Court disapproved of Defendants bringing two motions for judgment on the pleadings in piecemeal fashion. (*Id.* at 1–2.)  Even so, the Court provided the parties an opportunity to argue the effect of *Aleman Gonzalez* in the context of the class certification motion, which was already under submission.  (*Id.* at 3.)  The parties filed their supplemental briefs as directed.  (Defs.' Suppl. Opp'n, ECF No. 320; Pls.' Suppl. Reply, ECF No. 323.)

## IV.    LEGAL STANDARD

Class certification is appropriate only if the parties demonstrate each of the four requirements of Federal Rule of Civil Procedure ("Rule") 23(a) and at least one of the requirements of Rule 23(b).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14, 621 (1997).  Under Rule 23(a), a class action is certifiable only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a); *see, e.g.*, *Allen v. Verizon Cal., Inc.*, No. 8:08-cv-0774-DOC (MLGx), 2010 WL 11583099, at *2–4 (C.D. Cal. Aug. 12, 2010) (considering the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a)).  As for Rule 23(b), Plaintiffs here rely solely on Rule 23(b)(2), which applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, "[a] party seeking class certification must affirmatively demonstrate . . . compliance with the Rule," *id.*, by a preponderance of the evidence, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). When faced with conflicting or insufficient evidence on the issue of class certification, courts must "judge the persuasiveness and not merely the admissibility of evidence bearing on class certification." *Henson v. Fid. Nat'l Fin. Inc.*, 300 F.R.D. 413, 417 (C.D. Cal. 2014) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). This "may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Dukes*, 564 U.S. at 351).

"[A] court's class-certification analysis must be 'rigorous' . . . .'" *Id.* at 465. This is true of analysis under Rules 23(a) and 23(b) alike. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013). Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466. If a court concludes that the moving party has met its burden of proof, then the court has broad discretion to certify the class within the framework of Rule 23. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

## V.    EVIDENTIARY OBJECTIONS

Defendants raise numerous evidentiary objections in connection with this Motion. (Objs., ECF Nos. 266-5, 266-7, 266-9, 266-11, 266-13.) These objections are all directed toward evidence the Court does not consider in ruling on Plaintiffs' Motion. Accordingly, Defendants' evidentiary objections are **DENIED AS MOOT**.

# VI.    DISCUSSION

The Coalition Plaintiffs seek to certify and represent two classes.  Kidd, the only individual Plaintiff in this action, is not party to the Coalition Plaintiffs' class certification Motion.  The classes the Coalition Plaintiffs propose are as follows:

> **Ruse Class**: All individuals residing at a home in the Los Angeles Area of Responsibility ("LA AOR") where U.S. Immigration and Customs Enforcement ("ICE") has conducted or will conduct a warrantless civil immigration enforcement operation in which officers enter the home under a claim of consent, or where the individual exits their home at the request of ICE, without officers first verbally stating their true identity as immigration officers or their immigration law purpose.

> **"Knock and Talk" Class**: All individuals residing at a home in the LA AOR where ICE has conducted or will conduct a warrantless civil immigration enforcement operation using a "knock and talk."

(Notice Mot. 1, ECF Nos. 244 (sealed), 243 (unsealed).)  Plaintiffs clarify that by use of the term "warrantless" in these definitions, Plaintiffs refer to the lack of a judicial warrant, not the lack of an administrative warrant.  (*Id.* n.2.)

The Court first considers whether these two proposed classes meet the four requirements of Rule 23(a).

## A.    Rule 23(a)

Under Rule 23(a), the plaintiff must show that the class satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation in order to receive class treatment.  *See Olean Wholesale Grocery*, 31 F.4th at 663.  As explained below, the Court finds that both classes satisfy all four Rule 23(a) requirements.

