Name Christina Marquez, Assistant United States Attorney
Address 300 N. Los Angeles Street, Suite 7516
City, State, Zip Los Angeles, CA 90012
Phone 213-894-2467
Fax 213-894-7819
E-Mail Christina.Marquez@usdoj.gov
☐ FPD ☐ Appointed ☐ CJA ☐ Pro Per ☐ Retained

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Osny Sorto-Vasquez Kidd et al., PLAINTIFF(S), | CASE NUMBER: 2:20-cv-03512-ODW (JPRx) |
| v. | |
| Kristi Noem, Secretary, U.S. Department of Homeland Security, et al., DEFENDANT(S). | **NOTICE OF APPEAL** |

NOTICE IS HEREBY GIVEN that Kristi Noem et al. (*Name of Appellant*) hereby appeals to the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
Order re Motions for Summary Judgment (Dkt. 506)

☒ Judgment (specify):
Partial Final Judgment (Dkt. 542)

☐ Other (specify):

Imposed or Filed on June 24, 2025. Entered on the docket in this action on June 24, 2025.

A copy of said judgment or order is attached hereto.

July 29, 2025
Date

/s/ Christina Marquez
Signature
☐ Appellant/ProSe ☒ Counsel for Appellant ☐ Deputy Clerk

**Note:** The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

**O**

# United States District Court
# Central District of California

OSNY SORTO-VASQUEZ KIDD et al.,

Plaintiffs,

v.

ALEJANDRO MAYORKAS,[1] United States Secretary of Homeland Security, in his official capacity, et al.,

Defendants.

Case № 2:20-cv-03512-ODW (JPRx)

**ORDER RE MOTIONS FOR SUMMARY JUDGMENT [488] [489]**

## I. INTRODUCTION

While "knock and talks"—as defined by the United States Supreme Court—are considered constitutional, "knock and talks"—as defined and executed by U.S. Immigration and Customs Enforcement ("ICE")—are not. Considering the policies and practices governing how ICE conducts its "knock and talks," the more accurate title for certain law enforcement operations would be "knock and arrests." This Order serves to vacate those unlawful policies and practices.

In this action, Plaintiffs Osny Sorto-Vasquez Kidd, the Inland Coalition for Immigrant Justice ("ICIJ"), and the Coalition for Humane Immigrant Rights Los

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Alejandro Mayorkas and Tae D. Johnson substituted in as Defendants for Chad F. Wolf and Matthew T. Albence, respectively.

Angeles ("CHIRLA") seek class-wide declaratory relief that various actions, policies, and practices by which ICE officers allegedly enter residences or curtilage to arrest occupants violate the Fourth Amendment and the Administrative Procedure Act ("APA"). (First Am. Compl. ("FAC"), ECF No. 38.) Plaintiffs also seek class-wide injunctive relief to enjoin Defendants from engaging in certain actions, policies, and practices in the future. (*Id.*) Plaintiffs and Official Capacity Defendants[2] now both move for summary judgment. (*See* Pls.' Mot. Partial Summ. J. ("PMSJ"), ECF No. 489; Defs.' Mot. Summ. J. ("DMSJ"), ECF No. 488.) For the reasons below, the Court **GRANTS** Plaintiffs' Motion and **DENIES** Defendants' Motion, as described in more detail below.[3]

## II. BACKGROUND[4]

Plaintiffs challenge how ICE conducts law enforcement in its Los Angeles Area of Responsibility ("AOR"), which includes the counties of Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, and San Luis Obispo. (Pls.' SUF ("PSUF") 20, ECF No. 489-1; Defs.' SUF ("DSUF") 7, ECF No. 488-1.) Specifically, Plaintiffs allege two methods by which ICE officers in this district "routinely conduct arrests in or near the home that violate the Constitution": (1) ICE officers misrepresent themselves as police or probation to trick individuals into granting them entry into or otherwise relinquishing the privacy of their homes (the "Ruse" claims), and (2) ICE officers enter the constitutionally protected private areas around individuals' homes to arrest occupants without consent or a judicial warrant (the "Knock and Talk" claims).

---

[2] The Official Capacity Defendants' Motion for Summary Judgment, (ECF No. 488), is brought by Alejandro Mayorkas (Secretary of the U.S. Department of Homeland Security), Tae Johnson (Acting Director of ICE), Joseph Macias (Los Angeles Special Agent in Charge of Homeland Security Investigations), David Marin (Director of ICE's Los Angeles Field Office), and the United States of America (collectively, the "Official Capacity Defendants"). (*See* DMSJ; FAC ¶¶ 17–20.)

[3] Having carefully considered the papers filed in connection with the motions, the Court deemed the matters appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

[4] Unless otherwise noted, the Court derives the factual background from the parties' Statements of Uncontroverted Facts ("SUF"), Statements of Genuine Disputes ("SGD"), and Responses thereto (collectively, the "Statements"), in addition to the parties' clearly and specifically cited evidence. *See* C.D. Cal. L.R. 56-1 to 56-4.

(FAC ¶ 1.) Having previously informed the Court that the parties reached a resolution as to the "Ruse" claims,[5] the motions for summary judgment at issue here focus solely on the "Knock and Talk" claims.

**A. "Knock and Talks"**

ICE—a part of the U.S. Department of Homeland Security ("DHS")—generally defines a "knock-and-talk" as simply walking up to the door of a residence to speak with an occupant. (PSUF 36; DSUF 15.) As part of carrying out a "knock and talk," field officers enter onto curtilage without first obtaining residents' express consent and, upon initiating contact with the resident, generally state that they are "conducting an investigation." (PSUF 58; DSUF 22.) Field officers are trained that they may enter the curtilage of a home with "an implied license," meaning that they are instructed to walk across curtilage to speak to the occupants if the general public (*e.g.*, a mailman, a political canvasser, or a delivery person) could do so as well. (DSUF 17–19; *see also* DSUF 29 ("Los Angeles Field Officers understand that they may enter onto the curtilage of the property if the general public can do the same.").)

1. *"Knock and Talks" and Civil Immigration Arrests*

In addition to "walking up to the door of a residence to speak with an occupant," (DSUF 15), ICE officers use "knock and talks" to carry out civil immigration arrests. (PSUF 37.) Despite often stating a different purpose for their visit, the true "intent" and "actual purpose" behind a "knock and talk" is to make an immigration arrest. (PSUF 42, 48.) When executing a "knock and talk," field officers typically do not have a judicial warrant (*i.e.*, a warrant issued by a judge or other neutral magistrate), (PSUF 33), but are instead often armed with an administrative arrest warrant.[6] Plaintiffs' expert

---

[5] See *infra* Section II.B for discussion of this case's procedural history.