### 1.    Numerosity

The first issue is whether the proposed classes are sufficiently numerous such that joinder of all members would be impractical.  Fed. R. Civ. P. 23(a)(1).  While "[n]o exact numerical cut-off is required[,] . . . numerosity is presumed where the

plaintiff class contains forty or more members." *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009).  Furthermore, "[w]here the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *Orantes-Hernandez v. Smith*, 541 F. Supp. 351, 370 (C.D. Cal. 1982).  Alternatively, in cases where the class includes "unnamed, unknown future members," some courts have bypassed the numerical analysis altogether, finding that "the numerosity requirement is . . . met, regardless of class size." *Doe v. Wolf*, 424 F. Supp. 3d 1028, 1040 (S.D. Cal. 2020) (quoting *Nat'l Ass'n of Radiation Survivors v. Walters*, 111 F.R.D. 595, 599 (N.D. Cal. 1986)); *Walters*, 111 F.R.D. at 599 (finding numerosity satisfied on this basis and noting "class actions challenging statutes or administrative procedures on constitutional grounds, have been recognized as natural class actions, and inclusion in the class of potentially aggrieved individuals has often been regarded as sufficient to meet the Rule 23(a)(1) impracticability requirement" (quoting 1 H. Newburg, *Class Actions* § 3.07 (2d ed. 1985))).

Here, numerosity is satisfied under either approach.  This is a class action challenging the constitutionality of ICE's policies and practices when conducting home arrests in the LA AOR.  The classes are defined as those individuals in the LA AOR who will experience the effects of these policies or practices.  No one disputes ICE has and actually employs these policies and practices in the field.  It is therefore beyond dispute that the class contains unnamed, unknown future members who cannot currently be joined.  This is sufficient to meet the Rule 23(a)(1) numerosity requirement.

In the alternative, a numerical analysis confirms numerosity.  Plaintiffs present evidence that ICE conducts approximately 1,100 arrests at or near a home per year. (Saarman González Decl. ¶ 4 (noting that 9,066 arrest incidents from 2014 to 2021 had a residential address code in the ICE database).)  Defendants dispute that this number corresponds to the definition of either class.  (Opp'n 25.)  As to the Ruse

Class, however, Defendants do not and cannot dispute that ICE does have written policies, such as the Ruse Memo, permitting its officers to use certain types of ruses, which itself suggests that ICE officers in fact use ruses with at least some regularity. Moreover, ICE officers testified regarding specific encounters where officers used ruses and the frequency with which officers used ruses, and this testimony confirms that officers sometimes use ruses in the LA AOR.  (R.H. Dep. 304:24–10 (confirming R.H. has mentioned probation during home enforcement actions and that he has "seen" other officers do this); J.H. Dep. 199:2–4 (testifying about using a ruse for a home enforcement action a "[h]andful" of times).)  Additionally, one arrest incident can implicate the constitutional rights of multiple individuals, and of course, the class includes unknown future members.  Based on all these observations, the Court concludes that Plaintiffs demonstrate by a preponderance of the evidence that the Ruse Class is sufficiently numerous.

With respect to the Knock-and-Talk Class, ICE's database records show that there were at least 1,106 arrests since September 2017 that involved knock-and-talks. (Decl. Giovanni Saarman González ISO Reply ("Saarman González Decl. ISO Reply") ¶ 4 Ex. 2 ("OM2 Spreadsheet"), ECF No. 282-2 (lodged separately on thumb drive).)  The Knock-and-Talk Class is therefore sufficiently numerous.

Thus, the evidence is sufficient for the Court to form a "reasonable judgment" that both classes are sufficiently numerous.  *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1005 (9th Cir. 2018).

### 2.    *Commonality*

The next issue is whether the claims of the potential class members raise common questions of fact or law.  Fed. R. Civ. P. 23(a)(2).  "Plaintiffs need not show . . . that every question in the case, or even a preponderance of questions, is capable of class wide resolution.  So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)."  *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (internal quotation marks omitted).