[6] Plaintiffs state that field officers "are not required to always" have an administrative warrant when conducting civil immigration enforcement operations at or near homes, (PSUF 34, 53), but Defendants state that field officers "must possess" either a Form I-205 (Warrant of Removal) or Form I-200 (Warrant for Arrest of Noncitizen) when conducting a targeted arrest, (DSUF 24). As "civil immigration enforcement operations at or near homes" is broader than "a targeted arrest," both of these statements can be true. However, despite this minor disagreement, the parties agree that field officers do not typically possess a judicial warrant when carrying out a "knock and talk." (*See* Defs.'

witness, Dr. Bret M. Dickey, states that according to available ICE data, "knock and talks" accounted for at least 27% of residential arrests for the period during which data was available and at least 8% of all arrests in 2022. (Decl. Bret M. Dickey ISO PMSJ Ex. 1 ("Dickey Report") ¶¶ 17–21, 35, 48–50, ECF No. 489-11.)

2. *"Knock and Talks" in ICE Policy and Training*

ICE policies and trainings authorize and encourage officers to use "knock and talks" to carry out civil immigration arrests. (PSUF 56.) Field officers take Fourth Amendment training on a bi-annual basis, and the materials and content presented in such trainings are generated by ICE headquarters in Washington, DC. (DSUF 10–11.) During a "Fourth Amendment Refresher Training," dated June 2021, field officers were instructed that they "[m]ay walk across curtilage to speak to the occupants if the general public could do so as well." (Decl. Giovanni Saarman Gonzalez ISO PMSJ ("Saarman Gonzalez Decl.") Ex. 5 ("Refresher Training Presentation") 37, ECF No. 489-3.[7])

ICE's "At-Large Best Practices" Handbook lists a "knock and talk" as one of the "[f]our primary methods of apprehension." (Saarman Gonzalez Decl. Ex. 7 ("At-Large Best Practices") 8.) The Handbook defines a "knock and talk" as the "[a]rrest [of] an individual by knocking on the door of the residence and either making an entry or calling the subject outside." (*Id.*)

Furthermore, to become a full-fledged field officer, a prospective ICE officer must complete a 16-to-20-week Basic Immigration Enforcement Training Program ("BIETP") at the Federal Law Enforcement Training Center, also known as "the academy." (PSUF 30; DSUF 9.) The BIETP Lesson Plan, which includes a Performance Objective titled "Explain how to lawfully approach a dwelling for a knock and talk," lays out factors informing prospective ICE officers of best practices when using walkways/paths to access the property's door. (Saarman Gonzalez Decl. Ex. 3

---

SGD ("DSGD") 33, ECF No. 491-1 (disputing only the contention that ICE officers "never have a judicial warrant").)

[7] For clarity, the Court's pincites to exhibits refer to the documents' internal pagination, rather than the pagination provided by either the CM/ECF system or the documents' Bates label number.

("BIETP Lesson Plan") 15–18.) The BIETP Lesson Plan lists different approaches to "justify" encroaching on such walkways "for a stated purpose such as knocking on a door in an attempt to speak with an occupant." (*Id.* at 17.)

The Fugitive Operations Handbook, also created by ICE headquarters, is the main guide for ICE field operations for the Los Angeles Field Office. (PSUF 24.) In a section titled "Consent," the Fugitive Operations Handbook states:

> Neither a Warrant for Arrest of Alien (I-200) nor a Warrant of Removal (I-205) authorizes officers to enter the target's residence or anywhere else where the target has a reasonable expectation of privacy. A government intrusion into an area where a person has a reasonable expectation of privacy for the purpose of gathering information will trigger Fourth Amendment protections, including a physical intrusion into a constitutionally protected area . . . . Therefore, without a criminal warrant, officers must obtain voluntary consent before entering a residence or area where there is a reasonable expectation of privacy.

(Saarman Gonzalez Decl. Ex. 2 ("Fugitive Operations Handbook") 18.) The Fugitive Operations Handbook does not specifically reference "knock and talks." (*See id.*)

3. *Examples of "Knock and Talks" in Practice*

Plaintiffs provide numerous examples involving members of the "Knock and Talk Class" of ICE field officers executing a "knock and talk" with the purpose of arresting the occupant. (PSUF 69–81.[8]) The Court highlights a few here.

---

[8] Defendants object to portions of the declarations in support of the Statements in this section. (*See* Defs.' Objs. Evid. ISO PMSJ, ECF No. 491-7.) These objections are primarily based on hearsay, lack of foundation, the best evidence rule, and improper legal argument. (*See id.*) Much of the material to which Defendants object is unnecessary to the resolution of the motions and the Court need not resolve these objections. For similar reason, foundation-based objections are moot in the context of summary judgment motions. *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). Moreover, the Court does not consider improper argument and legal conclusions in the parties' Statements, (*see* Scheduling & Case Management Order ("Scheduling Order") 7–9, ECF No. 82), so Defendants' objections on that basis are also moot. As for hearsay, a court may consider evidence raised on summary judgment if the evidence could be presented in an admissible form at trial. Fed. R. Civ. P. 56(e); *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). However, the Court finds the evidence objected-to on the basis of hearsay as unnecessary to resolving these motions. Accordingly, Defendants' hearsay objections are also denied as moot. Finally, to the extent the Court relies on objected-to evidence in this order without further discussion, those objections have been

On February 17, 2017, at approximately 8:30 am, ICE officers conducted a "knock and talk" at the home of Diana Rodriguez[9] in Santa Ana. (PSUF 72.) The officers approached the back entrance of Rodriguez's home, which is only accessible by entering the back yard. (*Id.*) After Rodriguez's girlfriend answered the door, an officer asked Rodriguez to step outside, answer some questions, and provide the officers with identification. (*Id.*) After Rodriguez stepped outside, the officers took her into custody. (*Id.*)

On April 23, 2017, at approximately 7:30 am, ICE officers approached the residence of Linda Urbano Vasquez in Pomona by entering through a fence surrounding her property. (PSUF 73.) The officers entered onto a covered porch to reach the front door. (*Id.*) When Urbano Vasquez answered the door, officers indicated that they were probation and looking for her brother, Jose. (*Id.*) After Jose approached the front door, the officers took him into custody. (*Id.*)

On October 13, 2019, ICE officers conducted a "knock and talk" at the residence of Sigifredo Zendejas Lopez in Anaheim. (PSUF 74.) To access the front door, the officers had to enter a small patio outside the door that was covered by a tarp and enclosed by a gate. (*Id.*) When Mr. Zendejas Lopez's approached the door, the officers told him that they needed to speak with him outside, where the officers took him into custody. (*Id.*)

On April 23, 2020, at approximately 6:00 am, ICE officers came to home of Javier Gomez Rodriguez in Santa Maria to execute a "knock and talk." (PSUF 75.) Upon opening the door, two officers asked Gomez Rodriguez to step outside to answer

---

thoroughly considered and are overruled. See *Burch*, 433 F. Supp. 2d at 1122 (proceeding with only necessary rulings on evidentiary objections).