This standard is readily met where, as here, plaintiffs seek prospective relief "challeng[ing] a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005); *see also* 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1763 (4th ed. 2022) ("[C]lass suits for injunctive or declaratory relief by their very nature often present common questions satisfying Rule 23(a)(2)."). "In such circumstance, individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." *Id.* (citing *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). Here, the Coalition Plaintiffs seek declaratory or injunctive relief to stop ICE from engaging in certain systemwide practices and policies in conducting home arrests in the LA AOR. These practices and policies affect all putative class members because the classes themselves are defined as those who have experienced or will experience the effects of the practices and policies. Thus, Plaintiffs raise legal issues that the members of each respective class share in common. *See Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 808 (9th Cir. 2020) (finding commonality satisfied where plaintiffs challenged the reliability of ICE's practice of relying solely on electronic database checks to determine if there is probable cause for detainment).

Defendants argue that there is no commonality because Plaintiffs fail to establish a plausible claim for a Fourth Amendment violation by ICE. (Opp'n 10–17.) Of course, the plausibility of Plaintiffs' claims is a merits issue, which the Court is to avoid on class certification motions to the extent possible. *See Amgen*, 568 U.S. at 466. Here, the Court need not reach the merits to find that Plaintiffs raise common issues of fact or law. Defendants, by arguing that the Ruse Class and the Knock and Talk Class are "legally defective," (Opp'n 11, 16), and by presenting arguments why the claim should fail altogether (that is, as to the entire class), only emphasize the existence of common issues appropriate for classwide resolution. *Cf. Gonzalez*,

975 F.3d at 809 (collecting cases and noting that "Fourth Amendment claims concerning government policies, practices or procedures for probable cause determinations are plainly suitable for classwide resolution").

For these reasons, commonality is satisfied as to both classes.

### 3.    Typicality

The next issue is whether the claims of the Coalition Plaintiffs are typical of those of the classes, which consist primarily of individuals.  Typicality is satisfied when the class representative's claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. at 338.  The class representative "must be part of the class and 'possess the same interest and suffer the same injury' as the class members.'" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)); *Parsons*, 754 F.3d at 685 ("The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992))).  "Typicality is a permissive standard." *Johnson v. City of Grants Pass*, 50 F.4th 787, 805 (9th Cir. 2022) (cleaned up).

Here, a short, straightforward analysis shows typicality is satisfied.  Namely, the Coalition Plaintiffs' claims are typical because the Coalition Plaintiffs "challenge the same [policies and practices] under the same constitutional provisions as other class members." *Id.* at 806.

Defendants focus on the factual differences across various ICE encounters, including ICE's encounter with Kidd, and argue that, as a result of these differences, there is a "lack of cohesion" between the claims of the Coalition Plaintiffs' members, on one hand, and the claims of absent class members, on the other.  (Opp'n 22.)  This

argument does not defeat typicality because the Coalition Plaintiffs do not, by way of their class action, seek a declaration or injunction directed at any individual ICE encounter.  Instead, they challenge ICE's policies or practices on a systemwide basis. Because of the way the proposed classes are defined, all members of the proposed classes would benefit from a declaration that a particular ICE policy or practice is unconstitutional (or an injunction prohibiting ICE from maintaining a policy or practice).  This is because such a declaration or injunction would cause ICE to change how it conducts enforcement actions, thereby decreasing the possibility that class members will have their constitutional rights violated.  *See Baby Neal*, 43 F.3d at 57 ("Indeed, (b)(2) classes have been certified in a legion of civil rights cases where commonality findings were based primarily on the fact that defendant's conduct is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct.").