[9] Defendants ask the Court to judicially notice three different minute orders from Los Angeles and Orange County Superior Court related to the probation of Diana Rubick Rodriguez, Jose Urbano Vasquez, and Sigifredo Zendejas Lopez. (Req. Judicial Notice, ECF No. 488-2.) Defendants' Motion, however, makes no mention of these documents or states why they are in any way relevant. Regardless, the Court reviewed each of the documents and did not find them necessary to resolve either motion for summary judgment and, accordingly, **DENIES** Defendant's Request **AS MOOT**.

a couple of questions. (*Id.*) As soon as he stepped outside, the officers arrested him. (*Id.*)

In each of these instances, consistent with the training policies and procedures described above, ICE officers entered the curtilage of the home for the purpose of arresting the resident without a judicial warrant or the express consent of the resident.

**B. This Lawsuit**

On April 16, 2020, Plaintiffs initiated this lawsuit against various officials for ICE and DHS in their official capacities, the United States of America, and individual officers O.M., C.C., J.H., and J.N. (Compl., ECF No. 1; FAC.)

On February 7, 2023, the Court granted ICIJ and CHIRLA's (together, the "Coalition Plaintiffs") motion to certify two classes of individuals who have been or will be affected by Defendants' alleged unconstitutional practices: the "Ruse" Class and the "Knock and Talk" Class. (Order Granting Pls.' Mot. Certify Class, ECF No. 335.) The latter class includes "[a]ll individuals residing at a home in the [Los Angeles Area of Responsibility] where ICE has conducted or will conduct a warrantless civil immigration enforcement operation using a 'knock and talk.'" (*Id.* at 24.)

On October 10, 2023, after the parties informed the Court that they had reached or believed they would reach a settlement of all claims in this action related to the "Ruse" Class claims, the Court stayed all claims except for those related to the "Knock and Talk" Class. (Min. Order, ECF No. 485.)

The parties now each move for summary judgment regarding the "Knock and Talk" Class claims. (*See* PMSJ; DMSJ.) The Coalition Plaintiffs, on behalf of themselves and the certified "Knock and Talk" Class, seek summary judgment on their claims challenging Defendants' policy and practice of entering the curtilage of homes to arrest class members for alleged civil immigration violations. (*See* PMSJ.) Defendants seek summary judgment in their favor on the same "Knock and Talk" Class claims. (*See* DMSJ.)

## III. LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" where it might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once the moving party satisfies its initial burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *See id.* at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must show that there are "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics*, *Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250) (emphasis omitted). Provided the moving party has satisfied its burden, the court should grant summary judgment against a party who fails to make a sufficient showing on an element essential to her case when she will ultimately bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23.

In ruling on summary judgment motions, courts "view the facts and draw reasonable inferences in the light most favorable" to the nonmoving party, without making credibility determinations or weighing conflicting evidence. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks omitted). Thus, when parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006). The court considers each party's cited evidence, "regardless under which motion the evidence is

offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). Conclusory, speculative, or "uncorroborated and self-serving" testimony will not raise genuine issues of fact to defeat summary judgment. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The nonmoving party must provide more than a "scintilla" of contradictory evidence to survive summary judgment. *Anderson*, 477 U.S. at 251–52; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

The Court may assume that material facts claimed and adequately supported are undisputed except to the extent that such material facts are (a) included in the opposing party's responsive statement of disputes *and* (b) controverted by declaration or competent written evidence. C.D. Cal. L.R. 56-4. The Court is not obligated to look any further in the record for supporting evidence other than what is actually and specifically referenced. *Id.*

## IV. DISCUSSION

With only the "knock and talk" claims at issue here, Plaintiffs argue that the Court should "issue injunctive and declaratory relief to put an end to Defendants' blatant disregard of the Fourth Amendment and sanctity of the home" and "'set aside' Defendants' unlawful policy and practice under the APA." (PMSJ 2.) Conversely, Defendants ask that the Court grant summary judgment in their favor on the same issue. (DMSJ 2.)

The Court will first consider whether Defendants' home arrest policies and practices violate the Fourth Amendment; it will then determine whether those policies and practices violate the APA; and, finally, the Court will decide what remedies are available and best suited to address those determinations.

### A. "Knock and Talks" and the Fourth Amendment

The narrow issue here is whether Defendants' policy and practice of entering the curtilage of homes and knocking on the door, not merely to talk to residents but to arrest them, violates the protections of the Fourth Amendment.

1. *The Protections of the Fourth Amendment*

At the core of the Fourth Amendment stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)). The general rule states: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." *Florida v. Jardines*, 569 U.S. 1, 8 (2013) (alteration in original) (quoting *Entick v. Carrington*, 2 Wils. K.B. 275 (K.B. 1765)). This protection extends to curtilage—the area "immediately surrounding [the] house"—which "enjoys protection as part of the home itself." *Id.* at 6; *see also Oliver v. United States*, 466 U.S. 170, 180 (1984) (stating that curtilage is "part of [the] home itself for Fourth Amendment purposes."). Therefore, "[b]ecause the curtilage is part of the home, searches and seizures in the curtilage without a warrant are also presumptively unreasonable." *United States v. Perea-Rey*, 680 F.3d 1179, 1184 (9th Cir. 2012) (citing *Oliver*, 466 U.S. at 180).

Here, it is undisputed that ICE officers physically encroach on and occupy the curtilage of an individual's home when conducting a "knock and talk." Lacking a judicial warrant, express consent, or some other exception to the warrant requirement, Defendants argue that ICE officers are armed with implied consistent and an administrative warrant when executing a "knock and talk."