In connection with typicality, Defendants further argue that "the vague, subjective nature of the class definitions prevents the Court form knowing who will be in the class without individual testimony of each class member."  (Opp'n 23.)  In the first place, it is unclear how this argument relates to the typicality analysis.  More substantively, the Court does not see how this presents a hurdle to class certification given that, in Rule 23(b)(2) class actions where the only class claims are for classwide declaratory and injunctive relief, notice to the class is not required.  *See Grant v. Cap. Mgmt. Servs.*, No. 10-cv-2471-WQH (BGS), 2013 WL 6499698, at *6 (S.D. Cal. Dec. 11, 2013).  Thus, there is no need for the Court to create a comprehensive list of class members or otherwise make extensive findings regarding class membership. The Coalition Plaintiffs seek injunctions and declarations directing ICE to change its systemwide policies and practices, and it is unclear how the fact that the class may be underinclusive or overinclusive, or that the exact boundary between class members and non-class members is unclear, might prevent the Coalition Plaintiffs from

obtaining the relief they seek. The Court can grant (or deny) the requested declaration or injunction regardless of the exact contours of the classes.

Defendants' other arguments against typicality are improperly directed toward the merits of the Coalition Plaintiffs' claims or otherwise miss the mark. The interest of the Coalition Plaintiffs is to prevent the violation of their members' and volunteers' constitutional rights by challenging and changing ICE's policies and practices. This is the same interest of the putative class members. Typicality is satisfied.

### 4. Adequacy

Finally, the representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether the representation meets this standard, [courts] ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Here, the Coalition Plaintiffs argue that they are adequate class representatives because (1) there are no known or potential conflicts of interest between themselves and other class members, and (2) the Coalition Plaintiffs are represented by experienced counsel. (Mot. 23–24, and evidence cited therein.) Defendants generally do not oppose or rebut the Coalition Plaintiffs' showing of adequacy. (*See generally* Opp'n.) The Coalition Plaintiffs' evidence is sufficient for the Court to form a "reasonable judgment" that the Coalition Plaintiffs are adequate class representatives. *Sali*, 909 F.3d at 1005. Adequacy is satisfied.

### B. Rule 23(b)

Plaintiffs seek certification of the Ruse Class and the Knock and Talk Class pursuant to Rule 23(b)(2). Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class

as a whole." Fed. R. Civ. P. 23(b)(2). The key characteristic of a Rule 23(b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360.

The issue presented by the Rule 23(b)(2) inquiry in this case is very narrow: whether ICE has systemwide policies or practices whose constitutionality the Court could analyze on a systemwide basis. The answer to this question is a simple 'yes.'

In providing this answer, the Court emphasizes that classwide relief is expressly limited to those policies or practices of ICE that truly constitute systemwide policies and practices ("SWPPs"). This is an important clarification given that Plaintiffs in the First Amended Complaint request declaratory and injunctive relief related to Defendants' "actions, policies, or practices" more broadly. (FAC at 52:15–21.) Plaintiffs cannot obtain classwide declaratory or injunctive relief as to Defendants' "actions" on a general level because such relief would be too broad unless the Court first made a separate inquiry into each individual enforcement encounter, a process which would contradict the requirements of both Rule 23(a) and Rule 23(b). Similarly, Plaintiffs cannot obtain classwide declaratory or injunctive relief as to Defendants' "policies or practices" as a general concept. Instead, classwide relief shall be limited to policies or practices that ICE has applied to its practices in the LA AOR at large (as opposed to a specific practice undertaken during a specific encounter)—that is, policies or practices that are "systemwide" across the LA AOR.

For instance, the record indicates, and both sides generally agree, that the local ICE practice of officers verbally identifying themselves as police is a SWPP. (Mot. 7; Opp'n 4 ("At the academy[,] students are trained to refer to themselves as police . . . .").) The record similarly establishes that ICE has SWPPs with respect to knock-and-talks; as an example, the ICE training materials the parties submit show what ICE teaches its officers about how to conduct knock-and-talks. (*See* 2021 Refresher Training Mot. 104–09.) These training materials affect everyone in the