2. *Administrative Warrants*

Defendants argue that "ICE's execution of an arrest pursuant to an administrative warrant following a consensual encounter does not violate the Fourth Amendment." (DMSJ 2, 8–11.) That is not a proper formulation of the issue here, which focuses not on whether the arrest itself is authorized, but rather whether the "consensual encounter"

leading up to the arrest was proper. To this end, the administrative warrants upon which Defendants rely do not satisfy the Fourth Amendment's warrant requirement.

As a preliminary matter, Defendants have stipulated in this litigation that they "will not argue or claim" that an administrative warrant provides legal authority "to enter a residence or other location in which an individual has a reasonable expectation of privacy" or "that the presence of such warrant is a factor supporting any defense by Defendants in this action." (Stip. ¶ 22, ECF No. 153.) Defendants now try to argue that they may use the existence of administrative warrants not "as a factor supporting their *defense*, but rather to show that Plaintiffs cannot establish their *prima facie* case of a Fourth Amendment violation." (DMSJ 10.) Defendants' position is illogical and untenable. A "defense" includes a contention that "demonstrates that plaintiff has not met its burden of proof." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). Defendants cannot have their cake and eat it too. Defendants here have reaped the benefits of their agreement to enter into the stipulation by being excused from providing certain discovery, and they are now precluded from arguing that administrative warrants provide legal authority "to enter a residence or other location in which an individual has a reasonable expectation of privacy," which includes the curtilage of the home. (*See* Stip. ¶ 22.)

However, even if the Court were to consider administrative warrants, Defendants' arguments would still fall short. Although it is true that 8 U.S.C. §§ 1226(a) and 1231(a)—which authorize the arrest of noncitizens with an administrative warrant and mandate that noncitizens be taken into custody for removal—make no reference of a judicial warrant, the question here is whether an administrative warrant serves a sufficient basis upon which an ICE officer may enter the constitutionally protected areas of a home.

A judicial "arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within," *Payton*, 445 U.S. at 603, and "consistent with the Fourth

Amendment, immigration authorities may arrest individuals for civil immigration removal purposes pursuant to an administrative arrest warrant issued by an executive official, rather than by a judge," *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 825 (9th Cir. 2020). However, as the Court has previously noted, (*see* Order re Mot. Dismiss, ECF No. 58), the Supreme Court has expressly declined to consider whether an administrative warrant satisfied the requirements for "warrants" under the Fourth Amendment. *See Abel v. United States*, 362 U.S. 217, 230 (1960)).

Rather, case law supports the need for independent judgment in issuing warrants. *See, e.g.*, *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972) ("The warrant traditionally has represented an independent assurance that a search and arrest will not proceed without probable cause . . . . Thus, an issuing magistrate must . . . be neutral and detached."); *Coolidge*, 403 U.S. at 449 ("[T]he whole point of the basic rule . . . is that prosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigations.").

Here, not all case administrative warrants are reviewed by an independent officer. There are fifty-two immigration officer categories expressly authorized to issue arrest warrants for immigration violations, as well as "[o]ther duly authorized officers or employees of [DHS] or the United States who are delegated the authority." 8 C.F.R. § 287.5(e)(2). For example, a Form I-205 (Warrant of Removal) is reviewed by an ICE supervisor who signs on behalf of the Field Office Director and not by any judge (immigration or otherwise). (Decl. Anne Lai ISO Pls.' Opp'n DMSJ Ex. 12 ("Giles Dep.") 39:23–40:24, ECF No. 492-3.) Because the administrative warrants at issue here lack the independent assurance guaranteed by the Fourth Amendment, they do not immunize Defendants' conduct. This is also consistent with ICE training materials, which affirm "that administrative warrants do not authorize entry into a dwelling without consent." (DSUF 25.)

Having determined that an administrative warrant is insufficient to enter the constitutionally protected areas of a home, the Court turns next to whether ICE officers

have implied consent to conduct a “knock and talk”—as defined by ICE—to carry out a civil immigration arrest.

3. *Implied Consent*

Defendants argue that ICE officers have an implied license to enter the curtilage of an individual’s residence to “[a]rrest an individual by knocking on the door of the residence and either making entry or calling the subject outside.” (DMSJ 5–6; At-Large Best Practices 8.)

A person can give leave (even implicitly) for another to enter the constitutionally protected extensions of one’s home. “A license may be implied from the habits of the country,” *McKee v. Gratz*, 260 U.S. 127, 136 (1922), and “the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers for all kinds of salable articles,” *Breard v. Alexandria*, 341 U.S. 622, 626 (1951). “This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.” *Jardines*, 569 U.S. at 8. Thus, applying this standard to law enforcement, “a police officer not armed with a warrant may approach a home and knock, precisely because that is ‘no more than any private citizen might do.’” *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)).

Applying the Supreme Court’s holding in *Jardines*, the Ninth Circuit has found that “the scope of a license is often limited to a specific purpose, and the customary license to approach a home and knock is generally limited to the ‘purpose of asking questions of the occupants.’” *United States v. Lundin*, 817 F.3d 1151, 1159 (9th Cir. 2016) (citation omitted) (quoting *Perea-Rey*, 680 F.3d at 1187) (citing *Jardines*, 569 U.S. at 8–10). Accordingly, a law enforcement officer who knocks on the door of a home for a purpose other than “asking questions of the occupants . . . generally exceed[s] the scope of the customary license and therefore do[es] not qualify for the ‘knock and talk’ exception.” *Id.* This is because although the “reasonableness” inquiry under the Fourth Amendment “is predominantly an objective inquiry,” *Ashcroft v. al-*

*Kidd*, 563 U.S. 731, 736 (2011), the determination of "whether the officer's conduct was an objectively reasonable search . . . depends upon whether the officers had an implied license to enter the porch, which in turn depends upon the purpose for which they entered," *Jardines*, 569 U.S. at 10. Therefore, because an implied license to enter the curtilage of a home is limited "to a specific purpose," *id.* at 9, "[t]he 'knock and talk' exception to the warrant requirement does not apply when officers encroach upon the curtilage of a home with the intent to arrest the occupant," *Lundin*, 817 F.3d at 1160.