Knock-and-Talk Class because they affect how ICE officers conduct operations in the LA AOR. Thus, these training materials constitute "act[ion] on grounds that apply generally to the class," such that an injunction or declaration regarding the training materials will be "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Moreover, the Court can resolve the legal issues raised by each of these examples of SWPPs on a classwide, systemwide basis. For example, the Coalition Plaintiffs, in challenging the policy whereby ICE officers identify themselves as police, argue that ICE is not local law enforcement, and they argue that any consent ICE officers obtain as a result of identifying themselves as police is invalid, and any home arrest made pursuant to such consent is accordingly unconstitutional. (Mot. 14–16.) Defendants, for their part, argue that the Ninth Circuit has recognized that ICE are police, such that, in identifying themselves as police, ICE officers make no misrepresentation and accordingly do not violate the Fourth Amendment. (Opp'n 11–12.) The Court need not decide this legal question today; all the Court does today is observe that this legal question is capable of systemwide treatment by way of an injunction or a declaration regarding the constitutionality of the practice, or a denial of the same, and is therefore appropriate for Rule 23(b)(2) certification.

A similar analysis and conclusion apply to ICE's training materials on using knock-and-talks during home arrests. The parties disagree regarding the constitutionality of the practices embodied in these training materials. (Mot. 17–19; Opp'n 16–17.) The Court need not address the merits of these legal issues today; the Court merely observes that (1) there exist SWPPs regarding knock-and-talks, and (2) the Court can resolve the constitutionality of each SWPP on a classwide basis.[8]

---

[8] The two examples of SWPPs the Court provides herein do not preclude the possibility that Plaintiffs will be able to establish the existence of additional SWPPs as appropriate subjects of classwide declaratory or injunctive relief. Additionally, these two examples of SWPPs should not be read as implying that every ICE policy or practice Plaintiffs discuss in their Motion constitutes a SWPP appropriate for class treatment.

Defendants argue that Rule 23(b)(2) certification of the Knock-and-Talk Class is inappropriate because whether a particular area of a particular residence constitutes curtilage is a question that requires case-by-case analysis. (Opp'n 17.) But again, factual differences among various ICE encounters do not defeat class certification where, as here, the plaintiff seeks certification for the purposes of challenging the constitutionality of a broader government policy or practice. The Court can hear and resolve a challenge to a SWPP, and issue an injunction or declaration regarding the constitutionality of a SWPP, without ever considering what part of a particular residence constitutes curtilage. *Gonzalez*, 975 F.3d at 809 ("Although . . . the constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of an individual case, that question is quite different from the question of the adequacy of the procedures on which the government relies to make arrests and detain individuals." (quoting *Sibron v. New York*, 392 U.S. 40, 59 (1968) (cleaned up))). Nothing more is required at this phase of the case to allow the case to proceed as a Rule 23(b)(2) class action.

## C.    Intervening Authority: *Aleman Gonzalez*

On June 13, 2022, the Supreme Court issued its opinion in *Aleman Gonzalez*, holding in pertinent part that 8 U.S.C. § 1252 "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" certain statutory provisions specified in § 1252. 142 S. Ct. at 2065. As described above, Defendants moved for judgment on the pleadings in this matter pursuant to this holding from *Aleman Gonzalez*. (Second Mot. J. Pleadings (stricken).) The Court struck the motion as untimely but provided the parties with an opportunity to present their arguments in connection with the present Motion to Certify Class. (Order Striking Second Mot. J. Pleadings.)

The arguments in the parties' supplemental briefs further confirm that the Coalition Plaintiffs' claims are amenable to classwide treatment. Defendants argue that, under the plain holding of *Aleman Gonzalez*, the Coalition Plaintiffs cannot

obtain the declaratory and injunctive relief they seek.  (Suppl. Opp'n 2–3.)  Plaintiffs respond that (1) the holding in *Aleman Gonzalez* applies only to injunctions, not to declaratory relief, so their requests for classwide declaratory relief are unaffected; and (2) they are not asking the Court to enter an injunction that relates to the statutory provisions referenced in § 1252, but are instead asking for an injunction related to different statutory provisions.  (Suppl. Reply 2, 4–6.)  Plaintiffs also raise a novel argument regarding Defendants' waiver of this issue.  (*Id.* at 6–7.)  Each of these issues can be resolved on a classwide basis with a single legal determination, underscoring the appropriateness of class certification.