Defendants argue that the Ninth Circuit's holding in *Lundin* does not apply because it "arose in the criminal context, involved a warrantless arrest, and took place at 4:00 a.m." (DMSJ 6.) In doing so, Defendants rely on *Matias Rauda v. Wilkinson*, 844 F. App'x 945, 948 (9th Cir. 2021) (unpublished),[10] where the Ninth Circuit "decline[d] . . . to extend [the court's] holding in [*Lundin*]" and upheld the denial of a motion to suppress evidence in an immigration proceeding. However, *Matias Rauda* is materially distinguishable from this case. As expressly noted in the court's opinion, "[b]ecause the exclusionary rule is generally inapplicable to immigration proceedings," a petitioner must show an "egregious violation" of his or her Fourth Amendment rights to obtain a suppression remedy. *Id.* (quoting *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984)). In other words, the panel in *Matias Rauda* was considering whether the alleged Fourth Amendment violation warranted the suppression of evidence in Matias Rauda's immigration proceeding, which required an "egregious violation." This case arises under a different posture and legal standard, which seeks to affirmatively prevent future Fourth Amendment violations, including violations that may not qualify as "egregious." Although it is true that ICE is conducting arrests for the purpose of immigration enforcement, affirmative prospective relief against Fourth Amendment violations remains available and triggers constitutional concerns distinct from the "exclusionary

---

[10] As an unpublished case, *Matias Rauda* has no precedential value. *See* 9th Cir. R. 36-3(a) ("Unpublished dispositions and orders of this Court are not precedent.") Unpublished decisions are "of little use to district courts or litigants in predicting how [the Ninth Circuit] . . . will view any novel legal issues in the case on appeal." *Grimm v. City of Portland*, 971 F.3d 1060, 1067 (9th Cir. 2020).

rule" at issue in *Matias Rauda*. *See Lopez-Mendoza*, 468 U.S. at 1045 (discussing "the availability of alternative remedies for institutional practices by the INS that might violate Fourth Amendment rights").

Defendants second argument on why *Lundin* is inapplicable—ICE officers mostly possess administrative warrants—is equally fruitless. As discussed previously, the Court does not find that administrative warrants alone permit law enforcement entry into the protected areas of a home, and therefore do not grant ICE officers, who are armed with the intent to arrest the occupant, the authority to enter the protected areas of a residence to speak with the occupant or further "solicit consent to entry." (DMSJ 9.) And finally, ICE's guidance here that "knock and talks" can be conducted as early as 6:00 a.m. is not materially distinguishable from the "knock and talk" conducted at 4:00 a.m. in *Lundin*. Therefore, the Court heeds the Ninth Circuit's guidance in *Lundin*, which stands for the clear proposition that "[t]he 'knock and talk' exception to the warrant requirement does not apply when officers encroach upon the curtilage of a home with the intent to arrest the occupant." *Lundin*, 817 F.3d at 1160.

Here, ICE officers are trained "that they may enter the curtilage of a residence to conduct a knock and talk under the theory of an implied license." (DMSJ 3.) However, in contravention of the rule for implied licenses detailed above, ICE's policy and practice does not limit that encroachment to the purpose of "asking questions of the occupant." *See Lundin*, 817 F.3d at 1159. For example, although certain training materials state that ICE officers can merely "walk across curtilage to speak to the occupants if the general public could do so as well," (Refresher Training Presentation 37), or that field officers can knock on a person's door "for a stated purpose such as knocking on a door in an attempt to speak with an occupant," (BIETP Lesson Plan 17), ICE's training materials take that guidance too far when it encourages field officers to use "knock and talks" as one of the "[f]our primary methods of apprehension," (At-Large Best Practices 8). To be consistent with the Fourth Amendment, it is not sufficient that "[f]ield officers are instructed that the license is

granted for the purpose *of making contact with the occupant*." (DSUF 19 (emphasis added).) This is because the implied license of approaching the front door of a residence does not cover all instances "of making contact with the occupant," but is more narrowly tailored to "the purpose of asking questions of the occupants." *Perea-Rey*, 680 F.3d at 1187. The intent and purpose of arresting the occupant does not fall within the scope of the implied license.

However, that is precisely how "knock and talks" are employed by ICE field officers. ICE's Supervisory Detention and Deportation Officer (SDDO) C.S. states that "knock and talks" constitute "an arrest operation." (Decl. Christina Marquez ISO DMSJ ("Marquez Decl.") Ex. P ("SDDO C.S. Dep.") 100:13–19, ECF No. 488-4.) ICE Deportation Officer H.P. states that H.P.'s understanding of ICE's policy and practice regarding implied consent allows him to "knock on the door" to arrest someone "if [H.P.'s] intention is to make the arrest." (*Id.* Ex. N ("DO H.P. Dep.") 252:4–16.) In fact, according to ICE Deportation Officer D.G., the only time D.G. performs a "knock and talk" is when D.G. is executing an administrative arrest warrant. (*Id.* Ex. T ("DO D.G. Dep.") 119:5–20.) These sentiments are confirmed by ICE Deportation Officer F.G., who states that, after confirming that the suspect was home during a "knock and talk," F.G. would "do the arrest." (*Id.* Ex. U ("DO F.G. Dep.") 71:24–72:3.)

The narratives of "knock and talks" executed upon class members only further elucidate the consequences that ICE's training and policy have in practice. In each of the examples reviewed by the Court,[11] ICE officers routinely entered the curtilage of a home and, immediately upon identifying the suspect, took him or her into custody. In their briefing, Defendants agree that "[a]ll knock and talks require an administrative warrant . . . because [they are] considered . . . targeted arrest[s]." (DMSJ 9.)

To summarize, although it is true that the specific facts surrounding each "knock and talk" can vary, it is consistently true across ICE's policies and practice that field officers are trained to enter constitutionally protected areas of a home for the purpose

[11] *See supra* Section II.A.3 ("Examples of 'Knock and Talks' in Practice").

of arresting the occupant. Such policies and practices are materially distinguishable from lawfully "approaching a home . . . and knocking on the front door with the intent merely to ask the resident questions," *Lundin*, 817 F.3d at 1160, and exceed the scope of implied consent. It is therefore clear to the Court that "knock and talks"—which, as defined and executed by ICE, can be more accurately termed "knock and arrests"—violate the Fourth Amendment insofar that they are conducted with the purpose of arresting the resident.