In its Order striking Defendants' second motion for judgment on the pleadings, the Court articulated the possibility that the effect of *Aleman Gonzalez* on the merits of Plaintiffs' case might further affect the propriety of class certification.  (Order Striking Second Mot. J. Pleadings 3 n.1.)  Although some courts have denied class certification on the basis of a fundamental lack of merit to a claim, this approach appears to be at odds with both Rule 23 and the higher courts' instructions regarding class certification.  *Amgen*, 568 U.S. at 466.  Recently, district courts appear to be less frequently denying class certification based on a claim's lack of merit and more frequently certifying classes even where it is possible that the defendant will win on a dispositive issue common to the entire class.  *See, e.g.*, *Black Lives Matter L.A. v. City of Los Angeles*, No. 2:20-cv-05027-CBM (ASx), 2022 WL 16888576, at *5 (C.D. Cal. Oct. 3, 2022) (explaining that, even if defendants believed "that answers to common merits questions may favor" them, that "is irrelevant to class certification"); *see also Bennett v. Dart*, 953 F.3d 467, 469 (7th Cir. 2020) ("[Plaintiff], by contrast, proposes a class that will win if the Standards apply (and were violated, to detainees' detriment) and otherwise will lose.  That's how class actions should proceed.").

The pertinent observation here is that deciding who is correct on these issues will resolve the issues as to the entire class.  Thus, the parties' arguments based on

*Aleman Gonzalez* do not alter any of the above conclusions regarding Rule 23(a) and 23(b).

**D.    Summary**

In summarizing this discussion, the Court reiterates that it does not today reach the merits or demerits of the Coalition Plaintiffs' claims for declaratory and injunctive relief.  The Court's holding is limited to the unremarkable observation that there exist SWPPs within ICE's LA AOR, the constitutionality of which Plaintiffs may challenge on a classwide basis.  Beyond the two examples of SWPPs provided above, the Court makes no additional findings as to (1) whether a particular challenged policy or practice is sufficiently systemwide to merit classwide treatment, or (2) whether a given SWPP violates the Fourth Amendment.

## VII.    CONCLUSION

For the reasons discussed above, the Court **GRANTS** Plaintiffs' Motion to Certify Class.  (ECF Nos. 243, 244.)  In particular, as to the Ruse Class and the Knock and Talk Class:

- <u>Rule 23(a)(1).</u>  Each of the Classes is so numerous that joinder of all members is impracticable.

- <u>Rule 23(a)(2).</u>  There are questions of law and/or fact common to each of the Classes.

- <u>Rule 23(a)(3).</u>  The claims or defenses of the Coalition Plaintiffs are typical of the claims or defenses of each of the Classes.

- <u>Rule 23(a)(4).</u>  The Coalition Plaintiffs and their counsel are adequate representatives for each of the Classes.

- <u>Rule 23(b)(2).</u>  Defendants have systemwide policies or practices regarding home arrests that apply generally to each of the Classes, so that any final injunctive relief or corresponding declaratory relief would be appropriate with respect to each Class.

Pursuant to these findings, the Court certifies each Class as follows:

**Ruse Class**: All individuals residing at a home in the Los Angeles Area of Responsibility where U.S. Immigration and Customs Enforcement has conducted or will conduct a warrantless civil immigration enforcement operation in which officers enter the home under a claim of consent, or where the individual exits their home at the request of ICE, without officers first verbally stating their true identity as immigration officers or their immigration law purpose.

**"Knock and Talk" Class**: All individuals residing at a home in the LA AOR where ICE has conducted or will conduct a warrantless civil immigration enforcement operation using a "knock and talk."

The Court appoints CHIRLA and ICIJ as Lead Plaintiffs, and the Court appoints the ACLU Foundation of Southern California; the UC Irvine School of Law Immigrant Rights Clinic; and Munger, Tolles & Olson LLP as class counsel.

**IT IS SO ORDERED.**

February 7, 2023

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**