**B. "Knock and Talks" and the APA**

The next issue is whether ICE's systemwide policy and practice of "knock and talks" also runs afoul of the APA. Plaintiffs allege that Defendants' conduct constitutes both a regulatory and constitutional violation of the APA. The Court considers each in turn.

1. *Regulatory APA Violation*

A court reviewing an APA claim must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Relevantly, an APA claim seeking such relief may be brought where an agency is alleged to have done "precisely what [its] regulations forbid [it] to do." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *accord Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (1990) ("Pursuant to the *Accardi* doctrine, an administrative agency is required to adhere to its own internal operating procedures."); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.").

Here, Plaintiffs allege that the agencies fail to comply with 8 C.F.R. § 287.8(f)(2), which states in pertinent part,

> An immigration officer may not enter into non-public areas of . . . a residence including the curtilage of such residence . . . for the purpose of questioning the occupants or employees concerning their right to be or

> remain in the United States unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected.

This regulation applies to "[s]ite inspections," which are "enforcement activities undertaken to locate and identify aliens illegally in the United States . . . at locations where there is a reasonable suspicion, based on articulable facts, that such aliens are present." 8 C.F.R. § 287.8(f)(1).

Similar to the Fourth Amendment claims discussed above, Plaintiffs allege that ICE field officers violate this regulation when they enter onto the curtilage of a residence without a judicial warrant "for the purpose of questioning the occupants." (PMSJ 12–13 (quoting 8 C.F.R. § 287.8(f)(2)).) To make this determination, the Court must resolve: (1) whether ICE officers are entering into "non-public" areas of a residence, and (2) whether they possess a "warrant" for the purposes of 8 C.F.R. § 287.8(f)(2).

The first issue is whether immigration officers, when conducting a "knock and talk," are entering into "non-public" areas of a residence for the purposes of 8 C.F.R. § 287.8(f)(2). Despite the regulation expressly stating that the "non-public" areas of a residence "includ[e] the curtilage of [a] residence," Defendants argue that curtilage is exempt from this regulation because it constitutes "public" areas of a residence. (*See* DMSJ 11–12; Defs.' Opp'n PMSJ 9–10, ECF No. 491.) Defendants' position on this issue is untenable.

Defendants' primary argument is that their interpretation is supported by 8 C.F.R. § 287.8(f)(4), which authorizes an immigration officer to enter "any area of a business or other activity to which the general public has access or onto open fields that are not farms or other outdoor agricultural operations without a warrant, consent, or any particularized suspicion." However, the areas referenced in this section of the regulation are clearly distinguishable from the constitutionally protected areas of a home. Rather, the "public" areas referenced in this regulation reflect the "open fields doctrine," under which "open fields" are not protected by the Fourth Amendment. *See*

*Hester v. United States*, 265 U.S. 57, 59 (1924) (holding that the Fourth Amendment's protection accorded "persons, houses, papers and effects" did not extend to the open fields); *see also Oliver*, 466 U.S. at 178 (upholding the constitutionality of a search of an open field despite posted "no trespassing" signs). However, curtilage—the area immediately surrounding the home—does not fall under the open fields doctrine. *See United States v. Dunn*, 480 U.S. 294, 299–303 (1987) (distinguishing curtilage from open fields). Therefore, the Court finds, consistent with the clear language of 8 C.F.R. § 287.8(f)(2), that immigration officers enter non-public areas of a residence when conducting a "knock and talk" as defined and executed by ICE.

Second, 8 C.F.R. § 287.8(f)(2) requires that an immigration officer first obtain a warrant or appropriate consent to enter the curtilage. Plaintiffs argue that the use of the term "warrant" here means "a judicial warrant that complies with the Fourth Amendment, (PMSJ 12), whereas Defendants argue that "warrant" refers to an administrative warrant issued by authorized immigration officers, (DMSJ 11 n.3). "It is a well-established canon of statutory construction that when Congress uses a term of art, such as 'warrant,'" Congress intends "to incorporate the common definition of that term." *United States v. Vargas-Amaya*, 389 F.3d 901, 904 (9th Cir. 2004). Applying this understanding to the regulation, the Immigration and Naturalization Service ("INS") has found that "the rule incorporate[d] judicial precedent based on the Fourth Amendment to the Constitution concerning the issuance of warrants [and] the obtaining of consent to enter a premises." Enhancing the Enforcement Authority of Immigration Officers, 59 Fed. Reg. 42406, 42412 (Aug. 17, 1994). Furthermore, the Ninth Circuit has found that § 287.8[12] "'was intended to reflect constitutional restrictions on the ability of immigration officials to interrogate and detain persons in this country'" and thus "provid[es] at least as much protection as the Fourth Amendment." *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019) (quoting *Sanchez v. Sessions*, 904 F.3d 643,

[12] In *Perez Cruz*, the Ninth Circuit specifically referred to 8 C.F.R. § 287(b)(2), but that section involves equally important constitutional rights and the court's reasoning applies to subsection (f)(2).

651 (9th Cir. 2018)). The Court therefore agrees with this position and finds that the warrant requirements under the Fourth Amendment apply to 8 C.F.R. § 287.8(f)(2), which, as discussed previously, require a judicial warrant to enter a home or its curtilage under the Fourth Amendment.

To support their interpretation, Defendants again rely on a separate section of the regulation that defines a "warrant of arrest" as a "Form I-200, Warrant of Arrest." (DMSJ 11 n.3 (citing 8 C.F.R. § 236.1(b)).) However, although it is true that a "warrant of arrest" can refer to an administrative warrant, the use of the term "warrant" does not necessarily have the same definition as a "warrant of arrest."[13] For Defendants' interpretation to hold water, an administrative warrant would authorize officers to enter a residence, which, as discussed previously, is an untenable position.

Accordingly, the Court finds that Defendants' systematic conduct of entering persons' curtilage without a judicial warrant with the intent to arrest the occupant violates 8 C.F.R. § 287.8(f)(2).

2. *Constitutional APA Violation*

An APA claim can also be brought against a final agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). As discussed above, Plaintiffs sufficiently establish a Fourth Amendment violation resulting from the agencies' policy and practice regarding "knock and talks," and Defendants do not argue that this finding is insufficient to support an APA violation. Accordingly, summary judgment for the "Knock and Talk" Class is also appropriate as to the constitutional APA claim.

**C. Available and Appropriate Remedies**

Having determined that the "Knock and Talk" Class successfully establishes Fourth Amendment and APA violations, the Court must determine what remedies

---

[13] In fact, this argument, to a degree, cuts against Defendants as it makes clear that the legislature has the ability to clarify when they intend to refer to an administrative warrant when that is their intent.

properly and adequately cure Defendants' misconduct. Plaintiffs seek declaratory and injunctive relief.

The Court must first determine which remedies are available. Under 8 U.S.C. § 1252(f), "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter [§§ 1221–1232]." This statute "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

Defendants argue that injunctive relief would necessarily interfere with two statutes that fall within § 1252(f)'s specified statutory provisions: 1226(a) and 1231(a). Title 8 U.S.C. § 1226(a) states that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." Title 8 U.S.C. § 1231(a) provides that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." Sections 1226(a) and 1231(a) pertain to the issuance of a warrant for arrest, the general authority to arrest an alien, and the subsequent detention and removal of the alien.

In *Aleman Gonzalez*, the Supreme Court held that the test under § 1252(f) is whether an injunction would "interfere with [Defendants'] efforts to operate" one of the specified statutory provisions. *Aleman Gonzalez*, 596 U.S. at 551. An injunction in this action would not directly pertain to the issuance of warrants, but rather the method in which warrants are executed. In fact, Plaintiffs expressly disclaim any challenge against the issuance of the removal order itself or the decision to execute it. (PMSJ 15–16.) Rather, the *execution* of warrants is governed by 8 U.S.C. § 1357, which is not one of the specified statutory provisions covered by § 1252(f). Section 1252(f) therefore does not directly impede the Court's authority to issue injunctive relief to ensure that ICE executes warrants in a manner consistent with the United States Constitution. *See*

*Galvez v. Jaddou*, 52 F.4th 821, 830–31 (9th Cir. 2022) (holding § 1252(f) does not bar injunctive relief enjoining immigration statutes outside of the specified statutory provisions); *Gonzales v. DHS*, 508 F.3d 1227, 1232–33 (2007) (same).

While a court may not issue injunctive relief that interferes with a covered provision, a court may still "enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has *some collateral effect* on the operation of a covered provision." *Aleman Gonzalez*, 596 U.S. at 553 n.4 (citing *Gonzales*, 508 F.3d at 1233) (second emphasis added); *see Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1047 (S.D. Cal. 2022) (finding that § 1252(f) precluded injunctive relief where the statute that "Defendants principally invoke[d] as a legal basis to implement the unlawful regulation" nevertheless "interfere[d]" with Defendants' efforts to operate one of the specified statutory provisions). The question is therefore whether an injunction would "directly" implicate a covered provision or merely collaterally affect the operation of a covered provision. *Gonzales*, 508 F.3d at 1233.

An injunction requiring that Defendants execute warrants in a manner consistent with the Constitution would have no direct impact on the issuance of a warrant for arrest, the general authority to arrest an alien, or the subsequent detention and removal of the alien. There is a clear distinction between the authority to issue warrants under § 1226(a) and the one to execute arrests under § 1357. In *Al Otro Lado*, a case upon which Defendants heavily rely, a district court in the Southern District of California found that DHS's policy of turning back asylum seekers without evaluating their applications for asylum was a violation of both the APA and the Fifth Amendment's Due Process Clause. *Al Otro Lado*, 619 F. Supp. 3d at 1032. The court concluded, however, that § 1252(f) precluded classwide injunctive relief because "the inspection and referral duties this [c]ourt found Defendants had withheld by implementing their [Policy] are explicitly imposed by the INA at § 1225(a)(3) (delineating immigration

officers' duty to inspect) and § 1225(b)(1)(A)(ii) (delineating immigration officers' duty to refer asylum seekers)." *Id.* at 1045.

In contrast, classwide injunctive relief in this action would not "explicitly impose[]" any duty required by a provision covered by § 1225(f). The injunction sought in this case is more similar to another order issued in *Al Otro Lado*, where the court granted a permanent injunction barring application of the Asylum Ban to class members, finding that the injunction, while "no doubt[]" affecting the removal proceedings of class members, only did so "collateral[ly]." *Al Otro Lado, Inc. v. Mayorkas*, No. 17-cv-02366-BAS-KSC, 2022 WL 3142610, at *23 (S.D. Cal. Aug. 5, 2022), *appeal filed*, No. 22-55988 (9th Cir. Oct. 25, 2022).

The injunction that Plaintiffs seek in this case—prohibiting ICE's policies and practices regarding the execution of "knock and talks"—would at most collaterally impact any statutory provision covered by § 1252(f). Accordingly, as the Ninth Circuit upheld in *Gonzales*, the injunction's effect on a provision covered by § 1252(f) "is one step removed from the relief sought by Plaintiffs and therefore does not bring this action within the [§ 1252(f)] bar." *Gonzales*, 508 F.3d at 1233. The court *may*, therefore, issue injunctive relief.

In addition to issuing injunctive relief, the Court can issue declaratory relief—which is not precluded by § 1252(f)—and also vacate and set aside Defendants' unlawful policies and training materials under the APA. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010) ("It is simply not the case that Section 1252(f) bars Petitioner from receiving declaratory relief on behalf of the class."); *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481–82 (9th Cir. 1999) ("By its plain terms, and even by its title, [§ 1252(f)] is nothing more or less than a limit on injunctive relief. It prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–1231, but specifies that this ban does not extend to individual cases."). Defendants argue that § 1252(f) also precludes the Court's ability to issue a judicial vacatur, but that argument is inconsistent with *Aleman Gonzalez*. *See Aleman*

*Gonzalez*, 596 U.S. at 571 (Sotomayor, J., concurring in the judgment and dissenting in part) ("[T]he Court does not purport to hold that § 1252(f)(1) affects courts' ability to 'hold unlawful and set aside' agency action . . . under the [APA].").

Having evaluated the availability of the various equitable remedies, the Court must next determine which remedies are proper to cure Defendants' wrongful conduct. First, the Court deems declaratory judgment to be appropriate in this case, as it will "serve a useful purpose in clarifying and settling the legal relations between the parties." *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 703 (9th Cir. 1992). Defendants contend that declaratory judgment in this case "is only useful if it forces Defendants to change its policies or practices," (DMSJ 17), but the Court disagrees. Declaratory judgment has long been viewed as a useful remedy, as it serves to settle questions of law that lie at the heart of the parties' dispute. *See Eu*, 979 F.2d at 701 (holding that declaratory relief was available on the basis that it is "substantially likely" that the government "would abide by [the court's] authoritative determination"). The Court therefore finds it reasonable and appropriate to award declaratory judgment in Plaintiffs' favor.

Furthermore, the Court deems it appropriate to vacate Defendants' unlawful policies. Vacatur, as compared to an injunction, is a "less drastic remedy" that does not "compel[] nor restrain[] further agency decision-making." *Immigrant Defs. L. Ctr. v. Mayorkas*, No. 20-cv-9893-JGB (SHKx), 2023 WL 3149243, at *14 (C.D. Cal. Mar. 15, 2023) (alterations in original) (quoting *Texas v. United States*, 50 F.4th 498, 528–29 (5th Cir. 2022)). Unlike an injunction, "a vacatur does not restrain the enjoined defendants from pursuing other courses of action to reach the same or a similar result as the vacated agency action." *Al Otro Lado*, 619 F. Supp. 3d at 1045 (citing Daniel Mach, *Rules Without Reasons: The Diminishing Role of Statutory Policy and Equitable Discretion in the Law of NEPA Remedies*, 35 Harv. Env't L. Rev. 205, 237 (2011)). Here, either vacatur or an injunction would suffice to strike down ICE's "knock and talk" policy, but only an injunction would restrain Defendants from, in the future, attempting to institute a modified or amended version of the "knock and talk" policy

that complies with constitutional limitations. "An injunction is a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), and the Court finds the less drastic remedy of vacatur to be sufficient to redress the "Knock and Talk" Class's injury. By opting for vacatur, Defendants have the opportunity to develop a policy and practice that reaches the same or similar result as the vacated agency action, but in a constitutional manner. Accordingly, the Court finds it appropriate to vacate any policies and practices that the Court has found to conflict with the Fourth Amendment to United States Constitution and 8 C.F.R. § 287.8(f)(2), as detailed further below.

## V. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) as to the Knock and Talk Class's First, Second, and Third Cause of Action. (ECF No. 489.) The Court **DENIES** Defendants' Motion for Summary Judgment. (ECF No. 488.)

The Knock and Talk Class is entitled to judgment on its Fourth Amendment claim because Defendants maintain a system-wide policy and practice of entering the curtilage of homes, without a judicial warrant or consent, for the purpose of arresting the occupant. The Knock and Talk Class is further entitled to judgment on its APA claims because Defendants' system-wide policy and practice violates 8 C.F.R. § 287.8(f)(2) and is "contrary to [a] constitutional right," 5 U.S.C. § 706(2)(B).

Accordingly, the Court **DECLARES** that the challenged system-wide policies and practices of entering the curtilage of homes for the purpose of arresting the occupant violate the Fourth Amendment to the United States Constitution and the APA. The Court **VACATES** any policies and practices that allow officers in the Los Angeles Field Office of ICE or Enforcement and Removal Operations ("ERO"), and any agents with Homeland Security Investigations ("HSI") participating with such ERO officers on civil immigration enforcement operations in the Los Angeles AOR to enter the curtilage of a home for the purpose of arresting an occupant, absent a judicial warrant, valid express

consent by a resident of the home, or other legal authority by which the officer may enter the curtilage of the occupant's home. This Order specifically applies to the portions of Defendants' policies and trainings pertaining to the entry onto curtilage for the purpose of carrying out an arrest, without judicial warrant or express consent, through the use of "knock and talks." The Court will issue a final judgment to this effect at the resolution of this case.

**IT IS SO ORDERED.**

May 15, 2024

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

**O**

# United States District Court
# Central District of California

| | |
|---|---|
| OSNY SORTO-VASQUEZ KIDD et al.,<br>Plaintiffs,<br>v.<br>KRISTI NOEM,<br>United States Secretary of Homeland Security, in her official capacity, et al.,<br>Defendants. | Case № 2:20-cv-03512-ODW (JPRx)<br>**PARTIAL FINAL JUDGMENT** |

Following the parties' filing of motions for summary judgment, the Court granted Plaintiffs' Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(c) as to the Knock and Talk Class's First, Second, and Third Cause of Action. (ECF No. 506.)

Pursuant to the Court's Order Re Motions for Summary Judgment, (ECF No. 506), incorporated here by reference, and the Court's Order Granting Defendants' Ex Parte Application for Partial Judgment, issued contemporaneously with this Order, and finding no just reason for delay, *see* Fed. R. Civ. P. 54(b), it is hereby **ORDERED, ADJUDGED, and DECREED** as follows:

1. The Court **ENTERS** final partial judgment on Plaintiff Knock and Talk Class's Fourth Amendment claim in favor of Plaintiff Knock and Talk Class and against Official Capacity Defendants, as those parties are defined in the Court's Order Re Motions for Summary Judgment, because Defendants maintain a system-wide policy and practice of entering the curtilage of homes, without a judicial warrant or consent, for the purpose of arresting the occupant;
2. The Court **ENTERS** final partial judgment on Plaintiff Knock and Talk Class's Administrative Procedure Act ("APA") claims in favor of Plaintiff Knock and Talk Class and against Official Capacity Defendants because Defendants' system-wide policy and practice violates 8 C.F.R. § 287.8(f)(2) and is "contrary to [a] constitutional right," 5 U.S.C. § 706(2)(B);
3. The Court **DECLARES** that the challenged system-wide policies and practices of entering the curtilage of homes, without a judicial warrant or consent, for the purpose of arresting the occupant violate the Fourth Amendment to the United States Constitution;
4. The Court **DECLARES** that the challenged system-wide policies and practices of entering the curtilage of homes, without a judicial warrant or consent, for the purpose of arresting the occupant violate the APA;
5. The Court **VACATES** any policies and practices that allow officers in the Los Angeles Field Office of U.S. Immigration and Customs Enforcement ("ICE") or Enforcement and Removal Operations ("ERO"), and any agents with Homeland Security Investigations ("HSI") participating with such ERO officers on civil immigration enforcement operations in the Los Angeles Area of Responsibility to enter the curtilage of a home for the purpose of arresting an occupant, absent a judicial warrant, valid

express consent by a resident of the home, or other legal authority by which the officer may enter the curtilage of the occupant's home.

6. The Court shall retain jurisdiction to award costs and attorneys' fees on the Knock and Talk Class claims and over all other claims that Plaintiffs assert in the First Amended Complaint, (ECF No. 38).

**IT IS SO ORDERED.**

June 24, 2025

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**